# EXHIBIT A

 CT Corporation

**Service of Process Transmittal**
12/15/2014
CT Log Number 526238625

**TO:**  Legal Department
Remington Arms Company, Inc.
PO Box 700
Madison, NC 27025-0700

**RE:**  **Process Served in Connecticut**

**FOR:**  Remington Outdoor Company, Inc. (Domestic State: DE)

**ENCLOSED ARE COPIES OF LEGAL PROCESS RECEIVED BY THE STATUTORY AGENT OF THE ABOVE COMPANY AS FOLLOWS:**

| | |
|---|---|
| **TITLE OF ACTION:** | Donna L. Soto, Administratrix of the Estate of Victoria L. Soto, et al., Pltfs. vs. Bushmaster Firearms International, LLC, etc., et al. including Remington Outdoor Company, Inc., Dfts. |
| **DOCUMENT(S) SERVED:** | Summons, Introduction, Instructions, Exhibit(s) |
| **COURT/AGENCY:** | Fairfield at Bridgeport Superior Court Judicial District, CT Case # None |
| **NATURE OF ACTION:** | Wrongful Death - Bushmaster AR-15 rifle, model XM15-E2S |
| **ON WHOM PROCESS WAS SERVED:** | C T Corporation System, Hartford, CT |
| **DATE AND HOUR OF SERVICE:** | By Process Server on 12/15/2014 at 15:30 |
| **JURISDICTION SERVED :** | Connecticut |
| **APPEARANCE OR ANSWER DUE:** | 02/03/15 |
| **ATTORNEY(S) / SENDER(S):** | Joshua D. Koskoff Koskoff, Koskoff & Bieder, P.C. 350 Fairfield Avenue Bridgeport, CT 06604 203-336-4421 |
| **REMARKS:** | The documents received have been modified to reflect the name of the entity being served. |
| **ACTION ITEMS:** | SOP Papers with Transmittal, via  Fed Ex 2 Day , 772241424171 Email Notification, Legal Department lauren.coe@remington.com |
| **SIGNED:** | C T Corporation System |
| **ADDRESS:** | One Corporate Center Hartford, CT 06103-3220 |
| **TELEPHONE:** | 860-724-9044 |

Page 1 of  1 / MEF

Information displayed on this transmittal is for CT Corporation's record keeping purposes only and is provided to the recipient for quick reference. This information does not constitute a legal opinion as to the nature of action, the amount of damages, the answer date, or any information contained in the documents themselves. Recipient is responsible for interpreting said documents and for taking appropriate action. Signatures on certified mail receipts confirm receipt of package only, not contents.

**SUMMONS - CIVIL**
JD-CV-1  Rev. 9-14
C.G.S. §§ 51-346, 51-347, 51-349, 51-350, 52-45a,
52-48, 52-259, P.B. Secs. 3-1 through 3-21, 8-1

**STATE OF CONNECTICUT
SUPERIOR COURT**
www.jud.ct.gov

*See other side for instructions*

☐ "X" if amount, legal interest or property in demand, not including interest and costs is less than $2,500.

☒ "X" if amount, legal interest or property in demand, not including interest and costs is $2,500 or more.

☐ "X" if claiming other relief in addition to or in lieu of money or damages.

TO: Any proper officer; BY AUTHORITY OF THE STATE OF CONNECTICUT, you are hereby commanded to make due and legal service of this Summons and attached Complaint.

| Address of court clerk where writ and other papers shall be filed *(Number, street, town and zip code)* (C.G.S. §§ 51-346, 51-350) | Telephone number of clerk *(with area code)* | Return Date *(Must be a Tuesday)* | | |
|---|---|---|---|---|
| **1061 Main Street, Bridgeport, CT 06604** | ( **203** ) **579**-6527 | February | 3 | 2015 |
| | | Month | Day | Year |

| ☒ Judicial District | G.A. | At *(Town in which writ is returnable)* (C.G.S. §§ 51-346, 51-349) | Case type code *(See list on page 2)* | |
|---|---|---|---|---|
| ☐ Housing Session | Number: | **Bridgeport** | Major: **T** | Minor: **90** |

**For the Plaintiff(s) please enter the appearance of:**

| Name and address of attorney, law firm or plaintiff if self-represented *(Number, street, town and zip code)* | Juris number *(to be entered by attorney only)* |
|---|---|
| **Joshua D. Koskoff, Koskoff, Koskoff & Bieder, 350 Fairfield Avenue, Bridgeport, CT 06604** | **032250** |

| Telephone number *(with area code)* | Signature of Plaintiff *(If self-represented)* |
|---|---|
| ( **203** ) **336-4421** | |

| The attorney or law firm appearing for the plaintiff, or the plaintiff if self-represented, agrees to accept papers (service) electronically in this case under Section 10-13 of the Connecticut Practice Book. | ☒ Yes | ☐ No | Email address for delivery of papers under Section 10-13 *(if agreed to)* jkoskoff@koskoff.com |
|---|---|---|---|

| Number of Plaintiffs: 11 | Number of Defendants: 11 | ☒ Form JD-CV-2 attached for additional parties |
|---|---|---|

| Parties | Name *(Last, First, Middle Initial)* and Address of Each party *(Number; Street; P.O. Box; Town; State; Zip; Country, if not USA)* | |
|---|---|---|
| First Plaintiff | Name: Soto, Donna L., Administratrix of the Estate of Victoria L. Soto, Deceased<br>Address: 158 Knowlton Street, Stratford, CT 06615 | P-01 |
| Additional Plaintiff | Name: Hockley, Ian and Nicole, Co-Administrators of the Estate of Dylan C. Hockley<br>Address: 61 Charter Ridge Drive, Sandy Hook, CT 06482 | P-02 |
| First Defendant | Name: Bushmaster Firearms International, LLC aka Freedom Group, Inc. aka Remington Outdoor Company, Inc<br>Address: Corp Trust Ctr, 1209 Orange Street, Wilmington, DE/870 Remington Drive, Madison, NC 27025-8331 | D-01 |
| Additional Defendant | Name: Freedom Group, Inc aka Freedom Group aka Freedom Group, LLC aka Remington Outdoor Company<br>Address: Secretary, 870 Remington Drive, Madison, NC 27025/CT Corp System, 1 Corporate Center, Hartford, CT | D-02 |
| Additional Defendant | Name: Bushmaster Firearms aka Freedom Group, Inc. aka Remington Outdoor Company, Inc.<br>Address: Secretary, 999 Roosevelt Trail, Windham, ME 04062; CT Corp System, 1 Corporate Center, Hartford, CT | D-03 |
| Additional Defendant | Name: Bushmaster Firearms, Inc. aka Freedom Group, Inc. aka Remington Outdoor Company, Inc.<br>Address: Secretary, 999 Roosevelt Trail, Windham, ME 04062; CT Corp System, 1 Corporate Center, Hartford, CT | D-04 |

**Notice to Each Defendant**

1. **YOU ARE BEING SUED.** This paper is a Summons in a lawsuit. The complaint attached to these papers states the claims that each plaintiff is making against you in this lawsuit.
2. To be notified of further proceedings, you or your attorney must file a form called an "Appearance" with the clerk of the above-named Court at the above Court address on or before the second day after the above Return Date. The Return Date is not a hearing date. You do not have to come to court on the Return Date unless you receive a separate notice telling you to come to court.
3. If you or your attorney do not file a written "Appearance" form on time, a judgment may be entered against you by default. The "Appearance" form may be obtained at the Court address above or at *www.jud.ct.gov* under "Court Forms."
4. If you believe that you have insurance that may cover the claim that is being made against you in this lawsuit, you should immediately contact your insurance representative. Other action you may have to take is described in the Connecticut Practice Book which may be found in a superior court law library or on-line at *www.jud.ct.gov* under "Court Rules."
5. If you have questions about the Summons and Complaint, you should talk to an attorney quickly. The Clerk of Court is not allowed to give advice on legal questions.

| Signed *(Sign and "X" proper box)* | ☒ Commissioner of the Superior Court | Name of Person Signing at Left | Date signed |
|---|---|---|---|
| | ☐ Assistant Clerk | Joshua D. Koskoff | 12/13/2014 |

| If this Summons is signed by a Clerk: | For Court Use Only |
|---|---|
| a. The signing has been done so that the Plaintiff(s) will not be denied access to the courts. | File Date |
| b. It is the responsibility of the Plaintiff(s) to see that service is made in the manner provided by law. | |
| c. The Clerk is not permitted to give any legal advice in connection with any lawsuit. | |
| d. The Clerk signing this Summons at the request of the Plaintiff(s) is not responsible in any way for any errors or omissions in the Summons, any allegations contained in the Complaint, or the service of the Summons or Complaint. | |

| I certify I have read and understand the above: | Signed *(Self-Represented Plaintiff)* | Date |
|---|---|---|
| | | |

Name and address of person recognized to prosecute in the amount of $250
**Diana Orozco, 350 Fairfield Avenue, Bridgeport, CT 06604**

| Signed *(Official taking recognizance; "X" proper box)* | ☒ Commissioner of the Superior Court | Date | Docket Number |
|---|---|---|---|
| | ☐ Assistant Clerk | 12/13/2014 | |

A TRUE COPY
ATTEST:
CHARLES J. FISHER, JR.
STATE MARSHAL HARTFORD COUNTY
AS AN INDIFFERENT PERSON

(Page 1 of 2)

## Instructions

1. Type or print legibly; sign summons.
2. Prepare or photocopy a summons for each defendant.
3. Attach the original summons to the original complaint, and attach a copy of the summons to each copy of the complaint. Also, if there are more than 2 plaintiffs or more than 4 defendants prepare form JD-CV-2 and attach it to the original and all copies of the complaint.
4. After service has been made by a proper officer, file original papers and officer's return with the clerk of court.
5. The party recognized to pay costs must appear personally before the authority taking the recognizance.
6. Do not use this form for the following actions:

(a) Family matters (for example divorce, child support, custody, paternity, and visitation matters).
(b) Summary process actions.
(c) Applications for change of name.

(d) Probate appeals.
(e) Administrative appeals.
(f) Proceedings pertaining to arbitration.
(g) Any actions or proceedings in which an attachment, garnishment or replevy is sought.

---

### ADA NOTICE

The Judicial Branch of the State of Connecticut complies with the Americans with Disabilities Act (ADA). If you need a reasonable accommodation in accordance with the ADA, contact a court clerk or an ADA contact person listed at *www.jud.ct.gov/ADA*.

---

## Case Type Codes

| Major Description | Codes Major/ Minor | Minor Description | Major Description | Codes Major/ Minor | Minor Description |
|---|---|---|---|---|---|
| Contracts | C 00 | Construction - All other | Torts (Other than Vehicular) | T 02 | Defective Premises - Private - Snow or Ice |
| | C 10 | Construction - State and Local | | T 03 | Defective Premises - Private - Other |
| | C 20 | Insurance Policy | | T 11 | Defective Premises - Public - Snow or Ice |
| | C 30 | Specific Performance | | T 12 | Defective Premises - Public - Other |
| | C 40 | Collections | | T 20 | Products Liability - Other than Vehicular |
| | C 90 | All other | | T 28 | Malpractice - Medical |
| Eminent Domain | E 00 | State Highway Condemnation | | T 29 | Malpractice - Legal |
| | E 10 | Redevelopment Condemnation | | T 30 | Malpractice - All other |
| | E 20 | Other State or Municipal Agencies | | T 40 | Assault and Battery |
| | E 30 | Public Utilities & Gas Transmission Companies | | T 50 | Defamation |
| | E 90 | All other | | T 61 | Animals - Dog |
| | | | | T 69 | Animals - Other |
| Miscellaneous | M 00 | Injunction | | T 70 | False Arrest |
| | M 10 | Receivership | | T 71 | Fire Damage |
| | M 20 | Mandamus | | T 90 | All other |
| | M 30 | Habeas Corpus (extradition, release from Penal Institution) | Vehicular Torts | V 01 | Motor Vehicles* - Driver and/or Passenger(s) vs. Driver(s) |
| | M 40 | Arbitration | | V 04 | Motor Vehicles* - Pedestrian vs. Driver |
| | M 50 | Declaratory Judgment | | V 05 | Motor Vehicles* - Property Damage only |
| | M 63 | Bar Discipline | | V 06 | Motor Vehicle* - Products Liability Including Warranty |
| | M 66 | Department of Labor Unemployment Compensation Enforcement | | V 09 | Motor Vehicle* - All other |
| | M 68 | Bar Discipline - Inactive Status | | V 10 | Boats |
| | M 70 | Municipal Ordinance and Regulation Enforcement | | V 20 | Airplanes |
| | M 80 | Foreign Civil Judgments - C.G.S. 52-604 & C.G.S. 50a-30 | | V 30 | Railroads |
| | | | | V 40 | Snowmobiles |
| | M 82 | Housing Civil Matters | | V 90 | All other |
| | M 83 | Small Claims Transfer to Regular Docket | | | *Motor Vehicles include cars, trucks, motorcycles, and motor scooters. |
| | M 84 | Foreign Protective Order | | | |
| | M 90 | All other | | | |
| Property | P 00 | Foreclosure | Wills, Estates and Trusts | W 10 | Construction of Wills and Trusts |
| | P 10 | Partition | | W 90 | All other |
| | P 20 | Quiet Title/Discharge of Mortgage or Lien | | | |
| | P 30 | Asset Forfeiture | | | |
| | P 90 | All other | | | |

JD-CV-1 Rev. 9-14 (Back/Page 2)

**CIVIL SUMMONS**
**CONTINUATION OF PARTIES**

STATE OF CONNECTICUT
**SUPERIOR COURT**

JD-CV-2   Rev. 4-97

FIRST NAMED PLAINTIFF *(Last, First, Middle Initial)*
**Soto, Donna L., Administrator of the Estate of Victoria L. Soto, Deceased**

FIRST NAMED DEFENDANT *(Last, First, Middle Initial)*
**Bushmaster Firearms International, LLC**

| ADDITIONAL PLAINTIFFS | |
|---|---|
| NAME *(Last, First, Middle Initial, if individual)*     ADDRESS *(No., Street, Town and ZIP Code)* | CODE |
| Sherlach, William, Executor of the Estate of Mary J. Sherlach<br>33 Vintage Road, Trumbull, CT 06611 | 03 |
| Sherlach, William<br>33 Vintage Road, Trumbull, CT 06611 | 04 |
| Pozner, Leonard, Administrator of the Estate of Noah S. Pozner<br>2615 Main Street, #322, Newtown, CT 06470 | 05 |
| Rousseau, Gilles J., Administrator of the Estate of Lauren G. Rousseau<br>67 Horse Fence Hill Road, Southbury, CT 06488 | 06 |
| Wheeler, David C., Administrator of the Estate of Benjamin A. Wheeler<br>10 Lakeview Terrace, Sandy Hook, CT 06482 | 07 |
| Heslin, Neil and Lewis, Scarlett, Co-Administrators of the Estate of Jesse McCord Lewis<br>6 Great Ring Road, Sandy Hook, CT 06482 | 08 |
| Barden, Mark and Jacqueline, Co-Administrators of the Estate of Daniel G. Barden<br>35 Paugussett Road, Sandy Hook, CT 06482 | 09 |
| D'Avino, Mary, Administratrix of the Estate of  Rachel M. D'Avino<br>48 Deerwood Drive, Bethlehem, CT 06751 | 10 |
| Hammond, Natalie<br>108 Munn Road, Southbury, CT 06488 | 11 |
| | 12 |
| | 13 |

| ADDITIONAL DEFENDANTS | |
|---|---|
| NAME *(Last, First, Middle Initial, if individual)*     ADDRESS *(No., Street, Town and ZIP Code)* | CODE |
| Bushmaster Holdings, LLC aka Freedom Group, Inc. aka Remington Outdoor Company Inc.<br>Corporation Trust Center, 1209 Orange St. Wilmington, DE/CT Corp. System, One Corporate Center, 11th Fl., Hartford, CT | 54 |
| Remington Arms Co, LLC aka Bushmaster Firearms Int., Inc. aka Freedom Group, Inc aka Remington Outdoor Co.<br>Corp. Trust Center, 1209 Orange Street. Wilmington, DE/CT Corp System, One Corporate Center, 11th Fl., Hartford, CT | 55 |
| Remington Outdoor Company, Inc. aka Freedom Group, Inc.<br>CT Corp. System, 1 Corporate Ctr, 11th Fl, Hartford, CT 06103-3220/ Secretary, 870 Remington Drive, Madison, NC 27025-8331 | 56 |
| Camfour, Inc.<br>Secretary, 65 Westfield Industrial Park Road, Westfield, MA 01085-1693/Bryan R. Stefano, 1776 Main St., Springfield, MA 01102 | 57 |
| Camfour Holding, LLP a/k/a Camfour Holding, Inc.<br>Secretary, 65 Westfield Industrial Park Road, Westfield, MA 01085-1693/Bryan R. Stefano, 1776 Main St., Springfield, MA 01102 | 58 |
| Riverview Sales, Inc.<br>Agent for Service: Varunes & Associates, 5 Grand Street, Hartford, CT 06106 | 59 |
| David LaGuercia<br>1100 River Road, Agawam, MA 01001/119 Walnut Street, Agawam, MA 01001 | 60 |

| | | *FOR COURT USE ONLY - FILE DATE* |
|---|---|---|
| | 61 | |
| | 62 | |
| | 63 | DOCKET NO. |

**CIVIL SUMMONS-Continuation**

RETURN DATE:  FEBRUARY 3, 2015     :   SUPERIOR COURT

:

DONNA L. SOTO, ADMINISTRATRIX OF

THE ESTATE OF VICTORIA L. SOTO;    :   JUDICIAL DISTRICT OF

IAN AND NICOLE HOCKLEY,     :   FAIRFIELD

CO-ADMINISTRATORS OF THE

ESTATE OF DYLAN C. HOCKLEY;     :

WILLIAM D. SHERLACH, EXECUTOR    :   AT BRIDGEPORT

OF THE ESTATE OF MARY JOY SHERLACH;

WILLIAM D. SHERLACH, INDIVIDUALLY; :

LEONARD POZNER, ADMINISTRATOR OF :

THE ESTATE OF NOAH S. POZNER;     :

GILLES J. ROUSSEAU, ADMINISTRATOR :

OF THE ESTATE OF LAUREN G.     :

ROUSSEAU; DAVID C. WHEELER,     :

ADMINISTRATOR OF THE ESTATE OF    :

BENJAMIN A. WHEELER;     :

NEIL HESLIN AND SCARLETT LEWIS,    :

CO-ADMINISTRATORS OF THE ESTATE OF :

JESSE MCCORD LEWIS;     :

MARK AND JACQUELINE BARDEN,     :

CO-ADMINISTRATORS OF THE ESTATE OF:

DANIEL G. BARDEN; MARY D'AVINO,    :

ADMINISTRATRIX OF THE ESTATE     :

OF RACHEL M. D'AVINO; and     :

NATALIE HAMMOND     :

VS.

BUSHMASTER FIREARMS     :

INTERNATIONAL, LLC a/k/a FREEDOM   :

GROUP, INC. a/k/a REMINGTON OUTDOOR :

GROUP, INC; FREEDOM GROUP, INC. a/k/a :

FREEDOM GROUP a/k/a FREEDOM GROUP, :

LLC a/k/a REMINGTON OUTDOOR     :

COMPANY; BUSHMASTER FIREARMS a/k/a :

FREEDOM GROUP a/k/a REMINGTON    :

OUTDOOR COMPANY, INC.; BUSHMASTER :

FIREARMS, INC. a/k/a FREEDOM GROUP,   :

INC. a/k/a REMINGTON OUTDOOR     :

COMPANY, INC.; BUSHMASTER     :

HOLDINGS, LLC a/k/a FREEDOM GROUP,   :

INC. a/k/a REMINGTON OUTDOOR     :

COMPANY, INC.; REMINGTON ARMS CO.,   :

LLC, a/k/a BUSHMASTER FIREARMS INT., :

INC., a/k/a FREEDOM GROUP, INC. a/k/a   :

1

REMINGTON OUTDOOR CO.; REMINGTON :
OUTDOOR COMPANY, INC. a/k/a                    :
FREEDOM GROUP, INC.; CAMFOUR, INC.;  :
CAMFOUR HOLDING, LLP a/k/a CAMFOUR :
HOLDING, INC.; RIVERVIEW SALES, INC.;  :
DAVID LAGUERCIA                               :    DECEMBER 13, 2014

## INTRODUCTION

1.     This is a civil action for damages and injunctive relief stemming from the shooting at Sandy Hook Elementary School on December 14, 2012.

2.     In less than five minutes, 20 first-grade children and 6 adults were killed.  Two others were wounded.

3.     The number of lives lost in those 264 seconds was made possible by the shooter's weapon of choice: a Bushmaster AR-15 rifle, model XM15-E2S.

4.     The AR-15 was designed as a military weapon, and it has always excelled on the battlefield.  Born out of the exigencies of modern combat, the AR-15 was engineered to deliver maximum carnage with extreme efficiency.

5.     The AR-15 proved to be very good at its job.  It has endured as the United States Army's standard-issue rifle and has more recently become a valuable law enforcement weapon. In both contexts, the AR-15 is subject to strict safety measures, including advanced training and regimented storage.

6.     The AR-15, however, has little utility for legitimate civilian purposes.  The rifle's size and overwhelming firepower, so well adapted to the battlefield, are in fact liabilities in home defense.

7.     But there is one tragically predictable civilian activity in which the AR-15 reigns supreme: mass shootings.  Time and again, mentally unstable individuals and criminals have acquired an AR-15 with ease, and they have unleashed the rifle's lethal power into our streets, our malls, our places of worship, and our schools.

8.     Defendants – makers and sellers of the XM15-E2S rifle – have, like all Americans, watched mass shootings become a harrowing yet predictable part of modern life.

9.     Defendants know that, as a result of selling AR-15s to the civilian market, individuals unfit to operate these weapons gain access to them.

10.     And defendants know that the AR-15's military firepower, unsuited to home defense or recreation, enables an individual in possession of the weapon to inflict unparalleled civilian carnage.

2

11.     Despite that knowledge, defendants continued to sell the XM15-E2S rifle to the civilian market.

12.     In order to continue profiting from the sale of AR-15s, defendants chose to disregard the unreasonable risks the rifle posed outside of specialized, highly regulated institutions like the armed forces and law enforcement.

13.     Plaintiffs seek nothing more and nothing less than accountability for the consequences of that choice.

PARTIES

14.     Defendant Bushmaster Firearms, also known as B.F.I. and B.F.I., Inc., was a Maine corporation created in 1973 and located in Windham, Maine. Bushmaster Firearms manufactured and sold AR-15s. Bushmaster Firearms is now part of Freedom Group, Inc.

15.     Defendant Bushmaster Firearms, Inc. was another Maine corporation that manufactured and sold AR-15s. Upon information and belief, Bushmaster Firearms, Inc. manufactured and sold AR-15s. Bushmaster Firearms, Inc. is now part of Freedom Group, Inc.

16.     Defendant Bushmaster Firearms International, LLC was a Delaware corporation that was formed in 2006. (When originally created, it was named Rambo Acquisition, LLC.) According to corporate filings, Bushmaster Firearms International, LLC was merged into Remington Arms Company, LLC in 2011.

17.     At all relevant times, Bushmaster Firearms International, LLC manufactured and sold AR-15s.

18.     Upon information and belief, Bushmaster Firearms International, LLC manufactured the XM15-E2S that was used in the shooting at Sandy Hook Elementary School on December 14, 2012.

19.     Defendant Remington Arms Company, LLC is a Delaware limited liability corporation. Defendant Bushmaster Firearms International, LLC was merged into Defendant Remington Arms Company, LLC in 2011. At all relevant times, Remington Arms Company, LLC manufactured and sold AR-15s.

20.     Defendant Bushmaster Holdings, LLC was incorporated in 2006 and operated as a holding company for Bushmaster Firearms International, Inc. Bushmaster Holdings, LLC merged into Freedom Group, Inc. in 2009.

21.     Defendant Freedom Group, Inc., which is also sometimes called Freedom Group and Freedom Group, LLC is a Delaware corporation originally formed under another name in 2007. Freedom Group, Inc. is one of the world's largest manufacturers and dealers in firearms, ammunition, and related accessories.

22.     Upon information and belief, from 2006 on, Freedom Group, Inc. controlled, marketed and sold the Bushmaster brand.  Upon information and belief, during this time period Freedom Group, Inc. sold Bushmaster brand products directly to retail stores.

23.     Defendant Remington Outdoor Company, Inc. is a corporation formed in 2009 that is engaged in the business of manufacturing and selling AR-15s.  Freedom Group, Inc., which upon information and belief at all relevant times controlled the Bushmaster brand, was renamed Remington Outdoor Company, Inc.

24.     Upon information and belief, Defendants Bushmaster Firearms; Bushmaster Firearms, Inc.; Bushmaster Firearms International, LLC; Remington Arms Company, LLC; Bushmaster Holdings, LLC; Freedom Group, Inc.; and Remington Outdoor Company, Inc. are functionally one entity and are hereinafter referred to as the "Bushmaster Defendants."

25.     The Bushmaster Defendants manufacture and sell firearms and ammunition under the Bushmaster brand name.

26.     The Bushmaster Defendants, one or more of them, manufactured and sold the Bushmaster XM15-E2S rifle that was used in the shooting at Sandy Hook Elementary School on December 14, 2012.

27.     Defendant Camfour, Inc. is a Massachusetts corporation.  Camfour, Inc. was at all relevant times a distributor of firearms and was federally licensed to deal in firearms.

28.     Defendant Camfour Holding, Inc. aka Camfour Holding, LLP is a Massachusetts corporation.  Upon information belief, Camfour Holding, Inc. aka Camfour Holding, LLP is functionally the same entity as Camfour, Inc.  These entities are hereinafter referred to as the "Camfour Defendants."

29.     Upon information and belief, the Camfour Defendants purchased the Bushmaster XM15-E2S rifle that was used in the shooting at Sandy Hook Elementary School from the Bushmaster Defendants.

30.     The Camfour Defendants are qualified product sellers within the meaning of 15 U.S.C. § 7903(6).

31.     Upon information and belief, the Camfour Defendants sold the Bushmaster XM15-E2S rifle that was used in the shooting at Sandy Hook Elementary School to the Riverview Defendants, as described below.

32.     Defendant Riverview Gun Sales, Inc. aka Riverview Gun Sales is a retail gun store located in East Windsor, Connecticut.  The Bushmaster XM15-E2S rifle that was used in the shooting at Sandy Hook Elementary School on December 14, 2012 was purchased from Riverview Gun Sales.

4

33.     Defendant David LaGuercia is or was the federally licensed firearms dealer who through Riverview Gun Sales, Inc. sold the Bushmaster XM15-E2S rifle that was used in the shooting at Sandy Hook Elementary School.

34.     Riverview Gun Sales, Inc. and David LaGuercia are hereafter referred to as the "Riverview Defendants." The Riverview Defendants are qualified product sellers within the meaning of 15 U.S.C. § 7903(6).

35.     On February 7, 2013, Plaintiff Donna L. Soto was appointed Administratrix of the Estate of Victoria Leigh Soto. A copy of the fiduciary certificate is attached hereto as Plaintiffs' Exhibit A.

36.     On December 3, 2014, Plaintiffs Ian and Nicole Hockley were appointed Co-Administrators of the Estate of Dylan Christopher Jack Hockley. A copy of the fiduciary certificate is attached hereto as Plaintiffs' Exhibit B.

37.     On December 4, 2014, Plaintiff David C. Wheeler was appointed Administrator of the Estate of Benjamin A. Wheeler. A copy of the fiduciary certificate is attached hereto as Plaintiffs' Exhibit C.

38.     On January 22, 2013, Plaintiff Mary A. D'Avino was appointed Administratrix of the Estate of Rachel Marie D'Avino a/k/a Rachel M. D'Avino. A copy of the fiduciary certificate is attached hereto as Plaintiffs' Exhibit D.

39.     On December 8, 2014, Plaintiffs Mark and Jacqueline Barden were appointed Co-Administrators of the Estate of Daniel G. Barden. A copy of the fiduciary certificate is attached hereto as Plaintiffs' Exhibit E.

40.     On March 7, 2013, Plaintiff William D. Sherlach was appointed Executor of the Estate of Mary Joy Sherlach. A copy of the fiduciary certificate is attached hereto as Plaintiffs' Exhibit F. Mr. Sherlach also brings this action in his individual capacity for loss of consortium.

41.     On December 9, 2014, Plaintiffs Neil Heslin and Scarlett Lewis were appointed Co-Administrators of the Estate of Jesse McCord Lewis. A copy of the fiduciary certificate is attached hereto as Plaintiffs' Exhibit G.

42.     On December 10, 2014, Plaintiff Leonard Pozner was appointed Administrator of the Estate of Noah Samuel Pozner. A copy of the fiduciary certificate is attached hereto as Plaintiffs' Exhibit H.

43.     On January 3, 2013, Plaintiff Gilles J. Rousseau was appointed Administrator of the Estate of Lauren G. Rousseau. A copy of the fiduciary certificate is attached hereto as Plaintiffs' Exhibit I.

44.     Plaintiff Natalie Hammond brings this action in her individual capacity for injuries suffered on December 14, 2012.

THE GUN

### A.    The Bushmaster XM15-E2S is a Military Weapon

. 45.    Bushmaster's XM15-E2S is an AR-15 rifle, a weapon adopted by the United States military and other armed forces around the world because of its efficiency as a military assault rifle.

46.    After World War II, the U.S. Army's Operations Research Office analyzed over three million casualty reports from World War I and World War II. In its final report, the group observed that modern combat occurred at short range and was highly mobile. More importantly, they determined that the number one predictor of casualties was the total number of shots fired.

47.    These findings led the U.S. Army to develop specifications for a new combat weapon: a lightweight firearm that would hold a large detachable magazine and rapidly expel ammunition with enough velocity to penetrate body armor and steel helmets.

48.    A company called Armalite designed the AR-15 in response. Lightweight, air-cooled, gas-operated, and magazine-fed, the AR-15's capacity for rapid fire with limited recoil meant its lethality was not dependent on good aim or ideal combat conditions.

49.    After extensive testing, the military concluded that a five-man squad armed with AR-15s had equal or superior "hit-and-kill" potential in combat situations when compared with an 11-man squad armed with M14 rifles, the AR-15's predecessor. Troops field-testing the AR-15 reported instantaneous deaths, as well as routine amputations, decapitations, and massive body wounds. The military ultimately adopted the AR-15 as its standard-issue service rifle, renaming it the M16.

50.    After Armalite sold its licensing rights, Colt took over its military contracts and began manufacturing the M16.

51.    Today, Colt remains the largest supplier of combat rifles to the military.

52.    Bushmaster, meanwhile, holds the distinction of being the largest supplier of combat rifles to civilians.

53.    The XM15-E2S is one such rifle.

### B.    A "Civilian" Weapon Designed for Combat

54.    As an AR-15 rifle, the Bushmaster XM15-E2S is essentially indistinguishable from its military sibling, the M16. Both weapons are designed for mass casualty assaults. Both share design features of exceptional muzzle velocity, the ability to accommodate large-capacity magazines, and effective rapid fire.

## Muzzle Velocity

55.     The term "muzzle velocity" refers to the speed a bullet possesses at the moment it leaves the muzzle of a firearm.

56.     The velocity of a bullet on impact is the main determinant of its destructive capacity.

57.     Typical handgun muzzle velocities range from approximately 750 feet per second to approximately 1,300 feet per second.

58.     Because longer barrels give the ammunition's propellant more time to work, long guns eject projectiles at significantly higher velocities than short-barreled firearms.

59.     AR-15 rifles like the XM15-E2S are capable of propelling ammunition at 4,000 feet per second, which multiplies the lethality of each hit.

60.     According to a study by physicians who performed autopsies on soldiers killed by gunfire in Iraq, the greater the speed of the bullet on impact, the greater the extent of tissue deterioration. The study found that rounds with a velocity exceeding 2,500 feet per second cause a shockwave to pass through the body upon impact that results in catastrophic injuries even in areas remote to the direct wound.

## Large-Capacity Magazines

61.     In addition to exceptional muzzle velocity, AR-15 rifles are also designed to accept large-capacity magazines.

62.     Such magazines were first designed and produced for the military in order to increase the firepower of U.S. infantry by minimizing time spent reloading.

63.     "Civilian" AR-15 rifles, including the XM15-E2S, are manufactured to be compatible with large capacity magazines.

## Effective Rapid Fire

64.     All AR-15 rifles, including the XM15-E2S, can empty their magazines with exceptional speed.

65.     The rifles carried by U.S. forces are capable of both full automatic and semiautomatic fire. Full automatic fire can empty a 30-round magazine in two seconds. Semiautomatic fire can empty the same 30-round magazine in approximately ten seconds.

66.     The United States Army considers semiautomatic fire more effective than automatic fire in most combat situations.

67.    "Civilian" semiautomatic rifles like the XM15-E2S, therefore, are capable of the same rapid fire that the U.S. Army deems optimal for the military theater.

68.    Structurally and mechanically, therefore, AR-15 rifles remain the progeny – and instruments – of war.

69.    Semiautomatic fire unleashes a torrent of bullets in a matter of seconds; large-capacity magazines allow for prolonged assaults; and powerful velocity makes each hit catastrophic.

70.    The net effect is more wounds, of greater severity, in more victims, in less time.

71.    This superior capacity for lethality – above and beyond other semiautomatic weapons – is why the AR-15 style rifle has endured as the U.S. military's weapon of choice for 50 years.

## C.    A "Civilian" Weapon Marketed for Combat

72.    The uniquely military characteristics of the AR-15 type rifle are not lost on the Bushmaster Defendants.  In fact, they are the weapon's primary selling point.

73.    The Bushmaster Defendants tout Bushmaster rifle barrels as "the finest AR15-Type / M16-Type barrels made," promising that they "provide the same matte black, non-reflective finish found on quality military-type arms."

74.    When the Bushmaster Defendants rolled out a new AR-15 rifle model, defendants' advertising lauded the gun as "the uncompromising choice when you demand a rifle as mission-adaptable as you are."

75.    The Bushmaster Defendant's 2012 Bushmaster Product Catalogue shows soldiers moving on patrol through jungles, armed with Bushmaster rifles.  Superimposed over the silhouette of a soldier holding his helmet against the backdrop of an American flag is text that reads:  "When you need to perform under pressure, Bushmaster delivers."

76.    In the Bushmaster Defendant's 2011 Bushmaster Product Catalogue, firearms like the XM15-E2S are advertised with the slogan, "military-proven performance."

77.    In 2010, the Bushmaster Defendants promoted one of their "civilian" rifles as "the ultimate combat weapons system."

78.    Invoking the unparalleled destructive power of the weapon, the Bushmaster Defendants' advertising copy read:  "Forces of opposition, bow down. You are single-handedly outnumbered."

8

79. The Bushmaster Defendants' militaristic marketing reinforces the image of the AR-15 as a combat weapon used for the purpose of waging war and killing human beings.

80. This marketing tactic dovetails with the widespread popularity of realistic and addictive first-person shooter games – most notably "Call of Duty" – that prominently feature AR-15s and rewards players for "head shots" and "kill streaks" among other assaultive and violent "achievements."

81. It is widely known that "Call of Duty" exposes players to intensely realistic tactical scenarios and teaches assaultive weapon techniques such as "taped reloads," which allow high capacity magazines to be taped together to reduce reloading time.

### D.    A "Civilian" Weapon with no Legitimate Civilian Purpose

82. As set forth above, the AR-15's combination of exceptional muzzle velocity, ability to accept large-capacity magazines, and effective rapid fire has significant utility in the military context. These same features make the weapon ill-suited for legitimate civilian purposes.

<u>Self-Defense</u>

83. There is no evidence that semiautomatic rifles are commonly used for, or necessary for, legitimate self-defense by law-abiding citizens.

84. Semiautomatic rifles' length makes them inferior to smaller guns in the confines of a home.

85. It is handguns, and not long guns, that are widely considered to be the optimal weapon for home defense.

86. In *D.C. v. Heller*, 554 U.S. 570, 629 (2008), the Supreme Court of the United States extolled the handgun as the "quintessential self-defense weapon." The Court cited several reasons for this: "It is easier to store in a location that is readily accessible in an emergency; it cannot easily be redirected or wrestled away by an attacker; it is easier to use for those without the upper-body strength to lift and aim a long gun; it can be pointed at a burglar with one hand while the other hand dials the police." These virtues are absent from the AR-15.

87. Semiautomatic rifles are not only ill-suited to home defense, they are dangerous when used in that capacity.

88. The velocity and rate of semiautomatic fire in the home creates a significant risk of what is referred to as "over-penetration," where bullets breach walls and doors, putting family members, neighbors, and even passers-by at risk.

89. The military has concluded that use of the M16 in close quarters greatly increases the risk of noncombatant casualties, and trains soldiers accordingly.

90.     When a Bushmaster AR-15 was reviewed by Guns & Ammo Magazine in 1983, the reviewer commented: "As a home defense weapon, it certainly possesses ample firepower with a 30-round magazine, but the .223 cartridge is a mite too powerful and penetrating for this use." It concluded that the rifle would instead be of value to "a police S.W.A.T. team in close-quarter encounters with evil-doers."

91.     Moreover, the ability to accept large-capacity magazines, vital for modern combat, is unnecessary for home defense.

92.     The National Rifle Association Institute for Legislative Action ("NRA-ILA") maintains a database of "armed citizen" stories describing private citizens who have successfully defended themselves or others using a firearm. According to a study of all incidents in that database from 1997 to 2001, an average of 2.2 shots were fired by defenders. In 28% of incidents, no shots were fired at all.

93.     A similar analysis was performed for the period of 2011-2013 and revealed that defenders fired an average of 2.1 shots.

94.     The likelihood of an AR-15 causing accidental harm when used for home defense substantially exceeds the likelihood that large quantities of semiautomatic fire will be necessary for protection.

<u>Hunting and Sporting</u>

95.     The Gun Control Act of 1968 generally prohibits the importation of firearms into the United States, but makes an exception for weapons that are particularly suitable for or readily adaptable to sporting purposes.

96.     Congress stated that one of the purposes for the law was to stop the influx of military-grade weapons, which was turning the United States into "the dumping ground of the castoff surplus military weapons of other nations."

97.     The Bureau of Alcohol, Tobacco and Firearms (ATF) is responsible for interpreting the statute and thereby determining the suitability of various firearms for sporting or hunting purposes.

98.     In 1989, ATF issued a broad suspension of the importation of "assault-type rifles" until an analysis of their sporting utility could be undertaken. ATF defined this category to include rifles with three characteristics:  a military appearance, a detachable magazine, and the ability to fire semi-automatically. It referred to this group of weapons as "semiautomatic assault rifles."

99.     As part of its analysis, ATF studied advertising and marketing literature, reviewed evaluations of the firearms by technical writers, solicited information from the firearm importers,

and sent questionnaires to licensed hunting guides, state game and fish commissions, local hunting associations, competitive shooting groups, and hunting/shooting magazine editors.

100.    In its final report, ATF concluded that semiautomatic assault rifles were designed and intended for combat and not suited to either sporting or hunting.  It prohibited the importation of rifles with military features other than detachable magazines.

101.    Foreign gun manufacturers quickly adapted to the restriction.  They began exporting semiautomatic rifles that had been stripped of all military features except for the ability to accept a detachable magazine.  Significantly, these modified rifles had the ability to accept large-capacity magazines.

102.    In 1998, ATF was called upon to evaluate the sporting utility of semiautomatic assault rifles that accepted large-capacity magazines but lacked other military features.

103.    After an equally exhaustive analysis, ATF found it "clear and compelling" that semiautomatic assault rifles that accept large-capacity magazines are not suitable for sporting or hunting.

104.    ATF concluded that the ability to expel large amounts of ammunition quickly "serves a function in combat and crime, but serves no sporting purpose."

## ENTRUSTMENT OF MILITARY WEAPONS TO THE MILITARY

105.    When assault rifles are sold to the military, the seller entrusts them to a highly regulated institution with expertise in minimizing the risk of physical harm – whether criminal or accidental – to soldiers or others.

106.    Standardized medical fitness standards prohibit induction, enlistment, appointment, or retention in the Armed Forces if the individual suffers from major depression, bipolar disorder, affective psychoses, or a history of symptoms consistent with mental instability that impairs school, social, or work efficiency.

107.    When the U.S. Government purchases assault rifles for use by armed forces, it retains ownership of those weapons.

108.    Military assault rifles are issued to soldiers for instruction, training, exercises, and combat.

109.    Soldiers are held strictly accountable for their assault rifle at all times.

110.    Assault rifles must be kept in safety mode when not in use.

111.    Soldiers are instructed not to leave their assault rifle unattended under any circumstances.

112.    If an assault rifle cannot be accounted for, the Army will place an entire base or installation on lockdown until the weapon is located.

113.    After the assault rifle is located, an investigation will be conducted and a recommendation made as to the appropriate punishment.

114.    In general, the most lenient punishment for the transgression of misplacing an assault rifle is to lose rank and pay and to be assigned extra duty.

115.    If an assault rifle is misplaced in a combat zone, the soldier may face severe sanctions.

116.    Assault rifles are stored in secure weapons rooms on military bases.  Soldiers must sign out their rifle anytime they remove it so a chain of custody is established.

117.    The military requires soldiers to undergo extensive training on the proper use of an assault rifle, including techniques to minimize the weapon's potential for inflicting collateral damage.

118.    The Department of the Army produces a 400-page manual for commanders, leaders, and instructors devoted exclusively to weapon pedagogy and related safety issues.

119.    According to the manual, soldiers are first instructed on the weapon's capabilities, mechanical training, and the fundamentals and principles of rifle marksmanship.  Live-fire applications are scheduled only after the soldier has demonstrated preliminary skills.

120.    To ensure safety during live-fire applications, ammunition is issued to firing units immediately before scheduled training exercises and released to troops only when they are on the firing line.

121.    Commanders are charged with identifying any "hazards" to safety by using a complex "risk assessment matrix" to estimate the probability and severity of an adverse impact. The manual notes that hazards may arise from health or behavioral concerns.

122.    Military leadership is empowered to prevent access to combat weapons if circumstances warrant it.

## ENTRUSTMENT OF MILITARY WEAPONS TO LAW ENFORCEMENT

123.    When military-grade weapons are sold to law enforcement, the seller entrusts them to organizations and departments that regulate and oversee officers' access to firearms and possess expertise in minimizing the risk of physical harm to civilians.

124.    Prior to being entrusted with assault rifles, law enforcement officers undergo extensive training.

12

125.    Officers are trained on when it is and is not appropriate to use an assault rifle.

126.    For the vast majority of engagements in which it is necessary to draw or use a firearm, law enforcement considers an officer's sidearm – and not an assault rifle – to be the most appropriate weapon

127.    Police leadership is empowered to remove any weapon from an officer if circumstances warrant it.

## ENTRUSTMENT OF MILITARY WEAPONS TO THE PUBLIC

128.    The military and law enforcement have a legitimate need for a weapon as lethal as the AR-15, but they also recognize that strict safety measures are necessary to protect soldiers, police officers, and innocent civilians from physical harm.  Consequently, entrusting assault rifles to these specialized institutions is reasonable.

129.    The same is not true for the entrustment of AR-15 rifles to civilians.

130.    In addition to the lack of utility set forth above, when AR-15s are entrusted to the public there is no institutional structure in place to oversee the safe and intelligent use of those weapons.

131.    AR-15s are sold to wholesalers and/or dealers who sell directly to civilians.

132.    Large capacity magazines that are compatible with AR-15s are sold to wholesalers and/or dealers who sell directly to civilians.

133.    In the overwhelming majority of states, young people can legally purchase an AR-15 before they are legally permitted to drink alcohol.

134.    In at least a dozen states, the minimum age for possession of an AR-15 is 14 or 16, or there is no minimum age at all.

135.    In the overwhelming majority of states, a license or permit is not required to purchase or own an AR-15.

136.    In the overwhelming majority of states, no safety training is required for the purchase of an AR-15.

137.    There is not a single state that requires a mental health examination of a potential purchaser of an AR-15.

138.    There is not a single state that requires a potential purchaser of an AR-15 to answer questions about other individuals with whom they intend to share access.

139.    More than half of American households with firearms do not store them securely.

13

140.    Civilians are entrusted with AR-15s even though they are not suited for legitimate civilian purposes.

141.    Civilians are entrusted with AR-15s whether or not they have a mechanism to safely secure the weapons and ammunition in their home.

142.    Civilians are entrusted with AR-15s even if they have children in the home who can gain access to their weapons and ammunition.

143.    Civilians are entrusted with AR-15s even if they intend to make the weapon available to other persons, including those who may be mentally unstable.

144.    Several highly-publicized mass shootings have demonstrated that perpetrators of mass shootings are able to purchase or otherwise acquire AR-15s.

## THE ROAD TO SANDY HOOK

145.    The most chilling legacy of the entrustment of AR-15s to the general population may be that Americans are no longer shocked when combat weapons are used to kill people as they work, shop, commute, attend school, and otherwise go about their lives.  We may be horrified, saddened, even sickened, but we can no longer be shocked.

146.    Prior to December 14, 2012, assault rifles like the XM15-E2S had been used to kill in department stores and fast food chains, at offices and homecoming parties, on courthouse steps, and in schools.

147.    Prior to December 14, 2012, assault rifles like the XM15-E2S had torn apart communities in California and Massachusetts and Nevada and Washington and Nebraska and Wisconsin and Oregon and Texas and Florida and Washington D.C. and Missouri and Alabama.

148.    Prior to December 14, 2012, assault rifles like the XM15-E2S had been used to kill elementary school children, high school children, and college students.

149.    Yet Bushmaster Defendants continued to entrust the XM15-E2S to the civilian population through wholesalers and dealers.

150.    Bushmaster Defendants continued making the XM15-E2S compatible with large capacity magazines.

151.    Bushmaster Defendants continued marketing the XM15-E2S and similar rifles as combat weapons that would make others "bow down."

152.    Sometime prior to March of 2010, the Bushmaster Defendants entrusted the XM15-E2S Bushmaster rifle to the Camfour Defendants.

14

153.    Sometime prior to March of 2010, the Camfour Defendants entrusted the XM15-E2S Bushmaster rifle to the Riverview Defendants; the Riverview Defendants then entrusted the rifle to Nancy Lanza in March of 2010.

154.    On the morning of December 14, 2012, Lanza retrieved the Bushmaster rifle and ten 30-round magazines – several of which he taped together to allow for faster reload – from an unlocked gun closet in the house he shared with his mother and drove to Sandy Hook Elementary School.

155.    Upon information and belief, Adam Lanza chose the XM15-E2S to use in his attack on Sandy Hook Elementary School for its military and assaultive qualities, and in particular its efficiency in inflicting mass casualties.

156.    Meanwhile, on the morning of December 14, 2012, Victoria Leigh Soto was a 27-year-old first-grade teacher in classroom 10 at Sandy Hook Elementary School. In fewer than five years of teaching, Vicki had earned the reputation of being a fun, and sometimes zany, teacher. Vicki loved snow and had something of an obsession with pink flamingos. Vicki began her morning, as she usually did, with a long car ride from Stratford to Sandy Hook. On this particular morning, she had with her all the ingredients and materials for her class to make gingerbread houses for the holidays.

157.    On the morning of December 14, 2012, Dylan Hockley was a six-year-old boy in classroom 10. Dylan had a beaming smile that lit up a room and an infectious laugh. Dylan was a child with autism, but was learning to read and would come home every day from school proudly bearing a new book. He loved the moon, garlic bread, the color purple, cuddling, and bouncing on the trampoline. Dylan idolized his older brother, and best friend, Jake.

158.    On the morning of December 14, 2012, Benjamin Wheeler, 6, wasn't sure if he wanted to be an architect, a paleontologist, a lighthouse keeper – or all three at once. Benjamin was a bright, spirited, inquisitive, caring boy who brought joyful energy to his parents and big brother. He was an avid reader and was becoming a very strong swimmer. Each morning he could hardly wait to get to classroom 8.

159.    On the morning of December 14, 2012, Rachel D'Avino was a 29-year-old behavioral therapist with a passion for helping children and adults with autism. She was working toward a doctorate, and aspired to help shape the field of applied behavioral therapy. Rachel possessed seemingly limitless patience and empathy for the children with whom she worked; they, in turn, adored her. In eleven days, Rachel's boyfriend planned to propose.

160.    On the morning of December 14, 2012, Daniel Barden was – at age 7 – one of the older children in classroom 8. Daniel understood things about life in a way that prompted many who knew him to call him an "old soul." Daniel was not only bright and loving; he understood what it meant to live life with compassion. Daniel always made an effort to make other children around him feel accepted. He would take notice of children who sat alone and would ask to go sit with them or invite them to join an activity. He gave hugs often, and with abandon.

161.    On the morning of December 14, 2012, Mary Sherlach was a 56-year-old school psychologist at Sandy Hook Elementary School. After 18 years at the school, Mary was planning to retire the following June. On her calendar for retirement was spending more time with her husband, Bill, to whom she had been married for 31 years, and patiently waiting for one of her two daughters to provide her with a grandchild. Although retirement would allow more time for gardening and reading, Mary still planned on remaining professionally active for the pure joy that she took from helping a child through a difficult time.

162.    On the morning of December 14, 2012, Jesse Lewis, 6, was a first-grader in classroom 10. The only child of Neil Heslin and Scarlett Lewis, Jesse loved to ride horses, play memory card games for which he was known to be unbeatable, and have books read to him by his mother. He also loved going out for special breakfasts before school with his dad. On the morning of December 14, father and son found time to enjoy a sausage and egg sandwich, polished off by hot chocolate.

163.    On the morning of December 14, 2012, Noah Pozner was the youngest first grader in classroom 10, having just turned six only three weeks before. Noah loved costumes, video games, and superheroes – especially Spiderman. He was also a budding philosopher, known to stump his parents with spontaneous questions about Creation and the nature of free will. He was, truly, a force of nature.

164.    On the morning of December 14, 2012, Lauren Rousseau, 30, headed to Sandy Hook Elementary School, where she had recently landed a permanent substitute teaching job. That day, she was scheduled to teach in classroom 8. Lauren's warmth, enthusiasm, and creativity made her a natural first-grade teacher. That evening, Lauren planned to see the movie "The Hobbit" with her boyfriend and then attend a party with friends. Lauren had already made cupcakes for the party, each one featuring a different character from The Hobbit.

165.    On the morning of December 14, 2012, Natalie Hammond, 40, began her day as Lead Teacher of Sandy Hook Elementary School. It was special day for Natalie; her daughter was turning 12.

166.    Just before 9:30 am, Lanza shot his way into the locked school with the Bushmaster rifle. It was the weapon he would use to take every life in the school aside from his own.

167.    Mary Sherlach and the school's principal were in a meeting when they heard shots. When they went to investigate, both were killed with the Bushmaster rifle. Natalie Hammond and another staff member were shot with the Bushmaster rifle and wounded.

168.    Lanza then approached two first-grade classrooms, Classroom 8 and Classroom 10.

169.    In Classroom 8, Lanza used the Bushmaster rifle to kill 15 children and 2 adults, including Daniel Barden, Benjamin Wheeler, Noah Pozner, Rachel D'Avino, and Lauren Rousseau.

170.    In Classroom 10, Lanza used the Bushmaster rifle to kill 5 children and 2 adults, including Dylan Hockley, Jesse Lewis, and Victoria Soto.

171.    Nine children from Classroom 10 were able to escape when Lanza paused to reload the Bushmaster with another 30-round magazine.

172.    The first call to 911 from Sandy Hook Elementary School was made at 9:35am. By 9:40am, Lanza's massacre was complete.

173.    Police collected 154 spent .223 casings that had been expelled from the Bushmaster rifle.

COUNT ONE: § 52-555 Wrongful Death
(Estate of Victoria L. Soto v. Bushmaster Defendants)

1.-173.  Plaintiffs hereby incorporate and reallege as if fully set forth herein Paragraphs 1-173 of the foregoing opening section.

174.    The Bushmaster Defendants knew, or should have known, of all of the foregoing information alleged at Paragraphs 1-10, 45-173. Based on this and similar information, the Bushmaster Defendants knew, or should have known, that the sale of assault rifles, including the XM15-E2S, in the civilian market posed an unreasonable and egregious risk of physical injury to others.

175.    The Bushmaster Defendants knew, or should have known, of the civilian population's poor track record of safely securing weapons.

176.    A mass casualty event, such as the shooting at Sandy Hook Elementary School, was within the scope of the risk created by the Bushmaster Defendants' manufacture and sale of the XM15-E2S for the civilian market.

177.    The Bushmaster Defendants knew, or should have known, of the unreasonably high risk that the XM15-E2S would be used in a mass shooting to inflict maximum casualties before law enforcement was able to intervene.

178.    The Bushmaster Defendants knew, or should have known, that schools are particularly vulnerable to – and frequently targets of – mass shootings.

179.    The Bushmaster Defendants knew, or should have known, that the utility of the XM15-E2S for hunting, sporting or self-defense was negligible in comparison to the risk that the weapon would be used in its assaultive capacity.

180.    The Bushmaster Defendants knew, or should have known, that the XM15-E2S, when used in its assaultive capacity, would be likely to inflict multiple casualties and serious injury.

17

181.    The Bushmaster Defendants, as those who deal in firearms, are required to exercise the closest attention and the most careful precautions in the conduct of their business.

182.    The Bushmaster Defendants have for years sold AR-15s in a manner that foreseeably leads to the use of those weapons by unauthorized and unsafe users.

183.    The Bushmaster Defendants have had the ability for years to design and manufacture AR-15s for the civilian population with safety mechanisms that prevent the weapon from being fired by someone other than the purchaser.

184.    The Bushmaster Defendants have had the ability for years to design and manufacture AR-15s for the civilian market that do not accept large capacity magazines.

185.    The Bushmaster Defendants' conduct had a continuing inherent or natural tendency to create danger and inflict injury, was offensive to public policy, and posed a serious risk to public health.

186.    The Bushmaster Defendants' conduct interfered with the right of the public to be safe in their communities, and, more particularly, of children to be safe in their schools.

187.    In this case, on information and belief, the Bushmaster Defendants supplied the XM15-E2S to the Camfour Defendants for resale to the civilian population.

188.    The Bushmaster Defendants knew, or should have known, that the Camfour Defendants' use of the product – the supply to the civilian market – involved an unreasonable risk of physical injury to others.

189.    The Bushmaster Defendants' conduct as previously alleged constituted a public nuisance.

190.    Upon information and belief, the Bushmaster Defendants' conduct as previously alleged constituted a knowing violation of the Connecticut Unfair Trade Practices Act, Connecticut General Statutes Section 42-110a et seq.

191.    The Bushmaster Defendants' conduct as previously alleged was a substantial factor resulting in the injuries, suffering, and death of Victoria Soto, as further described in the following two paragraphs.

192.    On December 14, 2012, plaintiff's decedent, Victoria Soto, suffered the following injuries and losses:

    a.  Terror;
    b.  ante-mortem pain and suffering;
    c.  destruction of the ability to enjoy life's activities;
    d.  destruction of earning capacity; and

18

e.  death.

193.    As a result of the injuries and death of Victoria Soto, the Estate of Victoria Soto incurred funeral expenses to its financial loss.

COUNT TWO: § 52-555 Wrongful Death
(Estate of Victoria L. Soto v. Camfour Defendants)

1.-173.  Plaintiffs hereby incorporate and reallege as if fully set forth herein Paragraphs 1-173 of Count One.

174.    The Camfour Defendants knew, or should have known, of all of the foregoing information alleged at Paragraphs 1-10, 45-173 of Count One.  Based on this and similar information, the Camfour Defendants knew or should have known that the sale of assault rifles, including the XM15-E2S, in the civilian market posed an unreasonable and egregious risk of physical injury to others.

175.    The Camfour Defendants knew, or should have known, of the civilian population's poor track record of safely securing weapons.

176.    A mass casualty event, such as the shooting at Sandy Hook Elementary School, was within the scope of the risk created by the Camfour Defendants' sale of the XM15-E2S to the civilian market.

177.    The Camfour Defendants knew, or should have known, of the unreasonably high risk that the XM15-E2S would be used in a mass shooting to inflict maximum casualties before law enforcement was able to intervene.

178.    The Camfour Defendants knew or should have known that schools are particularly vulnerable to – and frequently targets of – mass shootings.

179.    The Camfour Defendants knew, or should have known, that the utility of the XM15-E2S for hunting, sporting or self-defense was negligible in comparison to the risk that the weapon would be used in its assaultive capacity.

180.    The Camfour Defendants knew, or should have known, that the XM15-E2S, when used in its assaultive capacity, would be likely to inflict multiple casualties and serious injury.

181.    The Camfour Defendants, as those who deal in firearms, are required to exercise the closest attention and the most careful precautions in the conduct of their business.

182.    The Camfour Defendants have for years sold AR-15s in a manner that foreseeably leads to the use of those weapons by unauthorized and unsafe users.

19

183.    The Camfour Defendants' conduct had a continuing inherent or natural tendency to create danger and inflict injury, was offensive to public policy, and posed a serious risk to public health.

184.    The Camfour Defendants' conduct interfered with the right of the public to be safe in their communities, and, more particularly, of children to be safe in their schools.

185.    The Camfour Defendants are a qualified product seller within the meaning of 18 U.S.C. § 7903(6).

186.    In this case, on information and belief, the Camfour Defendants supplied the XM15-E2S to the Riverview Defendants for resale to the civilian market.

187.    The Camfour defendants knew, or should have known, that the Riverview Defendants' use of the product – supplying it to the civilian population – involved an extreme and unreasonable risk of physical injury to others.

188.    The Camfour Defendants' conduct as previously alleged constituted a public nuisance.

189.    Upon information and belief, the Camfour Defendants' conduct as previously alleged constituted a knowing violation of the Connecticut Unfair Trade Practices Act, Connecticut General Statutes Section 42-110a et seq.

190.    The Camfour Defendants' conduct as previously alleged was a substantial factor resulting in the injuries, suffering, and death of Victoria Soto, as further described in the following two paragraphs.

191.    On December 14, 2012, plaintiff's decedent, Victoria Soto, suffered the following injuries and losses:

        a.  Terror;
        b.  ante-mortem pain and suffering;
        c.  destruction of the ability to enjoy life's activities;
        d.  destruction of earning capacity; and
        e.  death.

192.    As a result of the injuries and death of Victoria Soto, the Estate of Victoria Soto incurred funeral expenses to its financial loss.

COUNT THREE: § 52-555 Wrongful Death
(Estate of Victoria L. Soto v. Riverview Defendants)

1.-173.  Plaintiffs hereby incorporate and reallege as if fully set forth herein Paragraphs 1-173 of Count One.

174.    The Riverview Defendants knew, or should have known, of all of the foregoing information alleged at Paragraphs 1-10, 45-173 of Count One.  Based on this and similar information, the Riverview Defendants knew or should have known that the sale of assault rifles, including the XM15-E2S, in the civilian market posed an unreasonable and egregious risk of physical injury to others.

175.    The Riverview Defendants knew, or should have known, of the civilian population's poor track record of safely securing weapons.

176.    A mass casualty event, such as the shooting at Sandy Hook Elementary School, was within the scope of the risk created by the Riverview Defendants' sale of the XM15-E2S to Nancy Lanza.

177.    The Riverview Defendants knew, or should have known, of the unreasonably high risk that the XM15-E2S would be used in a mass shooting to inflict maximum casualties before law enforcement was able to intervene.

178.    The Riverview Defendants knew, or should have known, that schools are particularly vulnerable to – and frequently targets of – mass shootings.

179.    The Riverview Defendants knew, or should have known, that the utility of the XM15-E2S for hunting, sporting or self-defense was negligible in comparison to the risk that the weapon would be used in its assaultive capacity.

180.    The Riverview Defendants knew, or should have known, that the XM15-E2S, when used in its assaultive capacity, would be likely to inflict multiple casualties and serious injury.

181.    The Riverview Defendants, as those who deal in firearms, are required to exercise the closest attention and the most careful precautions in the conduct of their business.

182.    The Riverview Defendants for years sold AR-15s in a manner that foreseeably led to the use of those weapons by unauthorized and unsafe users.

183.    The Riverview Defendants' conduct had a continuing inherent or natural tendency to create danger and inflict injury, was offensive to public policy, and posed a serious risk to public health.

184.    The Riverview Defendants' conduct interfered with the right of the public to be safe in their communities, and, more particularly, of children to be safe in their schools.

185.    The Riverview Defendants are a qualified product seller within the meaning of 18 U.S.C. § 7903(6).

186.    The Riverview Defendants began the process of selling the XM15-E2S rifle to Nancy Lanza on March 15, 2010.

187.    The Riverview Defendants transferred the XM15-E2S rifle to Nancy Lanza on March 29, 2010.

188.    The Riverview defendants knew, or should have known, that Nancy Lanza's receipt and possession of the XM15-E2S involved an unreasonable risk of physical injury to others.

189.    The Riverview Defendants' sale of the XM15-E2S involved an unreasonable risk of physical injury to others.

190.    The Riverview Defendants' conduct as previously alleged constituted a public nuisance.

191.    Upon information and belief, the Riverview Defendants' conduct as previously alleged constituted a knowing violation of the Connecticut Unfair Trade Practices Act, Connecticut General Statutes Section 42-110a et seq.

192.    The Riverview Defendants' conduct as previously alleged was a substantial factor resulting in the injuries, suffering, and death of Victoria Soto, as further described in the following two paragraphs.

193.    On December 14, 2012, plaintiff's decedent, Victoria Soto, suffered the following injuries and losses:

        a.  Terror;
        b.  ante-mortem pain and suffering;
        c.  destruction of the ability to enjoy life's activities;
        d.  destruction of earning capacity; and
        e.  death.

194.    As a result of the injuries and death of Victoria Soto, the Estate of Victoria Soto incurred funeral expenses to its financial loss.

COUNT FOUR: § 52-555 Wrongful Death
(Estate of Dylan C. Hockley v. Bushmaster Defendants)

1.-173.  Plaintiffs hereby incorporate and re-allege as if fully set forth herein Paragraphs 1-173 of Count One.

174.-190.  Plaintiffs hereby incorporate and re-allege as if fully set forth herein Paragraphs 174-190 of Count One.

191.    The Bushmaster Defendants' conduct as previously alleged was a substantial factor resulting in the injuries, suffering, and death of Dylan Hockley, as further described in the following two paragraphs.

22

192.    On December 14, 2012, plaintiffs' decedent, Dylan Hockley, suffered the following injuries and losses:

       a.  Terror;
       b.  ante-mortem pain and suffering;
       c.  destruction of the ability to enjoy life's activities;
       d.  destruction of earning capacity; and
       e.  death.

193.    As a result of the injuries and death of Dylan Hockley, the Estate of Dylan C. Hockley incurred funeral expenses to its financial loss.

### COUNT FIVE: § 52-555 Wrongful Death
### (Estate of Dylan C. Hockley v. Camfour Defendants)

1.-173.  Plaintiffs hereby incorporate and re-allege as if fully set forth herein Paragraphs 1-173 of Count One.

174.-189.  Plaintiffs hereby incorporate and re-allege as if fully set forth herein Paragraphs 174-189 of Count Two.

190.    The Camfour Defendants' conduct as previously alleged was a substantial factor resulting in the injuries, suffering, and death of Dylan Hockley, as further described in the following two paragraphs.

191.    On December 14, 2012, plaintiffs' decedent, Dylan Hockley, suffered the following injuries and losses:

       a.  Terror;
       b.  ante-mortem pain and suffering;
       c.  destruction of the ability to enjoy life's activities;
       d.  destruction of earning capacity; and
       e.  death.

192.    As a result of the injuries and death of Dylan Hockley, the Estate of Dylan C. Hockley incurred funeral expenses to its financial loss.

### COUNT SIX: § 52-555 Wrongful Death
### (Estate of Dylan C. Hockley v. Riverview Defendants)

1.-173.  Plaintiffs hereby incorporate and re-allege as if fully set forth herein Paragraphs 1-173 of Count One.

174.-191.  Plaintiffs hereby incorporate and re-allege as if fully set forth herein Paragraphs 174-191 of Count Three.

192.    The Riverview Defendants' conduct as previously alleged was a substantial factor resulting in the injuries, suffering, and death of Dylan Hockley, as further described in the following two paragraphs.

193.    On December 14, 2012, plaintiffs' decedent, Dylan Hockley, suffered the following injuries and losses:

    a.  Terror;
    b.  ante-mortem pain and suffering;
    c.  destruction of the ability to enjoy life's activities;
    d.  destruction of earning capacity; and
    e.  death.

194.    As a result of the injuries and death of Dylan Hockley, the Estate of Dylan C. Hockley incurred funeral expenses to its financial loss.

## COUNT SEVEN:  §52-555 Wrongful Death
### (Estate of Mary Joy Sherlach v. Bushmaster Defendants)

1.-173.  Plaintiffs hereby incorporate and re-allege as if fully set forth herein Paragraphs 1-173 of Count One.

174.-190. Plaintiffs hereby incorporate and re-allege as if fully set forth herein Paragraphs 174-190 of Count One.

191.    The Bushmaster Defendants' conduct as previously alleged was a substantial factor resulting in the injuries, suffering, and death of Mary Joy Sherlach, as further described in the following two paragraphs.

192.    On December 14, 2012, plaintiff's decedent, Mary Joy Sherlach, suffered the following injuries and losses:

    a.  Terror;
    b.  ante-mortem pain and suffering;
    c.  destruction of the ability to enjoy life's activities;
    d.  destruction of earning capacity; and
    e.  death.

193.    As a result of the injuries and death of Mary Joy Sherlach, the Estate of Mary Joy Sherlach incurred funeral expenses to its financial loss.

COUNT EIGHT:  §52-555 Wrongful Death
(Estate of Mary Joy Sherlach v. Camfour Defendants)

1.-173.  Plaintiffs hereby incorporate and re-allege as if fully set forth herein Paragraphs 1-173 of Count One.

174.-189.  Plaintiffs hereby incorporate and re-allege as if fully set forth herein Paragraphs 174-189 of Count Two.

190.    The Camfour Defendants' conduct as previously alleged was a substantial factor resulting in the injuries, suffering, and death of Mary Joy Sherlach, as further described in the following two paragraphs.

191.    On December 14, 2012, plaintiff's decedent, Mary Joy Sherlach, suffered the following injuries and losses:

    a.  Terror;
    b.  ante-mortem pain and suffering;
    c.  destruction of the ability to enjoy life's activities;
    d.  destruction of earning capacity; and
    e.  death.

192.    As a result of the injuries and death of Mary Joy Sherlach, the Estate of Mary Joy Sherlach incurred funeral expenses to its financial loss.

COUNT NINE:  §52-555 Wrongful Death
(Estate of Mary Joy Sherlach v. Riverview Defendants)

1.-173.  Plaintiffs hereby incorporate and re-allege as if fully set forth herein Paragraphs 1-173 of Count One.

174.-191.  Plaintiffs hereby incorporate and re-allege as if fully set forth herein Paragraphs 174-191 of Count Three.

192.    The Riverview Defendants' conduct as previously alleged was a substantial factor resulting in the injuries, suffering, and death of Mary Joy Sherlach, as further described in the following two paragraphs.

193.    On December 14, 2012, plaintiff's decedent, Mary Joy Sherlach, suffered the following injuries and losses:

    a.  Terror;
    b.  ante-mortem pain and suffering;
    c.  destruction of the ability to enjoy life's activities;
    d.  destruction of earning capacity; and
    e.  death.

194.     As a result of the injuries and death of Mary Joy Sherlach, the Estate of Mary Joy Sherlach incurred funeral expenses to its financial loss.

## COUNT TEN:  Loss of Consortium
### (William D. Sherlach v. Bushmaster Defendants)

1.-173.  Plaintiffs hereby incorporate and re-allege as if fully set forth herein Paragraphs 1-173 of Count One.

174.-190.  Plaintiffs hereby incorporate and re-allege as if fully set forth herein Paragraphs 174-190 of Count One.

191.     The Bushmaster Defendants' conduct as previously alleged was a substantial factor resulting in the injuries, suffering, and death of Mary Joy Sherlach.

192.     At all times mentioned herein, the plaintiff William D. Sherlach was the husband of Mary Joy Sherlach.

193.     As a result of the aforesaid occurrences to Mary Joy Sherlach, the plaintiff William Sherlach has been deprived of the companionship and society of his wife, all to his damage.

## COUNT ELEVEN:  Loss of Consortium
### (William D. Sherlach v. Camfour Defendants)

1.-173.  Plaintiffs hereby incorporate and re-allege as if fully set forth herein Paragraphs 1-173 of Count One.

174.-189.  Plaintiffs hereby incorporate and re-allege as if fully set forth herein Paragraphs 174-189 of Count Two.

190.     The Camfour Defendants' conduct as previously alleged was a substantial factor resulting in the injuries, suffering, and death of Mary Joy Sherlach.

191.     At all times mentioned herein, the plaintiff William D. Sherlach was the husband of Mary Joy Sherlach.

192.     As a result of the aforesaid occurrences to Mary Joy Sherlach, the plaintiff William Sherlach has been deprived of the companionship and society of his wife, all to his damage.

COUNT TWELVE:  Loss of Consortium
(William D. Sherlach v. Riverview Defendants)

1.-173.  Plaintiff hereby incorporates and re-allege as if fully set forth herein Paragraphs 1-173 of Count One.

174.-191.  Plaintiff hereby incorporates and re-allege as if fully set forth herein Paragraphs 174-191 of Count Three.

192.    The Riverview Defendants' conduct as previously alleged was a substantial factor resulting in the injuries, suffering, and death of Mary Joy Sherlach.

193.    At all times mentioned herein, the plaintiff William D. Sherlach was the husband of Mary Joy Sherlach.

194.    As a result of the aforesaid occurrences to Mary Joy Sherlach, the plaintiff William Sherlach has been deprived of the companionship and society of his wife, all to his damage.

COUNT THIRTEEN: § 52-555 Wrongful Death
(Estate of Noah S. Pozner v. Bushmaster Defendants)

1.-173.  Plaintiffs hereby incorporate and re-allege as if fully set forth herein Paragraphs 1-173 of Count One.

174.-190. Plaintiffs hereby incorporate and re-allege as if fully set forth herein Paragraphs 174-190 of Count One.

191.    The Bushmaster Defendants' conduct as previously alleged was a substantial factor resulting in the injuries, suffering, and death of Noah Pozner, as further described in the following two paragraphs.

192.    On December 14, 2012, plaintiff's decedent, Noah Pozner, suffered the following injuries and losses:

    a.  Terror;
    b.  ante-mortem pain and suffering;
    c.  destruction of the ability to enjoy life's activities;
    d.  destruction of earning capacity; and
    e.  death.

193.    As a result of the injuries and death of Noah Pozner, the Estate of Noah S. Pozner incurred funeral expenses to its financial loss.

27

COUNT FOURTEEN: § 52-555 Wrongful Death
(Estate of Noah S. Pozner v. Camfour Defendants)

1.-173.  Plaintiffs hereby incorporate and re-allege as if fully set forth herein Paragraphs
1-173 of Count One.

174.-189.  Plaintiffs hereby incorporate and re-allege as if fully set forth herein
Paragraphs 174-189 of Count Two.

190.    The Camfour Defendants' conduct as previously alleged was a substantial factor
resulting in the injuries, suffering, and death of Noah Pozner, as further described in the
following two paragraphs.

191.    On December 14, 2012, plaintiff's decedent, Noah Pozner, suffered the following
injuries and losses:

        a.  Terror;
        b.  ante-mortem pain and suffering;
        c.  destruction of the ability to enjoy life's activities;
        d.  destruction of earning capacity; and
        e.  death.

192.    As a result of the injuries and death of Noah Pozner, the Estate of Noah S. Pozner
incurred funeral expenses to its financial loss.

COUNT FIFTEEN: § 52-555 Wrongful Death
(Estate of Noah S. Pozner v. Riverview Defendants)

1.-173.  Plaintiffs hereby incorporate and re-allege as if fully set forth herein Paragraphs
1-173 of Count One.

174.-191.  Plaintiffs hereby incorporate and re-allege as if fully set forth herein
Paragraphs 174-191 of Count Three.

192.    The Riverview Defendants' conduct as previously alleged was a substantial factor
resulting in the injuries, suffering, and death of Noah Pozner, as further described in the
following two paragraphs.

193.    On December 14, 2012, plaintiff's decedent, Noah Pozner, suffered the following
injuries and losses:

        a.  Terror;
        b.  ante-mortem pain and suffering;
        c.  destruction of the ability to enjoy life's activities;
        d.  destruction of earning capacity; and
        e.  death.

194.    As a result of the injuries and death of Noah Pozner, the Estate of Noah S. Pozner incurred funeral expenses to its financial loss.

## COUNT SIXTEEN: § 52-555 Wrongful Death
### (Estate of Lauren G. Rousseau v. Bushmaster Defendants)

1.-173.  Plaintiffs hereby incorporate and re-allege as if fully set forth herein Paragraphs 1-173 of Count One.

174.-190.  Plaintiffs hereby incorporate and re-allege as if fully set forth herein Paragraphs 174-190 of Count One.

191.    The Bushmaster Defendants' conduct as previously alleged was a substantial factor resulting in the injuries, suffering, and death of Lauren Rousseau, as further described in the following two paragraphs.

192.    On December 14, 2012, plaintiff's decedent, Lauren Rousseau, suffered the following injuries and losses:

    a.  Terror;
    b.  ante-mortem pain and suffering;
    c.  destruction of the ability to enjoy life's activities;
    d.  destruction of earning capacity; and
    e.  death.

193.    As a result of the injuries and death of Lauren Rousseau, the Estate of Lauren G. Rousseau incurred funeral expenses to its financial loss.

## COUNT SEVENTEEN: § 52-555 Wrongful Death
### (Estate of Lauren G. Rousseau v. Camfour Defendants)

1.-173.  Plaintiffs hereby incorporate and re-allege as if fully set forth herein Paragraphs 1-173 of Count One.

174.-189.  Plaintiffs hereby incorporate and re-allege as if fully set forth herein Paragraphs 174-189 of Count Two.

190.    The Camfour Defendants' conduct as previously alleged was a substantial factor resulting in the injuries, suffering, and death of Lauren Rousseau, as further described in the following two paragraphs.

191.    On December 14, 2012, plaintiff's decedent, Lauren Rousseau, suffered the following injuries and losses:

    a.  Terror;

29

    b. ante-mortem pain and suffering;
    c. destruction of the ability to enjoy life's activities;
    d. destruction of earning capacity; and
    e. death.

192.    As a result of the injuries and death of Lauren Rousseau, the Estate of Lauren G. Rousseau incurred funeral expenses to its financial loss.

### COUNT EIGHTEEN: § 52-555 Wrongful Death
### (Estate of Lauren G. Rousseau v. Riverview Defendants)

1.-173.  Plaintiffs hereby incorporate and re-allege as if fully set forth herein Paragraphs 1-173 of Count One.

174.-191.  Plaintiffs hereby incorporate and re-allege as if fully set forth herein Paragraphs 174-191 of Count Three.

192.    The Riverview Defendants' conduct as previously alleged was a substantial factor resulting in the injuries, suffering, and death of Lauren Rousseau, as further described in the following two paragraphs.

193.    On December 14, 2012, plaintiff's decedent, Lauren Rousseau, suffered the following injuries and losses:

    a. Terror;
    b. ante-mortem pain and suffering;
    c. destruction of the ability to enjoy life's activities;
    d. destruction of earning capacity; and
    e. death.

194.    As a result of the injuries and death of Lauren Rousseau, the Estate of Lauren G. Rousseau incurred funeral expenses to its financial loss.

### COUNT NINETEEN: § 52-555 Wrongful Death
### (Estate of Benjamin A. Wheeler v. Bushmaster Defendants)

1.-173.  Plaintiffs hereby incorporate and re-allege as if fully set forth herein Paragraphs 1-173 of Count One.

174.-190.  Plaintiffs hereby incorporate and re-allege as if fully set forth herein Paragraphs 174-190 of Count One.

191.    The Bushmaster Defendants' conduct as previously alleged was a substantial factor resulting in the injuries, suffering, and death of Benjamin Wheeler, as further described in the following two paragraphs.

192.    On December 14, 2012, plaintiff's decedent, Benjamin Wheeler, suffered the following injuries and losses:

    a.  Terror;
    b.  ante-mortem pain and suffering;
    c.  destruction of the ability to enjoy life's activities;
    d.  destruction of earning capacity; and
    e.  death.

193.    As a result of the injuries and death of Benjamin Wheeler, the Estate of Benjamin A. Wheeler incurred funeral expenses to its financial loss.

COUNT TWENTY: § 52-555 Wrongful Death
(Estate of Benjamin A. Wheeler v. Camfour Defendants)

1.-173.  Plaintiffs hereby incorporate and re-allege as if fully set forth herein Paragraphs 1-173 of Count One.

174.-189.  Plaintiffs hereby incorporate and re-allege as if fully set forth herein Paragraphs 174-189 of Count Two.

190.    The Camfour Defendants' conduct as previously alleged was a substantial factor resulting in the injuries, suffering, and death of Benjamin Wheeler, as further described in the following two paragraphs.

191.    On December 14, 2012, plaintiff's decedent, Benjamin Wheeler, suffered the following injuries and losses:

    a.  Terror;
    b.  ante-mortem pain and suffering;
    c.  destruction of the ability to enjoy life's activities;
    d.  destruction of earning capacity; and
    e.  death.

192.    As a result of the injuries and death of Benjamin Wheeler, the Estate of Benjamin A. Wheeler incurred funeral expenses to its financial loss.

COUNT TWENTY-ONE: § 52-555 Wrongful Death
(Estate of Benjamin A. Wheeler v. Riverview Defendants)

1.-173.  Plaintiffs hereby incorporate and re-allege as if fully set forth herein Paragraphs 1-173 of Count One.

174.-191.  Plaintiffs hereby incorporate and re-allege as if fully set forth herein Paragraphs 174-191 of Count Three.

31

192.   The Riverview Defendants' conduct as previously alleged was a substantial factor resulting in the injuries, suffering, and death of Benjamin Wheeler, as further described in the following two paragraphs.

193.   On December 14, 2012, plaintiff's decedent, Benjamin Wheeler, suffered the following injuries and losses:

     a.  Terror;
     b.  ante-mortem pain and suffering;
     c.  destruction of the ability to enjoy life's activities;
     d.  destruction of earning capacity; and
     e.  death.

194.   As a result of the injuries and death of Benjamin Wheeler, the Estate of Benjamin A. Wheeler incurred funeral expenses to its financial loss.

## COUNT TWENTY-TWO: § 52-555 Wrongful Death
### (Estate of Jesse McCord Lewis v. Bushmaster Defendants)

1.-173.   Plaintiffs hereby incorporate and re-allege as if fully set forth herein Paragraphs 1-173 of Count One.

174.-190. Plaintiffs hereby incorporate and re-allege as if fully set forth herein Paragraphs 174-190 of Count One.

191.   The Bushmaster Defendants' conduct as previously alleged was a substantial factor resulting in the injuries, suffering, and death of Jesse McCord Lewis, as further described in the following two paragraphs.

192.   On December 14, 2012, plaintiffs' decedent, Jesse McCord Lewis, suffered the following injuries and losses:

     a.  Terror;
     b.  ante-mortem pain and suffering;
     c.  destruction of the ability to enjoy life's activities;
     d.  destruction of earning capacity; and
     c.  death.

193.   As a result of the injuries and death of Jesse McCord Lewis, the Estate of Benjamin A. Wheeler incurred funeral expenses to its financial loss.

## COUNT TWENTY-THREE: § 52-555 Wrongful Death
### (Estate of Jesse McCord Lewis v. Camfour Defendants)

1.-173.   Plaintiffs hereby incorporate and re-allege as if fully set forth herein Paragraphs 1-173 of Count One.

174.-189.   Plaintiffs hereby incorporate and re-allege as if fully set forth herein Paragraphs 174-189 of Count Two.

190.   The Camfour Defendants' conduct as previously alleged was a substantial factor resulting in the injuries, suffering, and death of Jesse McCord Lewis, as further described in the following two paragraphs.

191.   On December 14, 2012, plaintiffs' decedent, Jesse McCord Lewis, suffered the following injuries and losses:

    a.   Terror;
    b.   ante-mortem pain and suffering;
    c.   destruction of the ability to enjoy life's activities;
    d.   destruction of earning capacity; and
    e.   death.

192.   As a result of the injuries and death of Jesse McCord Lewis, the Estate of Jesse McCord Lewis incurred funeral expenses to its financial loss.

COUNT TWENTY-FOUR: § 52-555 Wrongful Death
(Estate of Jesse McCord Lewis v. Riverview Defendants)

1.-173.   Plaintiffs hereby incorporate and re-allege as if fully set forth herein Paragraphs 1-173 of Count One.

174.-191.   Plaintiffs hereby incorporate and re-allege as if fully set forth herein Paragraphs 174-191 of Count Three.

192.   The Riverview Defendants' conduct as previously alleged was a substantial factor resulting in the injuries, suffering, and death of Jesse McCord Lewis, as further described in the following two paragraphs.

193.   On December 14, 2012, plaintiffs' decedent, Jesse McCord Lewis, suffered the following injuries and losses:

    a.   Terror;
    b.   ante-mortem pain and suffering;
    c.   destruction of the ability to enjoy life's activities;
    d.   destruction of earning capacity; and
    e.   death.

194.   As a result of the injuries and death of Jesse McCord Lewis, the Estate of Jesse McCord Lewis incurred funeral expenses to its financial loss.

COUNT TWENTY-FIVE: § 52-555 Wrongful Death
(Estate of Daniel G. Barden v. Bushmaster Defendants)

1.-173.  Plaintiffs hereby incorporate and re-allege as if fully set forth herein Paragraphs 1-173 of Count One.

174.-190.  Plaintiffs hereby incorporate and re-allege as if fully set forth herein Paragraphs 174-190 of Count One.

191.    The Bushmaster Defendants' conduct as previously alleged was a substantial factor resulting in the injuries, suffering, and death of Daniel Barden, as further described in the following two paragraphs.

192.    On December 14, 2012, plaintiffs' decedent, Daniel Barden, suffered the following injuries and losses:

      a.   Terror;
      b.   ante-mortem pain and suffering;
      c.   destruction of the ability to enjoy life's activities;
      d.   destruction of earning capacity; and
      e.   death.

193.    As a result of the injuries and death of Daniel Barden, the Estate of Daniel G. Barden incurred funeral expenses to its financial loss.

COUNT TWENTY-SIX: § 52-555 Wrongful Death
(Estate of Daniel G. Barden v. Camfour Defendants)

1.-173.  Plaintiffs hereby incorporate and re-allege as if fully set forth herein Paragraphs 1-173 of Count One.

174.-189.  Plaintiffs hereby incorporate and re-allege as if fully set forth herein Paragraphs 174-189 of Count Two.

190.    The Camfour Defendants' conduct as previously alleged was a substantial factor resulting in the injuries, suffering, and death of Daniel Barden, as further described in the following two paragraphs.

191.    On December 14, 2012, plaintiffs' decedent, Daniel Barden, suffered the following injuries and losses:

      a.   Terror;
      b.   ante-mortem pain and suffering;
      c.   destruction of the ability to enjoy life's activities;
      d.   destruction of earning capacity; and
      e.   death.

192.    As a result of the injuries and death of Daniel Barden, the Estate of Daniel G. Barden incurred funeral expenses to its financial loss.

COUNT TWENTY-SEVEN: § 52-555 Wrongful Death
(Estate of Daniel G. Barden v. Riverview Defendants)

1.-173.  Plaintiffs hereby incorporate and re-allege as if fully set forth herein Paragraphs 1-173 of Count One.

174.-191.  Plaintiffs hereby incorporate and re-allege as if fully set forth herein Paragraphs 174-191 of Count Three.

192.    The Riverview Defendants' conduct as previously alleged was a substantial factor resulting in the injuries, suffering, and death of Daniel Barden, as further described in the following two paragraphs.

193.    On December 14, 2012, plaintiffs' decedent, Daniel Barden, suffered the following injuries and losses:

     a.  Terror;
     b.  ante-mortem pain and suffering;
     c.  destruction of the ability to enjoy life's activities;
     d.  destruction of earning capacity; and
     e.  death.

194.    As a result of the injuries and death of Daniel Barden, the Estate of Daniel G. Barden incurred funeral expenses to its financial loss.

COUNT TWENTY-EIGHT: § 52-555 Wrongful Death
(Estate of Rachel M. D'Avino v. Bushmaster Defendants)

1.-173.  Plaintiffs hereby incorporate and re-allege as if fully set forth herein Paragraphs 1-173 of Count One.

174.-190.  Plaintiffs hereby incorporate and re-allege as if fully set forth herein Paragraphs 174-190 of Count One.

191.    The Bushmaster Defendants' conduct as previously alleged was a substantial factor resulting in the injuries, suffering, and death of Rachel D'Avino, as further described in the following two paragraphs.

192.    On December 14, 2012, plaintiff's decedent, Rachel D'Avino, suffered the following injuries and losses:

     a.  Terror;

35

    b.  ante-mortem pain and suffering;
    c.  destruction of the ability to enjoy life's activities;
    d.  destruction of earning capacity; and
    e.  death.

193.    As a result of the injuries and death of Rachel D'Avino, the Estate of Rachel M. D'Avino incurred funeral expenses to its financial loss.

COUNT TWENTY-NINE: § 52-555 Wrongful Death
(Estate of Rachel M. D'Avino v. Camfour Defendants)

1.-173.  Plaintiffs hereby incorporate and re-allege as if fully set forth herein Paragraphs 1-173 of Count One.

174.-189.  Plaintiffs hereby incorporate and re-allege as if fully set forth herein Paragraphs 174-189 of Count Two.

190.    The Camfour Defendants' conduct as previously alleged was a substantial factor resulting in the injuries, suffering, and death of Rachel D'Avino, as further described in the following two paragraphs.

191.    On December 14, 2012, plaintiff's decedent, Rachel D'Avino, suffered the following injuries and losses:

    a.  Terror;
    b.  ante-mortem pain and suffering;
    c.  destruction of the ability to enjoy life's activities;
    d.  destruction of earning capacity; and
    e.  death.

192.    As a result of the injuries and death of Rachel D'Avino, the Estate of Rachel M. D'Avino incurred funeral expenses to its financial loss.

COUNT THIRTY: § 52-555 Wrongful Death
(Estate of Rachel M. D'Avino v. Riverview Defendants)

1.-173.  Plaintiffs hereby incorporate and re-allege as if fully set forth herein Paragraphs 1-173 of Count One.

174.-191.  Plaintiffs hereby incorporate and re-allege as if fully set forth herein Paragraphs 174-191 of Count Three.

192.    The Riverview Defendants' conduct as previously alleged was a substantial factor resulting in the injuries, suffering, and death of Rachel D'Avino, as further described in the following two paragraphs.

193.    On December 14, 2012, plaintiff's decedent, Rachel D'Avino, suffered the following injuries and losses:

    a.  Terror;
    b.  ante-mortem pain and suffering;
    c.  destruction of the ability to enjoy life's activities;
    d.  destruction of earning capacity; and
    e.  death.

194.    As a result of the injuries and death of Rachel D'Avino, the Estate of Rachel M. D'Avino incurred funeral expenses to its financial loss.

## COUNT THIRTY-ONE: § 52-555 Wrongful Death
### (Natalie Hammond v. Bushmaster Defendants)

1.-173.  Plaintiffs hereby incorporate and re-allege as if fully set forth herein Paragraphs 1-173 of Count One.

174.-190.  Plaintiffs hereby incorporate and re-allege as if fully set forth herein Paragraphs 174-190 of Count One.

191.    The Bushmaster Defendants' conduct as previously alleged was a substantial factor resulting in the injuries and suffering of Natalie Hammond, as further described in the following two paragraphs.

192.    On December 14, 2012, plaintiff, Natalie Hammond, suffered the following injuries and losses:

    a.  Terror;
    b.  pain and suffering;
    c.  severe, permanent and painful injuries to her left calf, left foot, left thigh and left hand;
    d.  destruction of the ability to enjoy life's activities; and
    e.  destruction of earning capacity.

193.    As a result of such injuries, Ms. Hammond incurred medical expenses to her financial loss.

## COUNT THIRTY-TWO: § 52-555 Wrongful Death
### (Natalie Hammond v. Camfour Defendants)

1.-173.  Plaintiffs hereby incorporate and re-allege as if fully set forth herein Paragraphs 1-173 of Count One.

174.-189.  Plaintiffs hereby incorporate and re-allege as if fully set forth herein Paragraphs 174-189 of Count Two.

190.   The Camfour Defendants' conduct as previously alleged was a substantial factor resulting in the injuries and suffering of Natalie Hammond, as further described in the following two paragraphs.

191.   On December 14, 2012, plaintiff, Natalie Hammond, suffered the following injuries and losses:

      a.  Terror;
      b.  pain and suffering;
      c.  severe, permanent and painful injuries to her left calf, left foot, left thigh and left hand;
      d.  destruction of the ability to enjoy life's activities; and
      e.  destruction of earning capacity.

192.   As a result of such injuries, Ms. Hammond incurred medical expenses to her financial loss.

COUNT THIRTY-THREE: § 52-555 Wrongful Death<br>(Natalie Hammond v. Riverview Defendants)

1.-173.   Plaintiffs hereby incorporate and re-allege as if fully set forth herein Paragraphs 1-173 of Count One.

174.-191.   Plaintiffs hereby incorporate and re-allege as if fully set forth herein Paragraphs 174-191 of Count Three.

192.   The Riverview Defendants' conduct as previously alleged was a substantial factor resulting in the injuries and suffering of Natalie Hammond, as further described in the following two paragraphs.

193.   On December 14, 2012, plaintiff, Natalie Hammond, suffered the following injuries and losses:

      a.  Terror;
      b.  pain and suffering;
      c.  severe, permanent and painful injuries to her left calf, left foot, left thigh and left hand;
      d.  destruction of the ability to enjoy life's activities; and
      e.  destruction of earning capacity.

194.   As a result of such injuries, Ms. Hammond incurred medical expenses to her financial loss.

WHEREFORE, THE PLAINTIFFS CLAIM DAMAGES IN EXCESS OF FIFTEEN
THOUSAND DOLLARS AND THE FOLLOWING RELIEF AS FURTHER SET FORTH
BELOW:

Plaintiffs seek relief as follows:

A.  Monetary damages;

B.  Punitive damages;

C.  Attorneys' fees;

D.  Costs;

E.  Injunctive relief.

This matter is within the jurisdiction of this court.

Of this writ, with your doings thereon, make due service and return.

Dated at Bridgeport, Connecticut this ___1 3 TY___ of December, 2014.

THE PLAINTIFFS

By _____

Joshua D. Koskoff
Alinor C. Sterling
Katie Mesner-Hage
Koskoff, Koskoff & Bieder, P.C.
350 Fairfield Avenue
Bridgeport, CT 06604
Juris No. 032250
Tel: 203-336-4421
Fax: 203-368-3244

PLEASE ENTER THE APPEARANCE OF:

Koskoff, Koskoff & Bieder, P.C.
350 Fairfield Avenue
Bridgeport, CT 06604

for the Plaintiffs

A TRUE COPY
ATTEST:

CHARLES J. FISHER, JR.
STATE MARSHAL HARTFORD COUNTY
AN INDIFFERENT PERSON

40

FIDUCIARY'S PROBATE
CERTIFICATE
PC-450  REV. 8/02

STATE OF CONNECTICUT

COURT OF PROBATE

| COURT OF PROBATE, Stratford Probate District | DISTRICT NO. PD47 | |
|---|---|---|
| ESTATE OF/IN THE MATTER OF<br><br>Victoria Leigh Soto   (13-00070) | | DATE OF CERTIFICATE<br><br>*February 7, 2013*<br>*Valid for:*<br>1 year from this date |
| FIDUCIARY'S NAME AND ADDRESS<br>Donna Louise Soto, 158 Knowlton Street, Stratford, CT 06615 | FIDUCIARY'S POSITION OF TRUST<br><br>Administratrix | DATE OF APPOINTMENT<br><br>February 7, 2013 |

*The undersigned hereby certifies that the fiduciary of the above-named estate has accepted appointment, has executed bond according to law or has been excused from executing bond by will or by statute, and is legally authorized and qualified to act as such fiduciary on said estate because said appointment is unrevoked and in full force as of the above date of certificate.*

*Limitation, if any, on the above certificate:*

IN TESTIMONY WHEREOF, I have hereunto set my hand and affixed the seal of this Court on the above date of certificate.

Court
Seal

*Lorraine Maglione*
................................................................
Lorraine Maglione, Assistant Clerk

**NOT VALID WITHOUT COURT OF PROBATE SEAL IMPRESSED**

EXHIBIT A

FIDUCIARY'S PROBATE CERTIFICATE
PC-450

| FIDUCIARY'S PROBATE CERTIFICATE PC-450 REV. 7/13 | STATE OF CONNECTICUT |
|---|---|
| | COURT OF PROBATE |

| COURT OF PROBATE, Northern Fairfield County | DISTRICT NO. PD45 | |
|---|---|---|
| ESTATE OF/IN THE MATTER OF<br><br>Dylan Christopher Jack Hockley,   (14-0564) | | DATE OF CERTIFICATE<br><br>December 3, 2014 |

| FIDUCIARY'S NAME AND ADDRESS | FIDUCIARY'S POSITION OF TRUST | DATE OF APPOINTMENT |
|---|---|---|
| Ian Hockley, 61 Charter Ridge Drive, Sandy Hook, CT 06482 | Co-Administrator | December 3, 2014 |
| Nicole Hockley, 61 Charter Ridge Drive, Sandy Hook, CT 06482 | Co-Administrator | December 3, 2014 |

*The undersigned hereby certifies that the fiduciary in the above-named matter has accepted appointment, is legally authorized and qualified to act as such fiduciary because the appointment is unrevoked and in full force as of the above date of certificate.*

This certificate is valid for one year from the date of the certificate.

*Other limitation, if any, on the above certificate:*

IN TESTIMONY WHEREOF, I have hereunto set my hand and affixed the seal of this Court on the above date of certificate.

Anna M. Lucchesi, Clerk

**Court
Seal**

**NOT VALID WITHOUT COURT OF PROBATE SEAL IMPRESSED**

**EXHIBIT B**

FIDUCIARY'S PROBATE CERTIFICATE                                                                 PC-450

| FIDUCIARY'S PROBATE CERTIFICATE PC-450  REV. 7/13 | STATE OF CONNECTICUT COURT OF PROBATE | |
|---|---|---|

| COURT OF PROBATE, Northern Fairfield County | DISTRICT NO. PD45 | |
|---|---|---|
| ESTATE OF/IN THE MATTER OF<br><br>Benjamin Andrew Wheeler,   (14-0567) | | DATE OF CERTIFICATE<br><br>December 10, 2014 |

| FIDUCIARY'S NAME AND ADDRESS<br><br>David Cole Wheeler, 10 Lakeview Terrace, Sandy Hook, CT 06482 | FIDUCIARY'S POSITION OF TRUST<br><br>Administrator | DATE OF APPOINTMENT<br><br>December 4, 2014 |
|---|---|---|

*The undersigned hereby certifies that the fiduciary in the above-named matter has accepted appointment, is legally authorized and qualified to act as such fiduciary because the appointment is unrevoked and in full force as of the above date of certificate.*

**This certificate is valid for one year from the date of the certificate.**

*Other limitation, if any, on the above certificate:*

IN TESTIMONY WHEREOF, I have hereunto set my hand and affixed the seal of this Court on the above date of certificate.

Court
Seal

Jacqueline Buckle, Chief Clerk

## NOT VALID WITHOUT COURT OF PROBATE SEAL IMPRESSED

EXHIBIT C

FIDUCIARY'S PROBATE CERTIFICATE                                                                PC-450

FIDUCIARY'S PROBATE
CERTIFICATE
PC-450  REV. 7/13

STATE OF CONNECTICUT

COURT OF PROBATE

| COURT OF PROBATE,  Region # 22 Probate District | DISTRICT NO. PD22 | |
|---|---|---|
| ESTATE OF/IN THE MATTER OF | | DATE OF CERTIFICATE |
| RACHEL MARIE D'AVINO, , AKA RACHEL M. D'AVINO  (13-0036) | | December 10, 2014 |
| FIDUCIARY'S NAME AND ADDRESS | FIDUCIARY'S POSITION OF TRUST | DATE OF APPOINTMENT |
| Mary A. D'Avino, 48 Deerwood Drive, Bethlehem, CT 06751 | Administratrix | January 22, 2013 |

*The undersigned hereby certifies that the fiduciary in the above-named matter has accepted appointment, is legally authorized and qualified to act as such fiduciary because the appointment is unrevoked and in full force as of the above date of certificate.*

This certificate is valid for one year from the date of the certificate.

*Other limitation, if any, on the above certificate:*

IN TESTIMONY WHEREOF, I have hereunto set my hand and affixed the seal of this Court on the above date of certificate.

Pamela L. Osborne, Assistant Clerk

**NOT VALID WITHOUT COURT OF PROBATE SEAL IMPRESSED**

EXHIBIT D

FIDUCIARY'S PROBATE CERTIFICATE

PC-450

| FIDUCIARY'S PROBATE CERTIFICATE PC-450  REV. 7/13 | STATE OF CONNECTICUT |
|---|---|
| | COURT OF PROBATE |

| COURT OF PROBATE, Northern Fairfield County | DISTRICT NO. PD45 | |
|---|---|---|
| ESTATE OF/IN THE MATTER OF<br><br>Daniel Gerard Barden,   (14-0577) | | DATE OF CERTIFICATE<br><br>December 10, 2014 |

| FIDUCIARY'S NAME AND ADDRESS | FIDUCIARY'S POSITION OF TRUST | DATE OF APPOINTMENT |
|---|---|---|
| Mark Barden, 35 Paugussett Road, Sandy Hook, CT 06482 | Co-Administrator | December 8, 2014 |
| Jacqueline Barden, 35 Paugussett Road, Sandy Hook, CT 06482 | Co-Administrator | December 8, 2014 |

*The undersigned hereby certifies that the fiduciary in the above-named matter has accepted appointment, is legally authorized and qualified to act as such fiduciary because the appointment is unrevoked and in full force as of the above date of certificate.*

This certificate is valid for one year from the date of the certificate.

*Other limitation, if any, on the above certificate:*

IN TESTIMONY WHEREOF, I have hereunto set my hand and affixed the seal of this Court on the above date of certificate.

Jacqueline Buckle, Chief Clerk

Court
Seal

## NOT VALID WITHOUT COURT OF PROBATE SEAL IMPRESSED

EXHIBIT E

FIDUCIARY'S PROBATE CERTIFICATE

PC-450

12/09/2014 22:11 FAX                                                                    ☑001/001

FIDUCIARY'S PROBATE                          STATE OF CONNECTICUT
CERTIFICATE
PC-450  REV. 7/13                               COURT OF PROBATE

| COURT OF PROBATE,  Trumbull Probate District | | |
|---|---|---|
| ESTATE OF/IN THE MATTER OF | DISTRICT NO. PD46 | DATE OF CERTIFICATE |
| Mary Joy Sherlach, late of Trumbull, AKA MARY J. SHERLACH  (13-00062) | | December 10, 2014 |
| FIDUCIARY'S NAME AND ADDRESS | FIDUCIARY'S POSITION OF TRUST | DATE OF APPOINTMENT |
| William D. Sherlach, 33 Vintage Road, Trumbull, CT 06611 | Executor | March 7, 2013 |

*The undersigned hereby certifies that the fiduciary in the above-named matter has accepted appointment, is legally authorized and qualified to act as such fiduciary because the appointment is unrevoked and in full force as of the above date of certificate.*

This certificate is valid for one year from the date of the certificate.

*Other limitation, if any, on the above certificate: ·*

IN TESTIMONY WHEREOF, I have hereunto set my hand and affixed the seal of this Court on the above date of certificate.

                                        *Susan m Pulos*
                                    Susan M, Pulos, Assistant Clerk

          Court
          Seal

              NOT VALID WITHOUT COURT OF PROBATE SEAL IMPRESSED

                                                              EXHIBIT F

FIDUCIARY'S PROBATE CERTIFICATE

                                                              PC-450

FIDUCIARY'S PROBATE CERTIFICATE
PC-450  REV. 7/13

STATE OF CONNECTICUT

COURT OF PROBATE

| COURT OF PROBATE,  Northern Fairfield County | DISTRICT NO. PD45 | |
|---|---|---|
| ESTATE OF/IN THE MATTER OF<br><br>Jessie McCord Lewis, , AKA Jessie M. Lewis  (13-0048) | | DATE OF CERTIFICATE<br><br>December 10, 2014 |

| FIDUCIARY'S NAME AND ADDRESS | FIDUCIARY'S POSITION OF TRUST | DATE OF APPOINTMENT |
|---|---|---|
| Scarlett Lewis, 6 Great Ring Road, Sandy Hook, CT 06482 | Co-Administrator, d.b.n. | December 9, 2014 |
| Neil Heslin, 90 Polar Drive, Shelton, CT 06484 | Co-Administrator, d.b.n | December 9, 2014 |

*The undersigned hereby certifies that the fiduciary in the above-named matter has accepted appointment, is legally authorized and qualified to act as such fiduciary because the appointment is unrevoked and in full force as of the above date of certificate.*

**This certificate is valid for one year from the date of the certificate.**

*Other limitation, if any, on the above certificate:*

IN TESTIMONY WHEREOF, I have hereunto set my hand and affixed the seal of this Court on the above date of certificate.

Court
Seal

Jacqueline Buckle, Chief Clerk

## NOT VALID WITHOUT COURT OF PROBATE SEAL IMPRESSED

EXHIBIT G

FIDUCIARY'S PROBATE CERTIFICATE

PC-450

| FIDUCIARY'S PROBATE CERTIFICATE PC-450 REV. 7/13 | STATE OF CONNECTICUT |
|---|---|
| | COURT OF PROBATE |

| COURT OF PROBATE, Northern Fairfield County | DISTRICT NO. PD45 | |
|---|---|---|
| ESTATE OF/IN THE MATTER OF<br><br>Noah Samuel Pozner,   (14-0589) | | DATE OF CERTIFICATE<br><br>December 10, 2014 |

| FIDUCIARY'S NAME AND ADDRESS<br>Leonard Pozner, 261 South Main Street, #332, Newtown, CT 06470 | FIDUCIARY'S POSITION OF TRUST<br><br>Administrator | DATE OF APPOINTMENT<br><br>December 10, 2014 |
|---|---|---|

*The undersigned hereby certifies that the fiduciary in the above-named matter has accepted appointment, is legally authorized and qualified to act as such fiduciary because the appointment is unrevoked and in full force as of the above date of certificate.*

This certificate is valid for one year from the date of the certificate.

*Other limitation, if any, on the above certificate:*

IN TESTIMONY WHEREOF, I have hereunto set my hand and affixed the seal of this Court on the above date of certificate.

Court
Seal

Anna M. Lucchesi, Clerk

## NOT VALID WITHOUT COURT OF PROBATE SEAL IMPRESSED

EXHIBIT H

FIDUCIARY'S PROBATE CERTIFICATE

PC-450

| FIDUCIARY'S PROBATE CERTIFICATE PC-450 REV. 7/13 | STATE OF CONNECTICUT COURT OF PROBATE | |
|---|---|---|

| COURT OF PROBATE, Danbury Probate District | DISTRICT NO. PD43 | |
|---|---|---|
| ESTATE OF/IN THE MATTER OF<br><br>Lauren G. Rousseau,   (13-0007) | | DATE OF CERTIFICATE<br><br>December 11, 2014 |
| FIDUCIARY'S NAME AND ADDRESS<br>Gilles J. Rousseau, 67 Horse Fence Hill Road, Southbury, CT 06488 | FIDUCIARY'S POSITION OF TRUST<br>Administrator | DATE OF APPOINTMENT<br>January 3, 2013 |

*The undersigned hereby certifies that the fiduciary in the above-named matter has accepted appointment, is legally authorized and qualified to act as such fiduciary because the appointment is unrevoked and in full force as of the above date of certificate.*

This certificate is valid for one year from the date of the certificate.

*Other limitation, if any, on the above certificate:*

IN TESTIMONY WHEREOF, I have hereunto set my hand and affixed the seal of this Court on the above date of certificate.

............................................................
Jessica E. Regan, Assistant Clerk

Court
Seal

**NOT VALID WITHOUT COURT OF PROBATE SEAL IMPRESSED**

EXHIBIT I

FIDUCIARY'S PROBATE CERTIFICATE

PC-450