UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF CONNECTICUT

| | |
|---|---|
| DONNA L. SOTO, ) | |
| ADMINISTRATRIX OF THE ) | |
| ESTATE OF VICTORIA L. SOTO, ) | |
| ET AL ) | |
| ) | |
| Plaintiffs ) | NO. 3:15 cv 00068 RNC |
| ) | |
| V. ) | |
| ) | |
| BUSHMASTER FIREARMS ) | |
| INTERNATIONAL, ) | |
| LLC, A/K/A FREEDOM GROUP, INC., ) | |
| A/K/A ) | MAY 13, 2015 |
| REMINGTON OUTDOOR GROUP, ) | |
| INC., ET AL ) | |
| ) | |
| Defendants ) | |

EXHIBIT B
TO MEMORANDUM OF LAW IN SUPPORT OF
<u>SUPPLEMENTAL MOTION TO REMAND</u>

Respectfully submitted,

By      /s/ Joshua D. Koskoff, ct15619
JOSHUA D. KOSKOFF, ct15619,
ALINOR C. STERLING, ct17207
KOSKOFF KOSKOFF & BIEDER
350 FAIRFIELD AVENUE
BRIDGEPORT, CT 06604
jkoskoff@koskoff.com
asterling@koskoff.com
Telephone:    (203) 336-4421
Fax:              (203) 368-3244

**ATTORNEYS FOR PLAINTIFFS**

## **CERTIFICATE OF SERVICE**

I hereby certify that on May 13, 2015, a copy of the foregoing Motion was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent by e-mail to all parties by operation of the court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing under the court's CM/ECF System.

                                                      /s/ Joshua D. Koskoff, ct15619
                                                     **JOSHUA D. KOSKOFF, ct15619,**
                                                       **ALINOR C. STERLING, ct17207**

**Exhibit B**

Case 3:15-cv-00068-RNC   Document 46-3   Filed 05/13/15   Page 4 of 12





# Congressional Record

United States of America

PROCEEDINGS AND DEBATES OF THE *109th* CONGRESS, FIRST SESSION

*Vol. 151*  WASHINGTON, WEDNESDAY, JULY 27, 2005  *No. 104*

# Senate

The Senate met at 9:30 a.m. and was called to order by the President pro tempore [Mr. STEVENS].

### PRAYER

The Chaplain, Dr. Barry C. Black, offered the following prayer:

Let us pray.

Eternal God, You have challenged us to become like children in order to enter Your kingdom. Today give us a child's trust, that we may find joy in Your guidance. Give us a child's wonder, that we may never take for granted the Earth's beauty and the sky's glory. Give us a child's love, that we may find our greatest joy in being close to You. Give us a child's humility, that we will trust Your wisdom to order our steps.

Guide our Senators and those who support them through the challenges of this day. As they look to You for wisdom, supply their needs according to Your infinite riches.

We pray in Your righteous Name. Amen.

### PLEDGE OF ALLEGIANCE

The PRESIDENT pro tempore led the Pledge of Allegiance, as follows:

I pledge allegiance to the Flag of the United States of America, and to the Republic for which it stands, one Nation under God, indivisible, with liberty and justice for all.

### RESERVATION OF LEADER TIME

The PRESIDENT pro tempore. Under the previous order, the leadership time is reserved.

### PROTECTION OF LAWFUL COMMERCE IN ARMS ACT—MOTION TO PROCEED

The PRESIDENT pro tempore. Under the previous order, the Senate will resume consideration of the motion to proceed to S. 397, which the clerk will report.

The legislative clerk read as follows:
A bill (S. 397) to prohibit civil liability actions from being brought or continued against manufacturers, distributors, dealers, or importers of firearms or ammunition for damages, injunctive or other relief resulting from the misuse of their products by others.

The PRESIDENT pro tempore. Under the previous order, the time from 10 to 2 p.m. shall be equally divided, with the majority in control of the first hour and the Democrats in control of the second hour, rotating in that fashion until 2 p.m.

### RECOGNITION OF THE MAJORITY LEADER

The PRESIDENT pro tempore. The majority leader is recognized.

### SCHEDULE

Mr. FRIST. Mr. President, this morning we are returning to the motion to proceed to the Protection of Lawful Commerce in Arms Act, otherwise known as the gun manufacturers liability legislation. Yesterday we invoked cloture on the motion to proceed. We now have an order to begin the bill at 2 p.m. today. The debate will be equally divided until 2 o'clock today. I understand a rollcall vote will not be necessary, and we will have a voice vote at 2 p.m. and then be on the bill.

Senators can expect a cloture vote on the underlying bill to occur on Friday, unless we change that time by consent. As I stated repeatedly over the last several days, we are going to have a very busy session as we address a range of issues, including energy and highways and the Interior funding bill, the gun manufacturers liability bill, veterans funding, nominations, and other issues.

Just a quick update on several of these. In terms of the Energy bill, after 5 years of hard work, the energy conferees are now done. I expect that that legislation will be filed shortly. This is a major accomplishment that will cause serious and dramatic changes in how we produce, deliver, and consume energy. We simply would not be at this point without the hard work, the perseverance, and the patience of Senator DOMENICI and his partner, Senator BINGAMAN, as well as Congressman BARTON. We will pass that conference report this week. Our country will be all the better for it.

I was talking to the Secretary of Energy earlier this morning. We were discussing the absolute importance of passing this bill to establish a framework of policy from this legislative body. He again referred to the great good this bill will do.

On highways, it has taken this Congress 3 tough years of work to come to this point, but with just a little more work, we will have a bill that the President will sign. Our conferees are working and should complete the writing of it today. I spent time with several of the conferees yesterday and with the Speaker, as we coordinate completion of this highway bill.

The good news for the American people is, as they see what is sometimes confusing on the floor of the Senate as these bills come in, this particular highway bill will make our streets and our highways safer. It will make our economy more productive. It will create many new jobs.

I mentioned veterans funding. Yesterday, the House and Senate majority agreed to ensure that $1.5 billion of needed funding will be given to the Department of Veterans Affairs this fiscal year. Veterans can be assured that their health care will remain funded. I know it is confusing what you hear on the floor, but that action is being taken.

I mentioned Interior funding. Yesterday both Houses agreed to fund many of the programs that affect many of our public lands held in trust for Americans throughout the country. We intend to complete action on this conference report this week as well.

Late last night, the conferees completed work on the Legislative Branch appropriations bill, and we will be attempting to clear that legislation as well this week.

---

● This "bullet" symbol identifies statements or insertions which are not spoken by a Member of the Senate on the floor.


Printed on recycled paper.

Mr. CORZINE. Mr. President, I appreciate the Senator's candor. I hope we will be able to bring up my amendment, which will protect the rights of law enforcement officers who are victimized by gun violence to get justice through the American legal system.

I would note the presence of my colleague from the State of New Jersey in the Chamber, who has been a remarkable advocate for law enforcement and for the safety and security of people in our community.

This past Monday night, I missed a vote on the floor of the Senate because I went to a wake for a police officer, Officer Reeves, who was shot on the streets of Newark by a gang member. The gun that was used has not yet been traced to find out whether it was trafficked in the illegal or black market, or whether it was bought by a straw purchaser.

But there is one thing that is certain—there were five children sitting in the pew with their mother at that wake, all under the age of 11. Gun violence is real. The amendment I would like to bring up—which I appreciate the rules of the Senate and respect the judgment of the Senator from Idaho—but the Lemongello amendment I would like to offer to the gun immunity bill is about protecting police officers on the street and giving them the right to get justice in a court of law. If, by unfortunate circumstances, they are the victims of gun violence, we have the right in the State of New Jersey, within the legal system, to call to account those who have wrongfully allowed guns to get into the hands of criminals.

In the case of Detective Lemongello, 11 guns were sold to a gun trafficker out of a gunshop—11 guns. Why does one person happen to need 11 guns? These guns were bought by a straw-purchaser for a career criminal, who then put the guns in a car and drove them to New Jersey, where one was sold to the criminal who shot Detective Lemongello in Orange, NJ.

That gun was turned on this gentleman shown in this picture, Detective Lemongello, just as a gun was recently turned on the young police officer whose wake I recently attended in Newark on Monday night, Officer Dwayne Reeves. Officer Reeves was 31 years old, and he was married with five children.

I believe in the constitutional right of individuals to bear arms under circumstances that will protect the public. I have no argument with that. But I do not think there is a constitutional right to put guns into the hands of criminals who attack police officers and other innocent victims in our country.

I represent a State where crime rates are going down, but murder rates are going up because guns are freely available among gangs on the streets in our communities. This is completely unacceptable. And to allow gun trafficking to continue on, without giving the victims of gun violence the right to seek justice in a court of law, is just plain wrong. It should be enough for any individual with common sense to say: Enough is enough.

Prohibiting civil liability actions as this bill does—and I recognize that some may argue about limited exceptions to the general immunity given to the gun industry in this bill—would make it next to impossible for Detective Lemongello, his partner Officer McGuire, or the family of Officer Dwayne Reeves to have their day in court, to seek and receive justice through the American legal system.

So again, the purpose of my amendment is to protect the rights of law enforcement officers. I understand that this bill is going to pass with, I understand, 61 cosponsors. But I hope my colleagues will understand that, at a minimum, law enforcement officers should be permitted to bring lawsuits against culpable gun dealers and manufacturers.

In the Lemongello case, actually, the people who sold the guns recognized their own mistake, and settled with Detective Lemongello and Officer McGuire. They were able to reach this settlement because Congress did not pass this bill last year, which would have given the gun dealer immunity and removed these lawsuits from the courts.

Now, what's more, the gun dealer who sold the gun to the criminal who shot Detective Lemongello and Officer McGuire, along with several other purveyors of guns in that West Virginia city, changed their policies. These gun dealers now sell one gun at a time as a result of this lawsuit and they no longer make bulk sales.

So this is a real issue. This is not just a debate. There are people dying because we are not doing the right thing. There are lots of forums where we can make this case, and we will continue to, those of us who care about public safety, who want fewer guns on the streets, and who care about accountability.

It is hard for me to understand this legislation as it relates to States rights, in the sense that State legislatures, both Republican and Democratic, have supported the right of victims of gun violence to have access to the courts.

So this is my view, and I am only one Senator, but it is heartfelt. My opposition to this bill and my support for this amendment comes in the context of the real problems and the real tragedies that will occur if we do not have the right checks and balances in the system, if we take away the right of innocent victims to go to court when they are wronged.

I understand that this bill will pass but I am asking all my colleagues to, at the least, support this amendment to protect the brave men and women in uniform who risk their lives to protect the citizens of our country every single day—people like Detective Lemongello, Officer McGuire, and Officer Reeves.

I yield the floor.

The PRESIDING OFFICER. The Senator from Alabama.

Mr. SESSIONS. Mr. President, I thank the Senator from New Jersey and will share a little personal perspective.

I have been in law enforcement for the better part of my professional career as a prosecutor. Some of my best friends are law enforcement officers. I have stood shoulder to shoulder with them in prosecuting cases. I know the risks they undertake to carry out their duties. I believe in what they do, and I believe they should be supported.

These law enforcement officers are not telling me that if a criminal murders one of their brothers or sisters, that they want to sue Smith & Wesson. The thought does not cross their mind. They are concerned that if they catch the criminal who did it, that it is likely to be 15 or 20 years before the litigation and prosecution is over. If they are found guilty and sentenced to death—if the law provides for it, they should be—they get upset when it never seems to happen, and years and years and years go by. That disrespects police officers.

It seems to me some of the same people who are talking so much about defending police officers are not as aggressive as they should be on some of these issues that really mean much to them.

I would say that I think, on the Lemongello case that has been referred to, based on my experience and understanding of the law as a prosecutor in the Federal court, as a U.S. attorney who prosecuted individuals under Federal laws involving this, you cannot sell a firearm to a "straw" person who is holding it to move it to another person. And if you have reasonable evidence to believe the person you are selling it to is a "straw" person, and it is going to someone else, then that someone else must fill out all the forms, put their name on it, and qualify to receive the weapon. And if you do that, and sell the firearm under those circumstances to someone who is not the true purchaser, you are not only subject to a lawsuit under this bill for civil damages, but you are subject to criminal prosecution as violating a Federal law.

I have prosecuted people for that. I have even had the responsibility to prosecute a gun dealer for not accurately handling these kind of matters. If it is a crime, there is clearly a basis to sue the gun seller. But you don't want to sue the manufacturer off in Massachusetts or wherever they are making the gun. If a seller irresponsibly sells it or violates a law in selling a weapon, you don't sue the manufacturer. They don't become an insurer for criminal acts.

That is what we are trying to do here, to pass some legislation that does nothing more than restore the classical understanding of American civil liability. Who should be sued and under what

circumstances should they be sued? If they sell 11 guns and they don't make them comply with the waiting requirement, if they don't get the proper identification from the person who is actually buying the gun, then they have aided and abetted in getting the gun to someone illegally. That is something for which they can be prosecuted and sued under this legislation. What we are talking about is abusive lawsuits where people are being held liable for criminal intervening acts. That is not a principle of American law.

People say: Enough is enough. We just have to do something.

What do you mean we have to do something? We are the legislative branch. We can consider laws if there are enough votes to pass them. But that doesn't mean we allow improper lawsuits to go forward. Senator CRAIG just read the letter from Beretta. One city, Washington, DC, if its laws are allowed to stand, which make gun manufacturers liable strictly for every crime committed by a criminal in DC, it will bankrupt every gun company in America. One city can do that. And these companies sell guns to our police officers. They sell guns to our military people. They are an important part of our American economy. Are we going to now buy our guns from foreign companies? We are not going to have any left in the United States that can survive this flood of lawsuits. It is a serious matter.

The bill is carefully crafted. That is why the Democratic leader, Senator REID, and former Democratic leader, Senator BYRD, and others are cosponsoring this bill. It has been here for several years. It has been reviewed. The loopholes in it have been examined and closed. It has gained support. Now we have a bill that should have already been passed.

I find it passing strange that our colleagues who filibustered a motion to proceed to consider the bill—they filibustered that and delayed this process over a day on that issue alone, when we could have already had the bill up, debated, and voted on. The votes are here to pass it. Let's move forward and get it done. It is quite odd that our colleagues would complain about wasting time on the bill. They are just unhappy because they don't have the votes to defeat it up or down. They don't have the votes to sustain a filibuster. They are conducting delaying tactics that make this legislation that is needed, that has strong bipartisan support, cost more days and more hours of the Senate's time than it ought to.

I wish to share an overall perspective on gun law enforcement in America. Back when I was a U.S. attorney, I came to believe that we should aggressively prosecute criminals who utilize guns during the course of criminal activity, that felons ought not to possess firearms. Both of these have been in our Federal law for many years. We enhanced penalties. Not too many years ago, in the 1980s, they made it a mandatory 5 years in jail, 60 months without parole, for anybody to carry a firearm during the commission of a Federal felony or any felony. That is a strong tool. I believe we ought to prosecute those cases because I am convinced that a lot of the murders in this country are caused by drug dealers and gang members carrying guns around as they do their criminal work. And if somebody crosses them, they pull out a gun and shoot them, and people get killed.

Let me say this first: Most Americans are not murderers. Most Americans are not criminals. Most Americans who have guns—and most Americans do have guns—are law-abiding, decent, peaceful citizens. They are not ever going to murder somebody. This is some sort of myth out there that we are going to fill up the jails if we enforce these laws. There are not that many people out here trying to kill somebody or commit crimes carrying firearms. That is a hardcore group of criminals who deserve to be targeted.

I created my own program called "project trigger lock" in the 1980s. I created a newsletter on it. We sent out news to our sheriffs and our police chiefs about these kind of crimes and the policies of my office to prosecute cases that they may be working on involving these kind of criminals. We enhanced our prosecutions.

Then I was elected to the Senate. I come in here in the middle of the 1990s. All I heard is, we have to pass more laws to crack down on innocent people who own guns, people who don't commit crimes. They are the ones for whom they want to make it more difficult. They want to constrict the constitutional right to keep and bear arms through any number of devices. At that time, it was thought to be politically popular, that we would just keep voting more and more restrictions on private ownership of guns. Pretty soon, I guess they thought people would just give up and Americans would capitulate and not stand up for their right to keep and bear arms. But it didn't happen that way. The American people got their back up on it.

The politicians are beginning to hear it now, and the people expect to be able to maintain their constitutional right to have a firearm. That is just what has happened.

As all this happened—and I am in the Senate—I am thinking, This isn't going to affect crime. Ninety percent of convictions in Federal firearms cases have to do with using a firearm or carrying a firearm during the commission of a felony and the possession of a firearm after having been convicted of a felony. Those are the bread-and-butter cases. Many of them are being brought. And when you effectively enforce justice, just those two laws—and there are many others, such as machine guns and other kinds of sawed-off shotguns—that is a common case that used to be prosecuted, and I prosecuted lots of them. I personally tried sawed-off shotgun cases. I personally tried and prosecuted cases where the serial number had been erased from a firearm. It is a crime to erase it. It is a crime to sell or to carry a firearm that has a serial number erased. It is a crime to transfer a firearm to somebody else that has the serial number erased. We have all kinds of laws. It is a crime to go to a gun dealership and provide any false statement on a document that you have to sign before you get a firearm or to violate any of the myriad of laws out there.

What I am saying again is that the most common cases are the possession of a sawed-off shotgun, carrying of a firearm during a criminal offense, or possession of a firearm after having been convicted of a felony. For the rest of your life, unless your disabilities are removed, if you are convicted of a felony, you cannot be allowed to possess any firearm, even to go hunting. That really galls some people, but that is the law. We enforce that. It is enforced right now in Federal court.

So we had all these cases. And the other side, President Clinton and Vice President Gore, was declaring that if you did not support all these new restrictions on legitimate ownership of guns—these laws and regulations that they were putting up, one right after another; as soon as one passed, they would come up with another one—then you didn't believe in law enforcement, you didn't believe in fighting crime, that you were allowing murders to take place, that you didn't love children. We heard all that.

I went down to the Department of Justice to pull their statistical book. I have seen the statistical book. I used to get it when I was U.S. attorney. It would show the number of prosecutions in every category of crime. What did I find? That under President Clinton's Attorney General Reno, Department of Justice gun prosecutions had declined rather significantly. At the same time they were accusing Members on this side of being soft on gun crimes and not supporting efforts to protect the innocent from criminals and all of these things, they were reducing the number of Federal prosecutions for gun crimes. I raised that in hearing after hearing after hearing. By the time the Clinton administration was leaving office, the numbers had picked up a little bit.

President Bush came in. At the first hearing, I asked new Attorney General John Ashcroft: Are you going to make it a priority of the U.S. Department of Justice to increase the number of gun prosecutions in this country? Attorney General Ashcroft said: Yes, that is my mandate. That is what the President wants. That is what I believe in, and we are going to do it. And prosecutions have gone up. Murders continue to decline. That is one of the more remarkable things that has happened.

We can celebrate. Murder and violent crime have been on a period of decline. I am absolutely convinced that one of

the reasons that has occurred is because of the steadfast, consistent, tough prosecution of criminals who carry guns, either former criminals or criminals while they are conducting their crimes on the streets. I believe it works. In fact, it is known throughout the criminal community that if you carry a firearm during drug-trafficking offenses, if you carry a firearm during any other kind of crime you are committing, you are likely to go to Federal court to be tried by a Federal prosecutor. And in addition to the sentence you get for the underlying crime you committed, such as selling drugs or robbery or burglary, you get whacked by another 5 years in jail without parole. If you carried a machine gun, a fully automatic weapon, that is 20 years consecutive without parole. It is goodbye, so long, throw away the key. You are exiled from our community. That is what happened.

During the Clinton administration, a very fine U.S. attorney in Richmond began to drive this issue. He called it "Project Exile." He put out the word in the street. They had billboards. They put up signs. If you are convicted of carrying a gun during a crime—you are a felon and you carried a gun—we will prosecute you. You will be guaranteed a long time in jail without parole. You will be sent off to a Federal institution, maybe in a distant city. That is why he called it "Project Exile." The violent crime rate in Richmond plummeted. They did what they said they were going to do. They prosecuted those cases.

All I am saying is, with great sincerity, based on my personal experience and a fair analysis of what has happened out there, let's continue to be aggressive with these prosecutions.

Let's not let up. Let's make sure that even more people understand with crystal clarity that if they are a criminal and they are out using a gun in the course of their work, or carrying one as they go about their business, they will be prosecuted. And when they are prosecuted, they will not only be convicted, but they can be assured they are not going to get probation, some sort of halfway house, a couple of months on probation, or something like that, but they are going to the slammer for a significant period of time—perhaps a very long period of time. And if we keep that pressure on, we are going to continue to see the crime rate drop.

That is my hope and that is what is happening. I believe that is the fact. Fortune magazine, in the last few months, had an article about it. They said very few people have commented on the obvious fact that, yes, our prison population has gone up, but our crime rate has dropped. Can we add 2 and 2? Most people in America are not criminals. We are not going to continue to have the prison population go through the roof because most people don't commit robbery, burglary, or carry guns during illegal activities. Very few people do that.

What we were doing in the 1960s and 1970s was calling the criminal the victim. We forgot the true victims. We wanted to see what we could do to help the person who was committing the crimes. We finally realized that some of these people are just dangerous criminals and they have to be punished and removed from society. If you let them back out, they will commit more crimes.

So this has been occurring in our society. We are doing a better job of targeting repeat offenders. We are doing a better job of targeting violent offenders. Can we do better? Yes, we can. Can we be more sophisticated? Yes. Are our current laws a bit too heavyhanded? Probably so. We could probably reduce the penalties on some of the defendants. But the very principle that there is certainty and tough punishment for violation of Federal gun laws is one of the concepts that has led to the reduction of violent crime in America, for which we all ought to be excited.

Mr. President, I will conclude by saying we are doing some things right in law enforcement. Our law enforcement officers really are doing a fine job. We have turned the tide, in some ways. It is a mathematical thing. I have come to understand that.

Back in the 1960s, the crime rate was increasing 10, 15, 18 percent a year. People went from the 1950s when they never locked their doors to being terrified, raped, robbed, and murdered in the 1960s and 1970s. The crime rate had more than doubled in 20 years. Now there has been a decline. It has been declining for the reasons I just stated. We can be more sophisticated. I have personally offered legislation that would reduce the mandatory penalties for crack cocaine. Some on my side think that is soft on crime. I think we need to be sophisticated in enforcement. Every year in jail should be carefully considered, and people should not serve longer than they need to serve. I think we can modify that. Judges tell me they think it ought to be modified. I stepped up to the plate to do that.

But the basic principle that you crack down and you are tough on people who commit crime, and you are consistent, and they know if they are carrying a gun and committing a crime in our country they are going to be sentenced to a long time in jail, that will deter them. The word is out in Philadelphia, Richmond, and Alabama that if you carry a gun during your crimes, you are likely to go to Federal court and serve hard time, without parole. And they are not doing it so much.

I say this: It is likely that the number of gun prosecutions are going to begin to decline because criminals are not carrying guns anymore because they know it is a ticket to the big house. It is something that has worked. It has saved hundreds and thousands of innocent lives in this country. It has saved thousands of people from being permanently disabled by being victims of crime, whether it is guns, knives, or anything else. It has been a good thing that has been accomplished. I love the law enforcement community, our law officers with whom I served. They put their lives on the line for us. They work very hard for us.

As the crime rate has declined, we now have more police officers per crime. They are able to give even closer focus on each individual crime. At one point, there were so many crimes they hardly had time to investigate or prosecute them. Now, we have trends going our way. We need to keep after it. But having the right to bring out bogus lawsuits against an honest seller of a legal firearm, or against an honest manufacturer of a legal firearm, is not the right approach. It is just not consistent with our American principles of law; it is not what we believe in. It is not a legitimate tactic. It is an abuse of the legal system to carry out a political agenda, and it should not be done.

Every company, every person who has a license to sell guns, according to the law, ought to be able to do so without fear of being brought into some bogus lawsuit. That is all we are saying. I think this bill does that. I see my colleague from New Jersey, the great advocate that he is on this issue.

I yield the floor.

The PRESIDING OFFICER (Mr. COBURN). The Senator from New Jersey is recognized.

Mr. LAUTENBERG. Mr. President, I want to say a few words about this bill and how I see it.

I think this is a terrible period for America—the fact that we are taking an action and making it a preceding action to considering some other issues that are, I think, far more important than the subject at hand.

I heard an accusation by our friends on the other side that the Democrats were using delaying tactics and just not permitting us to get this bill—this important piece of legislation that says if a gun manufacturer does something, or the dealer is careless and leaves the gun on the counter and someone picks it up and goes out and kills someone, you cannot sue them; there is no civil action. That is determined to be more important than getting a defense authorization through that said give our troops everything they need to protect themselves. No, no, no, we have to put that aside because what we want to protect today in this place—and it is shameful, in my view—is gun manufacturers who might knowingly make guns available to a criminal or someone who is deranged and not yet a criminal—he is not a criminal until he pulls the trigger—or a distributor or a gun dealer.

We saw a case not too long ago regarding the Washington sniper, and the fact that the shop owner could not tell whether this fellow had stolen the gun or whether he sold him the gun. There were no records kept. It is shocking. We have heard this: When a car manufacturer produces a car and a drunk

judges and juries are not indiscriminately finding against gun manufacturers. Most are probably gun owners and hunters as well.

Despite what the NRA pedals to its members to justify its existence and their dues, the second amendment is accepted and respected by the overwhelming majority of Americans and there is no threat to responsible manufacturers, dealers, lawful buyers, or owners of the millions of guns in America. There is no justification for this special legislation and the special treatment it gives to that industry.

Of course, the gun industry is accustomed to getting special treatment from Congress. Firearms and tobacco are the only two consumer products specifically exempt from regulation by the Consumer Products Safety Commission. What an exemption. I have to hand it to the NRA, whether I agree with them or not, they sure know how to operate around here. Many industries and even individual corporations pour a lot more money into lobbying and into political contributions than the NRA and they do not get nearly the special treatment, special favors from Congress the gun lobby does—a complete exemption from consumer product safety laws and regulations, and now almost complete immunity for lawsuits from negligence or product malfunctions. All other businesses and industries in America are in discount coach while the gun lobby has special privileges flying first class on Air America under this Congress and preceding Congresses.

It is because there is that exemption from the consumer product safety laws of this country that some of these lawsuits, not frivolous, but determined by a judge or jury through the process to be legitimate and bona fide, and the resulting civil damages are necessary to move the industry to take some of the safety actions it can technologically and financially certainly afford to make that it probably would not do otherwise.

For example, take Bushmaster. Their dealer lost the sniper's assault rifle along with 238 other guns that were then used by the snipers against the innocent victims in Washington, DC. As a result of its settlement with the victims of those families, they agreed also to inform their dealers of safer sales practices that hopefully will prevent other criminals from obtaining the guns, something that had never been done before.

In June of 2004, two former New Jersey police officers were shot in the line of duty with a trafficked gun negligently sold by a West Virginia dealer. They won a $1 million settlement, and the dealer who sold the gun, along with 11 other handguns in a cash sale to a straw buyer for a gun trafficker—after that lawsuit that dealer, as well as two other area pawnshops, agreed to implement safer practices to prevent sales to traffickers, including a policy of ending large-volume sales of handguns.

In 2004 also, Tennille Jefferson, whose 7-year-old son was unintentionally killed by another child with a trafficked gun, won a settlement from a gun dealer that amounted to $850,000. The handgun was one of many the dealer sold to the trafficker despite clear signs the guns were headed for the underground market. That, too, resulted in changes in policies and sales practices that hopefully will prevent other mothers from suffering that terrible fate of losing a child.

I am not saying every one of those cases filed against the manufacturers or dealers is proper. Again, that is for the process to determine. But there is no evidence, no evidence at all, that there is anything about the nature of these suits, the outcomes of them, the jury awards relative to the damages that have occurred, that indicates this industry is being prejudiced or plagued by those who they contrive to be doing so, to justify this legislation. If we are going to reform the tort system in this country, let's do it openly and aboveboard with all industries, all of American businesses affected equally by those changes. To single out one industry, particularly one that manufacturers products, potentially, as dangerous as guns, is just a terrible day for the Senate.

Mr. President, I yield the floor.

The PRESIDING OFFICER. The Senator from Illinois.

Mr. DURBIN. Mr. President, this is a sad day in the Senate. It is a sad day in two respects. Yesterday, we were debating a bill, the Department of Defense Authorization Act. It is an important bill. It is a $440 billion bill for our American military: our soldiers, sailors, marines, airmen, members of the Coast Guard, Guard and Reserve. We were trying, in that bill, to help our fighting men and women and their families.

We had a long list of amendments that we wanted to consider: extra pay for totally disabled veterans, help for the widows and orphans of combat soldiers who die in the line of duty, fair compensation for Guard and Reserve when they are activated and they are Federal employees, daycare for the families of soldiers who are activated, quality-of-life issues for the men and women in uniform who are fighting for America.

A decision was made by the Republican leadership to leave that bill, leave that issue, to come to this one. What could be more important for us to consider than the safety, the lives, and fortunes of the men and women who serve our country and risk their lives, on military duty, and their families?

Well, in the estimation of the Republican leader, Senator FRIST, there was one issue that was more important than talking about our men and women in uniform. That issue was providing immunity from liability for one industry in America, to say that of all the businesses in America that provide us with goods and services, all of the businesses that are currently held responsible for wrongdoing, we will create one exception. We will say, if the gun industry is guilty of wrongdoing, they cannot be sued. That is right. The firearms industry, which sells millions of firearms each year in the United States, should not be held responsible for their bad conduct and wrongdoing.

It is hard to say those words and not shake your head. If personal responsibility is what it means to be an American and an American business man or woman, why in the world would you exempt one industry and say they are special, they are political royalty, they cannot be held liable for their misconduct? And why did we move to this bill and away from the Department of Defense authorization bill to help our soldiers and their families? The answer is too obvious. It is because of the political clout of the National Rifle Association and the gun lobby. It is the only group I can think of which would just go straightforward with the concept they are more important to the Senate calendar than the fighting men and women who are now risking their lives for our country. They have done it many times.

The NRA runs certain people in this Chamber and on the other side when it comes to the agenda. They decide what will be taken up and what amendments will pass—an extremely powerful group. The NRA succeeded in having the Senate debate guns—and that is a rare debate—but only when it comes to this question of gun immunity.

Isn't it interesting, we want to put an amendment on this bill that says when you sell a firearm you have to check to see if the purchaser is on a watch list of terrorists. Is that unreasonable? If you have computer access through your store—and these stores do—shouldn't you check to see if that person standing across the counter from you is on the watch list for terrorism in America? That concept is rejected by the National Rifle Association. Background checks: extremely limited. Information gathered about criminal people is to be destroyed so quickly that it is of little value to law enforcement.

A March 2005 report from the Government Accountability Office found that between February and June of 2004, people on U.S. lists of suspected terrorists applied 44 times to buy guns. It is not unheard of. It happens in this country. In only nine instances were they turned down. In the months since the study ended, 12 more suspected terrorists had the green light to buy or carry guns.

FBI Director Bob Mueller—whom I respect very much—said he was forming a group to study the problem. Why aren't we talking about this instead of granting immunity for the gun dealer who sells a weapon to someone he should have known could misuse it for a crime or for terrorism? We are shielding them from civil liability for not

living up to their responsibility when it comes to the sale of lethal firearms.

Or we could talk about ways to solve the problem in America of guns being trafficked, many crossing State lines, and used in crimes. The ATF says 90 percent of the guns recovered in crimes were used by persons other than the original purchaser, other than "straw men," people who bought them to sell them to criminals. One-third of all crime guns cross State lines.

In my State of Illinois, 47 percent of guns traced to crimes committed in Illinois originated in other States. One State, Mississippi—the little State of Mississippi—is far and away the per capita leader in selling guns exported from their State and used in crime. Do you know why? Because firearms laws are not really strictly enforced in Mississippi, and some other States.

From 2000 to 2002, Department of Justice prosecutors filed three cases in Mississippi for violations of gun trafficking laws. In contrast, 32 cases were filed in Kentucky, 28 in Tennessee. So we have gun dealers in Mississippi selling trunkloads of guns to people who get on the interstate and drive up to Illinois and, perhaps, your State, too, selling them to gun gangs and drug gangs on the streets, and then spreading out these guns to kill innocent people. And the people pushing this bill are arguing that we should not hold those firearms dealers responsible because they did not "know" that a crime was going to be committed.

One hundred "Saturday night specials" to stick in the trunk of your car, junk guns, that you would never use for sports or hunting, and they didn't know? They should have known. That is a standard in law almost everywhere: that you knew or should have known. They are changing the law. They are saying, for firearms dealers, we are not going to hold them to this same standard that we hold every other business in America to when people buy products.

There are lots of other issues we could talk about, the gun show loophole, and others. But I think one of the most important things we could talk about is why this bill is on the floor today. It is not because gun manufacturers and gun dealers are facing bankruptcy and a lot of litigation. I read into the RECORD yesterday—and will not repeat—the major gun manufacturers in this country have no problems in terms of profitability. In fact, one of the leading companies, Smith & Wesson, said:

In the nine months ended January 31, 2005, [Smith & Wesson] incurred $4,535 in [legal] defense costs, net of amounts received from insurance carriers, relative to product liability and municipal litigation.

Mr. President, $4,500—does that sound like a business crisis that would move a gun immunity bill to the front of the calendar in front of the Department of Defense authorization bill? What it comes down to is this gun lobby has a lot of clout, and they are pushing for this sweeping immunity.

What kind of cases are we talking about? I said to my staff, you can talk about the law. And I could stand here as a person trained in law school and go through the obvious problems with this bill. But I think it is more important to talk about real-life situations. It is more important to give illustrations of why this is such a terrible bill.

Let me tell you about Anthony Oliver. Anthony Oliver was 14 years old. He was shot and killed on July 23 of last year while he was playing video games with his friend who was 13. Anthony's friend, his 13-year-old friend, had just bought a gun on the street for $50. He told the police he bought the gun with his allowance near his home because he was intimidated by a group of kids who jumped his friend and threatened to beat him up. He said he thought the safety was on when he accidentally killed Anthony with one shot to the stomach.

Federal investigators traced the gun. It was a "Saturday night special," one of those cheap guns just used for crime. They traced it to Lou's Jewelry and Pawn store in Upper Darby, PA. From 1996 to the year 2000, this pawnshop in Pennsylvania sold 441 guns traced to crime. It ranks as the No. 1 dealer in Pennsylvania in selling guns to criminals and 43rd in the Nation among all gun dealers.

In 2003, the last year for which we have statistics, Lou's sold 178 guns traced to crime. That year, less than 1 percent of the more than 3,000 dealers in Pennsylvania sold even one gun traced to crime. So you have a handful of dealers, just a small percentage, who are not paying attention or ignoring openly the fact that they are selling guns over and over and over again to gun traffickers and to straw purchasers.

How is that done? Well, the person who has a criminal record and cannot buy a gun brings his girlfriend in, and while he is standing there picking out the guns, the girlfriend is handing over the credit card or the cash to pay for them. They cannot sell to him. He is a criminal. He has a record of felonies, so the girlfriend buys it. So should the gun dealer be aware of that? Why, of course. It is obvious.

Should they be held accountable if they should have known that gun, through that girlfriend, is going straight into the hands of a felon, straight on to the street, killing innocent people? In America, a jury decides that. They will not be able to when this bill is passed. When this bill is passed, those who vote for it have decided they will be the jury forever when it comes to those questions of liability. We are taking that matter out of the hands of American citizens. We are putting it in the hands of a handful of Senators.

The gun that killed Anthony was sold in 2003 by Lou's to a trafficker who had purchased six guns in a very short period. They bought multiple guns, including many "Saturday night specials," which are small, easily concealed, low-quality handguns sought basically by kids, drug gangs, and those who are going to have a fast crime experience on a Saturday night.

The purchase of multiple firearms at once should have been a red flag to Lou, but Lou doesn't pay any attention to that: Give me some cash—I'll give you a gun; no questions asked.

When this bill passes, the family of Anthony Oliver will lose their lawsuit, the lawsuit they brought against Lou's pawnshop that continues to sell these guns used in crime. So what a great piece of news for that family: the tragedy of losing your 14-year-old son to a "Saturday night special" from a pawnshop which specializes in selling guns to gun traffickers and criminals. This is a great bill, isn't it?

Let me tell you about another case. Danny Guzman was a 26-year-old father of two from Worcester, MA, killed by a stray bullet fired outside of a nightclub on Christmas Eve in 1999.

After the shooting, the loaded gun used in the shooting was found behind an apartment building by a 4-year-old child. The gun had no serial number. They determined the gun was one of several stolen from Kahr Arms, a Worcester gun manufacturer, by their own employees, who hired many of these employees and, it turns out, never checked whether they had criminal records.

One of the thieves, Mark Cronin, who worked for this gun manufacturer, had been hired despite his history of crack addiction, theft, alcohol abuse, violence, and assault and battery. They did not check it. The gun manufacturer hired people to make guns and did not do a criminal background check on their employees.

Cronin told an associate that he took guns out of the Kahr company "all the time" and that he could just walk out the door with them. He took the gun that was used to kill Danny right off the assembly line. And he was pretty smart about it. He took it off the assembly line before it was stamped with a serial number. Smart guy. Can't be traced.

The investigation also led to the arrest of another employee, Scott Anderson, who had a criminal history, who pled guilty to stealing guns from the company.

Fifty Kahr firearms disappeared in a 5-year period. The local police captain classified the recordkeeping at that facility as "shoddy," that it was possible to remove weapons without detection because they did not keep their records well.

Danny Guzman's family brought a wrongful death suit in Massachusetts State court against the owner of the gun manufacturing company, saying: You should have kept your records so you could see that guns were being stolen. And you certainly should have done a background check on your employees. Hiring somebody who has such a criminal record to work in a plant

Case 3:15-cv-00068-RNC   Document 46-3   Filed 05/13/15   Page 10 of 12

people. They believe it is OK to allow lawsuits to achieve some sort of political end.

Clearly, I do not agree and a majority of people in this body do not agree. Indeed, most Americans certainly do not agree. Most Americans think this is just blatantly unfair.

Our Constitution protects the right to keep and bear arms. Indeed, 33 States have passed laws to preempt frivolous gun lawsuits—33 States. Still today, we have the antigun crusaders who are, in effect, aided and abetted by the special interest trial lawyers charging ahead.

Since 1997, more than 30 cities and counties have sued firearm companies in an attempt to force them to change the way they make guns and the way they sell guns. In California, then-Gov. Gray Davis signed legislation explicitly authorizing lawsuits against gun manufacturers.

Because the firearms business is relatively small, one big verdict, one substantial verdict could bankrupt the entire industry. In California, that is a real possibility.

Never mind that every trial court that has heard these municipality lawsuits has thrown them out in whole or in part. Appellate courts in three States have overturned lower court verdicts and allowed the suits to go forward. Thus, it is critical we act now.

If the gun industry is forced into bankruptcy, the right to keep and bear arms will be a right in name only. Lawsuits have already pushed two companies into bankruptcy. Even if some gun manufacturers are able to hold on, the prices for firearms will be so high that owning a gun, such as a hunting rifle, will be a privilege only the wealthy can afford.

There is one other important and little known aspect of the issue. America relies on private gun manufacturers to equip our soldiers and law enforcement officers with sidearms. The guns our police officers use, the guns that our soldiers carry, are made in the United States by American workers.

We are all agreed, no one wants guns in the hands of criminals. There are thousands of laws and regulations to stop illegal gun sales, but we do not want these frivolous, unnecessary lawsuits to strip police officers and soldiers of their sidearms. Do we really want unfair litigation to cripple our national security? The answer clearly is no, and thus we will act and we will act over the course of today, tomorrow, Monday, and complete this action on Tuesday.

The bill before us is narrowly tailored. It is focused. It is fair. It is equitable. It ensures that private parties are held responsible for their actions and that is why this bill comes to this floor with broad bipartisan support. That is why passing this bill is the right thing to do.

I yield the floor.

RESERVATION OF LEADER TIME

The ACTING PRESIDENT pro tempore. Under the previous order, the leadership time is reserved.

PROTECTION OF LAWFUL COMMERCE IN ARMS ACT—MOTION TO PROCEED

The ACTING PRESIDENT pro tempore. Under the previous order, the Senate will proceed to consideration of S. 1805, which the clerk will report.

The assistant journal clerk read as follows:

A bill (S. 1805) to prohibit civil liability actions from being brought or continuing against manufacturers, distributors, dealers, or importers of firearms or ammunition for damages resulting from the misuse of their product by others.

The ACTING PRESIDENT pro tempore. The Senator from Idaho.

Mr. CRAIG. Mr. President, we are now on S. 1805. Last night, Senator REED and I worked into the evening with our colleagues and leadership on both sides to craft a unanimous consent that now governs us through late next Tuesday. It establishes a variety of amendments that will be voted on over the course of today. Some will be offered and set aside to be voted on on Tuesday. On Tuesday, other key amendments will be voted on and then final passage.

I am sure there are some Members on both sides who might have amendments that were not listed to be considered for votes today and/or Tuesday. What I would ask them to do is come to the Chamber and talk to Senator REED and myself to see if we might work those out certainly. We are happy to take a look at them. There may be an opportunity late Tuesday and possibly Friday to offer additional amendments. The unanimous consent request does not preclude any Member from doing that.

I said very early on yesterday that we wanted an open, robust debate on this issue. Clearly, 75 Members of this Senate, in a very bipartisan way, said let's get on with it, with the cloture vote yesterday. We spent the day then fashioning an agreement that brings us to where we are this morning. I believe it is possible Senator DASCHLE will be in the Chamber in a few moments to offer a perfecting amendment, then Senator BOXER will have an amendment on gunlocks.

I believe the agreement that is in front of us gives us something that oftentimes is very hard to achieve in the Senate, and that is a procedure and a final passage locked into an agreement. While Senator REED and I worked late into the evening, as I mentioned, to allow that to happen, and all sides gave a little in it, what I think we have in front of us is just that, an agreement that allows a variety of Senators, who have been prominent in this debate on both sides of the issue, to offer their amendments and to have a vote.

The timelines are very limited. We are not going to filibuster in any of this. It is clear that when there are 20-, 30- and 60-minute time limits to be shared equally, it does shape and limit the debate in a way that many of us would like to see.

Certainly on Tuesday, key votes are going to be the McCain-Reed gun show loophole and Senator FEINSTEIN's gun ban, or assault weapon ban as it is argued. Those clearly will be the dominant issues on one side. Senator BEN NIGHTHORSE CAMPBELL, conceal/carry will be another one voted on on that day, and possibly debate. I will debate that along with Senator CAMPBELL today. It is on the list to accomplish today. Possibly we will also have another amendment to be voted on on Tuesday which deals with Washington, DC, and some of the gun laws that free and law-abiding citizens have to cope with in this city.

That is the character of what we have been able to put together. Senator REED, the manager on the other side, is now in the Chamber. I yield the floor for any comments he would wish to make. Timewise, we hope Senator DASCHLE can make it to the Chamber to offer his amendment, but if he cannot, at this moment I see no reason Senator BOXER could not proceed with her amendment.

The ACTING PRESIDENT pro tempore. The Senator from Rhode Island.

Mr. REED. Mr. President, the Senator from Idaho has indicated we worked late last evening to craft a unanimous consent that will allow several important amendments to be debated today, and continuing on through Tuesday. It represents a recognition that there are serious issues to discuss. Now we are at the stage of not only discussing those issues but also taking amendments up and voting on them. I know Senator DASCHLE will be here in a moment.

Mr. REID. Will the Senator yield?

Mr. REED. I would be happy to yield to the Democratic whip.

Mr. REID. We have explained to the majority that we would, in fact, ask consent that Senator BOXER be allowed to offer her amendment. Senator DASCHLE is occupied at the present time. If necessary, I could offer it on his behalf, but I think it would be better if he offered it himself. So we ask unanimous consent that Senator BOXER be allowed to go forward with her amendment.

The ACTING PRESIDENT pro tempore. Is there objection? Without objection, it is so ordered.

Mr. REED. Mr. President, I yield the floor.

The ACTING PRESIDENT pro tempore. The Senator from California.

AMENDMENT NO. 2620

Mrs. BOXER. Mr. President, I send an amendment to the desk and I ask for its immediate consideration.

The ACTING PRESIDENT pro tempore. The clerk will report.

The assistant journal clerk read as follows:

they don't have a right to recovery, so be it. But should we pass a law to say these families do not even have a chance to go after the reckless misconduct of these gun dealers that resulted in the deaths of their loved ones? That is what this bill is all about. The Senator from Maryland has dramatized it in terms that everyone who works in this Capitol will understand.

There was a time when you couldn't go home from work, from this building, for fear of being shot in the street. It happened over and over and over again. Why in the world would the Senate pass a bill to insulate this reckless gun dealer from his civil liability for selling these guns?

I thank the Senator for her leadership.

Ms. MIKULSKI. I yield such time as he may consume to the Senator from Rhode Island.

Mr. REED. Mr. President, Senator MIKULSKI is here, doing something that is, unfortunately, necessary because the underlying legislation would cause currently pending suits on behalf of the families and the estates of these victims of the snipers to be thrown out of court. That is not only unfortunate but it is unconscionable.

There are arguments that this legislation is crafted so these suits go forward. But that is not the case at all. The two salient facts in the sniper shootings with respect to this legislation are, first, the sniper, Malvo, claims he shoplifted the gun. The storeowner claims that he was unaware of these weapons being missing until he was contacted after the shooting by the ATF.

As a result, none of the appropriate exemptions from the preemption to sue would be applicable in this particular situation.

There are two particular exemptions that are often pointed to. One talks about the negligent entrustment, which is a theory of law, and negligence per se. None would apply because it requires the defendant to have knowledge of a violation of the statute or knowledge that something untoward would happen. Under the facts as we know them, the defendant alleges he was unaware of the missing weapons.

In addition, the other exemption would be if there was a violation of Federal and State statute and that violation was the proximate cause, almost direct or substantial cause of the harm caused to the plaintiff.

That, too, can be substantiated. We have a situation where this statute not only does not cover this situation and would require these cases be thrown out of court, but it raises the extraordinary question about what other cases there might be in the future that would cry out for justice, to bring a suit and demand some type of compensation because of negligence caused by a gun dealer or manufacturer or trade association. They, too, would fall. That would be as compelling as these cases of the Washington area sniper victims.

I commend Senator MIKULSKI for standing up for these families. They are good people. This is a cutout of these cases from law and allowing them to go forward. But it just begs the question of how many other worthy cases will be frustrated by this legislation, if we pass it. I, of course, urge that we do not pass the legislation. But I certainly urge the amendment proposed by Senator MIKULSKI be agreed to.

I yield my time.

Mr. CRAIG. Mr. President, may I inquire as to the time?

The PRESIDING OFFICER. The Senator from Idaho has 20 minutes, and the Senator from Maryland has 5 minutes.

Mr. CRAIG. Mr. President, I will use some of my time at this moment.

At the outset, let me say Senator MIKULSKI and I are best of friends. We appreciate our friendship, and we work closely on a variety of pieces of legislation. There is nothing I would do nor is there anything S. 1805 will do to damage the argument and passion and concern Senator MIKULSKI has put before us today with her amendment. If you believe in the underlying bill, S. 1805, there is a problem, and the problem is Senator MIKULSKI carves out a very big exception and guts the bill in the underlying principle. Let me talk about that principle.

I ask the Senator to go with me to page 7 of the bill and to look at section 4 of the bill. Let us talk about that in relation to the phenomenal tragedy that hit this city and the families she is discussing.

Not only did her friends and neighbors hunker down in fear, but so did we as John Lee Malvo and John Allen Muhammad terrorized the neighborhoods in Maryland and Virginia.

Here is the problem. What are the facts? The Senator said I am not going to try the case on the floor, but I am going to point fingers. I am not going to try the case on the floor, but I am going to point fingers.

We probably have reasonable cause to point fingers at Bull's Eye in Tacoma, WA. Something went wrong up there. There are over 300 guns missing. Lee Malvo himself said, I stole the Bushmaster I used in the sniper incidents in Virginia and in Maryland. "I stole the gun." He said so. It is on the record. Already he sets up an interesting scenario.

As a result of that, the BATF pulled the license of the gun dealer and recommended felony charges be brought by the Justice Department. This case is maturing at this moment.

What does our bill do? It tries to very narrowly create an environment and an exception.

Let us go to that bill and to page 7. Let me read starting on page 6 of the bill because I think it is important. Many Senators have ignored this in the rhetoric of the day. They shouldn't ignore it.

In general, the term "qualified civil liability action" means a civil action brought by any person against a manufacturer or seller of a qualified product or a trade association for damages resulting from the criminal or unlawful misuse of a qualified product by a person or a third party but shall not include—

In other words, the exceptions under which the Malvo and Muhammad case can be tried in which those parties the Senator is talking about contain compensation are the following.

No. 1, an action brought against the transactor convicted under section 924 of title 18 United States Code or a comparable or identical State felony law by a party directly harmed by the conduct for which the transferee is convicted.

Parties harmed. In other words, did the transferee, the gun dealer, malfunction? Did he break the law? There is a strong appearance that he might have.

No. 2, an action brought against a seller for negligent entrustment or negligent per se.

No. 3, an action in which a manufacturer or a seller of a qualified product knowingly and willingly violated State and Federal statute applicable to the sale or marketing of a product and the violation was a proximate cause for the harm and for which the relief is sought.

No. 4, an action for breach of contract or warranty in connection with—

And then we go on to deal with basically product liability.

My point is quite simple. I believe we are protecting those families. I would not write the kind of law that is being suggested would be written. What I am concerned about are lawsuits in which we are trying to hold accountable the innocent party—in this case potentially a manufacturer of a product—unless there is criminal intent, or unless they have broken the law.

Mr. DURBIN. Mr. President, will the Senator yield?

Mr. CRAIG. I can't yield. My time is limited. I am sorry. The Senator has had time. Let me continue.

That is the sense of the argument we are dealing with here. Negligent entrustment:

In subparagraph (a)(2), the term "negligent entrustment" means the supplying of a qualified product by a supplier for use by another person when the supplier knows or should know—

That is very important.

—the person to whom the product is supplied is likely to and does use the product in a manner involving unreasonable risk of physical injury to the person or to others.

What are we trying to do here?

Again, I have said time and time again over the last 24 hours it is a very narrow exception, but to entrust us to a century of tort law that says innocent parties are not guilty nor should they be swept into lawsuits if they have met certain standards of the law—in this case, licensed gun dealers and manufacturers.

Did the folks up at Bull's Eye in Tacoma meet those standards? We don't know. But I will tell you the BATF pulled their Federal firearms license. There is an investigation underway. If they lost that many firearms and they didn't notice it and they didn't report

it, I am not an attorney, but I have to assume they have a big violation on their hands. If Malvo walks in and pulls a Bushmaster from off the rack and walks out with it and that is not detected, they have a problem on their hands. I believe they have a problem on their hands, and they are not exempt.

The argument is—and some have used it—they do not even make it to the courthouse. That is not a valid statement.

This is a basis from which you argue before the court and a knowledgeable, and I hope trusting, judge will take these evaluations in hand and make the determination that this is not a frivolous or a junk lawsuit; that there is basis, and the reason there is basis is because there has been a clear violation of Federal law.

If there has not been a violation of Federal law, even though many of us can certainly have great concern about the families involved, do we continue to suggest that we go out and harass through the courts legal, law-abiding citizens and producers of a legal product in this country simply because it fits the passion of the day or the politics of the moment? I think not. I don't think the Senator from Maryland wants to do that. It is clear if you carve out this exception, you gut the bill because you are saying no, no. We are saying we are giving you all of these exceptions very clearly in the law. I read them to you. They are in the law. It is section 4. That is what we are dealing with. It is a very important part of it.

We think it is the right thing to do at this time. I believe a majority of my colleagues in the Senate agree with that. The reason they agree is for the very reason we have been very specific and clear to adhere to Federal law but to make sure we are not just going to the court for the purpose of expanding the sweep that one might like to take because they do not like guns or they do not like the current law or they want to control them in different ways.

The Federal law is there. It is clear. It is present. The investigation is underway. We cannot try that case here. But I do agree with the Senator from Maryland, we cannot try to, but we can point fingers.

Our bill, S. 1805, sets up a very clear case in which these lawsuits can be effectively argued and a decision made whether there was a rupturing of Federal law or whether we do have law-abiding practitioners in the business of the manufacturing and sale of firearms in this country. That has to be and it must remain the basis of the argument and the basis of this law. The amendment the Senator offers goes directly in the opposite, to carve out special exceptions within the law now and into the future.

I retain the remainder of my time.

The PRESIDING OFFICER. The Senator from Maryland.

Ms. MIKULSKI. Mr. President, I have two legal opinions, one from Lloyd Cutler, a very distinguished American lawyer who has served as White House counsel to a President, who says that S. 1805 contains language that would require the dismissal of the Johnson case. I have another legal opinion from Boise, Schiller & Flexner who essentially say the exceptions would only preserve civil claims brought under other kinds of law. Other than that, what they are saying is this would preempt their ability to bring this case.

The opinions clearly state that section 4 on page 7 articulated by my esteemed colleague does not hold water. It does not protect the victims of Malvo and Muhammad because it is in such plain English limited to those cases by the name of the perpetrator and predator. This does not create a loophole.

Talk about loophole, talk about the gun shield loophole, talk about all the other loopholes in the gun bills. My amendment does not create a loophole.

The legal opinions show there is ambiguity in S. 1805 and that section 4 could preempt the ability of these families to bring this case.

The distinguished Senator from Idaho has his opinion. I have my two legal opinions that show that there is confusion and honest disagreement about the bill. That is why the Mikulski amendment is necessary, to clear up the ambiguity on the matter of these cases committed by Malvo and Muhammad.

His point and my legal opinions prove the necessity of the amendment, to clear up the confusion, end the ambiguity, protect these victims and the families and their right to pursue.

I yield to the Senator from Illinois, a distinguished lawyer himself, to further amplify this argument.

Mr. DURBIN. I thank the Senator from Maryland.

I say to the Senator from Idaho who stood up here and said he did not believe the survivors of the DC sniper shooting had a right to go to court and therefore he was going to oppose the Senator's amendment, I guess that is clearly his point of view, but he said just the opposite. He said he reads this law to allow the victims and their families of the DC sniper to go court against the dealer.

If that is his opinion, then he ought to accept the amendment from the Senator from Maryland because that is all she is asking for.

If you do not believe the victims of the DC sniper should have a day in court against the dealer to determine whether or not he is guilty of wrongdoing, then just say it. But if you believe that these sniper victims and their families should have a day in court, for goodness' sake, accept the amendment of the Senator from Maryland. If you do not, it really tells the story of your bill.

If your bill is going to stop the families and victims of the DC snipers from holding a gun dealer guilty for irresponsible, reckless misconduct, frankly, that is another good reason for us to defeat the bill. Let us stand behind the innocent victims of the DC snipers.

Talk about people who hate guns. I do not hate guns but I hate snipers who shoot children and innocent people on the street and I hate the people who sell them guns irresponsibly. I think they ought to be held accountable. That is all the Senator from Maryland is asking.

Ms. MIKULSKI. Continuing my argument, there is ambiguity and there is honest disagreement. I know the Senator from Idaho might bring us a CRS opinion saying the cases might survive. My colleague from Rhode Island has an earlier CRS opinion that says the opposite. The point is, there is ambiguity both in the law and in opinions about the law.

My amendment is a simple, straightforward way to clear up the ambiguity and let these cases move forward.

The PRESIDING OFFICER. The Senators are reminded to address each other in the third person.

The Senator from Idaho has 10 minutes 27 seconds remained.

Ms. MIKULSKI. Parliamentary inquiry: Did I do something wrong?

The PRESIDING OFFICER. The Senator from Illinois referred to the Senator from Idaho in the first person.

Mr. DURBIN. I beg your pardon.

Parliamentary inquiry: I referred to the Senator from Idaho on the floor; is that improper?

The PRESIDING OFFICER. The Senator several times during his talk used the pronoun "you."

Mr. DURBIN. I apologize for using the pronoun "you." I will never do it again.

Mr. CRAIG. Mr. President, may I inquire as to the time remaining on both sides of the Mikulski amendment?

The PRESIDING OFFICER. Ten minutes 20 seconds for the Senator from Idaho and 14 seconds for the Senator from Maryland.

Mr. CRAIG. With 14 seconds remaining for the Senator from Maryland to argue, this is her amendment, and under the unanimous consent I will then offer the Frist-Craig amendment. As we know, then they will be stood up to be voted on, Frist-Craig first, Mikulski second.

If the Senator would like to make any concluding remarks about her amendment, I would certainly welcome that. She then controls 20 minutes of the 40 that would be on my amendment and the debate could go on.

Ms. MIKULSKI. Excuse me, Senator. The Frist-Craig amendment is on what topic, sir?

Mr. CRAIG. On your topic.

Ms. MIKULSKI. What is the Frist-Craig amendment?

Mr. CRAIG. I have not offered it yet.

Ms. MIKULSKI. You want to conclude debate on this amendment.

Mr. CRAIG. Then we set yours aside for the Frist-Craig debate on the same subject matter and then stand these up for votes.