## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| DONNA L. SOTO, ADMINISTRATRIX OF THE ESTATE OF VICTORIA L. SOTO, *et al.* | ) ) | |
| Plaintiffs, | ) ) | Civil Action No. 3:15-cv-68 (RNC) |
| VS. | ) ) | |
| BUSHMASTER FIREARMS INTERNATIONAL, LLC a/k/a/ FREEDOM GROUP, INC. a/k/a/ REMINGTON OUTDOOR GROUP, INC., *et al.* | ) ) ) ) | May 18, 2015 |
| Defendants. | ) ) | |

### AMENDED MEMORANDUM OF LAW IN SUPPORT OF
### SUPPLEMENTAL MOTION TO REMAND

## I.  INTRODUCTION

To find fraudulent joinder under the *Pampillonia v. RJR Nabisco, Inc.*, 138 F.3d 459, 461

(2d Cir. 1991) test, the Court must determine "by clear and convincing evidence. . . that there is

*no possibility*, based on the pleadings, that a plaintiff can state a cause of action against the non-

diverse defendant in state court."  *Id.* (emphasis supplied).  There is absolutely no basis for the

Court to make such a prediction, let alone to do so with the high degree of certainty necessary to

sustain jurisdiction.  The Bushmaster Defendants contend that the Protection of Lawful

Commerce in Arms Act, 15 U.S.C. §§ 7901 *et seq.*, conclusively establishes that plaintiffs cannot

prevail against Riverview in Connecticut Superior Court, but no Connecticut case supports their

interpretation of PLCAA.  Under the demanding *Pampillonia* standard, the absence of binding

authority supporting their position is dispositive.

PLCAA, moreover, is no defense to plaintiffs' claims of negligent entrustment and violation of the Connecticut Unfair Trade Practices Act, Conn. Gen. Stat. §§ 42-110a *et seq*. PLCAA *permits* these claims, explicitly preserving negligent entrustment claims and claims based on statutes "applicable" to the sale and marketing of firearms.  The relevant case law from other jurisdictions – including the Second Circuit's holding in *City of New York v. Beretta*, 524 F.3d 384 (2nd Cir. 2008), *cert. denied*, 556 U.S. 1104 (2009) – confirms this is so.  A Connecticut court confronting this case will hold that PLCAA is no defense to plaintiffs' claims for negligent entrustment and violation of CUTPA.

Whether to apply PLCAA's plain language or to adopt a more restrictive reading of its provisions, however, is not the focus of this jurisdictional inquiry.  The Court must determine merely whether the Bushmaster Defendants have shown clearly and convincingly that there is *no possibility* a Connecticut court will construe PLCAA less restrictively than they do.  *See Pampillonia*, 138 F.3d at 461.  They cannot even come close to meeting this heavy burden.

The Court must remand this case to the Connecticut Superior Court.

## II.    FACTUAL AND PROCEDURAL BACKGROUND

This action arises out of the shooting at Sandy Hook Elementary School in Newtown on December 14, 2012 that killed twenty first-grade children and six educators and wounded two others.  Plaintiffs allege that the Bushmaster XM15-E2S used in the shooting belongs to a specific category of weapons that were designed for the United States military to function as a lightweight but massively destructive service weapon.  *See* Dkt. #1, Notice of Removal, Ex. 1, Complaint ¶¶ 45-49, 54.  The United States military and law enforcement are appropriate users for these weapons due to their specialized needs and highly regimented safety protocols.  Compl. ¶¶ 105-127.  Civilians, by contrast, are wholly inappropriate users for these weapons: military

rifles are grossly ill-suited to home defense and sold with no regard for the purchaser's training, experience, commitment to follow safe storage practices, or intent to make the weapon available to others. *Id.* ¶¶ 128-143. Repeated mass shootings of Americans with weapons like the Bushmaster XM15-E2S – including several attacks against school children – have been widely publicized and are well known to the entities that manufacture and sell the Bushmaster XM15-E2S. *Id.* ¶¶ 144-48.

With particular regard to Riverview, plaintiffs allege that it is a retail gun store located in East Windsor, Connecticut. Compl. ¶ 32. Riverview for years sold AR-15s in a manner that foreseeably led to the use of those weapons by unauthorized and unsafe users. *Id.* Count Three ¶ 182. Riverview knew or should have known that the XM15-E2S it sold to Nancy Lanza was a military weapon designed for a purely military purpose: to inflict mass casualties in as short a time as possible. *Id.* ¶¶ 45-174. Additionally, Riverview knew or should have known that the weapon was unfit and unsafe for home use, or civilian use; that some such weapons were likely to be used in their assaultive capacity, despite Connecticut's ban on similar weapons; and that, if the XM15-E2S were used in its assaultive capacity, it could easily inflict mass casualties before law enforcement was able to intervene. *Id.* It nonetheless sold the XM15-E2S to Nancy Lanza. *Id.* ¶¶ 32, 153. Nancy Lanza stored the XM15-E2S in an unlocked gun closet in the home she shared with her son, Adam. *Id.* at ¶ 154. On the morning of December 14, 2012, Adam Lanza retrieved the Bushmaster XM15-E2S from the closet, along with ten 30-round magazines. *Id.* Based on these and additional allegations, plaintiffs assert claims of negligent entrustment, knowing violation of CUTPA, and public nuisance against Riverview. All of these claims arise under state law.

Riverview shares Connecticut citizenship with the plaintiffs.  Notice of Removal ¶¶ 9, 11.

Plaintiffs' chosen venue, Connecticut Superior Court, is the only proper forum in which these

claims can be litigated.  Despite that fact, the Bushmaster Defendants removed this case on

January 14, 2015.  They assert that plaintiffs fraudulently joined Riverview as a defendant in

order to circumvent diversity jurisdiction.  Although that allegation, if true, would provide a

basis for federal jurisdiction, the Bushmaster Defendants' removal papers do not identify any

defect specific to Riverview.  Rather, they claim that PLCAA bars all of plaintiffs' claims against

Riverview and every other defendant.  Notice of Removal ¶¶ 20-30; *see also* 1/21/15 Letter to

Court, at p. 2.  Because the removing defendants' showing as to Riverview invokes a defense

common to all defendants, plaintiffs filed a Motion to Remand based on the rule stated in

*Chesapeake & O. R. Co. v. Cockrell*, 232 U.S. 146 (1914).  *See* Dkt. #27, Motion to Remand.

That issue is now fully briefed.  *See* Dkt. #34 (Memorandum in Opposition); Dkt. #39 (Reply);

Dkt. #42 (Surreply).

## III.    STANDARD FOR ESTABLISHING FRAUDULENT JOINDER

The doctrine of fraudulent joinder provides that "a plaintiff may not defeat a federal

court's diversity jurisdiction and a defendant's right of removal by merely joining defendants

with no real connection with the controversy." *Pampillonia*, 138 F.3d at 460–61 (citation and

internal quotation marks omitted); *see also Brown v. Eli Lilly*, 654 F.3d 347, 356 (2d Cir. 2011);

*Bounds v. Pine Belt Mental Health Care Res.*, 593 F.3d 209, 215 (2d Cir. 2010).

Fundamental principles of jurisdictional restraint dictate that the doctrine of fraudulent

joinder be applied sparingly.  *See Purdue Pharma L.P. v. Kentucky*, 704 F.3d 208, 213 (2d Cir.

2013).  Consequently, a defendant seeking to establish fraudulent joinder "bears [a] heavy

burden."  *Brown*, 654 F.3d at 356.

## A.   THE REMOVING DEFENDANT MUST SHOW THERE IS NO POSSIBILITY THE PLAINTIFF CAN STATE A CLAIM AGAINST THE NON-DIVERSE DEFENDANT.

In order to establish fraudulent joinder, "a defendant must demonstrate, by clear and convincing evidence, either that there has been outright fraud committed in the plaintiff's pleadings, or that there is no possibility, based on the pleadings, that a plaintiff can state a cause of action against the non-diverse defendant in state court." *Pampillonia*, 138 F.3d at 460-61.  In the absence of outright fraud, "[j]oinder will be considered fraudulent when it is established that there can be no recovery against the defendant under the law of the state on the cause alleged." *Whitaker v. Am. Telecasting, Inc.*, 261 F.3d 196, 207 (2d Cir. 2001).  In making this determination, "all factual and legal issues must be resolved in favor of the plaintiff." *Pampillonia*, 138 F.3d at 461.

"This standard has been strictly applied in [the Second] Circuit." *Dieterle v. Rite Aid Pharmacy*, 2015 WL 1505666, at *3 (D. Conn. Mar. 31, 2015).  "The doctrine of fraudulent joinder requires a defendant to show, by clear and convincing evidence, that a claim is so flawed that it would be impossible for the plaintiff to recover." *Ret. Program for Employees of the Town of Fairfield v. NEPC, LLC*, 642 F. Supp. 2d 92, 97 (D. Conn. 2009) (noting that "although the adequacy of the Plaintiffs' negligence claim against [the non-diverse defendant] has the potential to be a thorny issue, it is not one that should be conclusively resolved at this stage."); *see also Stan Winston v. Toys "R" Us, Inc.*, 314 F. Supp. 2d 177, 183 (S.D.N.Y. 2003) (concluding that defendants had not shown that it was "legally impossible" for non-diverse defendant to be liable under state law); *Nemazee v. Premier, Inc.*, 232 F. Supp. 2d 172, 178 (S.D.N.Y. 2002) (noting that fraudulent joinder "turns on whether recovery is per se precluded"; "[a]ny possibility of recovery, even if slim, militates against a finding of fraudulent joinder").

**B.      THE COURT MUST VIEW THE ISSUES AS A CONNECTICUT COURT WOULD, RESOLVING ALL OPEN QUESTIONS IN FAVOR OF REMAND.**

In assessing whether the Bushmaster Defendants have met *Pampillonia*'s stringent standard, the Court must view the issues as a Connecticut court would.  Connecticut courts of course defer to Connecticut precedent.  *Stuart v. Stuart*, 297 Conn. 26, 45-46 (2010) ("it is manifest to our hierarchical judicial system that this court has the final say on matters of Connecticut law and that the Appellate Court and the Superior Court are bound by our precedent").  They are not bound by the same precedent that binds this Court.  *See CUSA LLC v. Travelers Co., Inc.*, 2007 WL 3046270, at *3 (D. Conn. Oct. 15, 2007) (Hall, J.) (observing that while Second Circuit had spoken on an issue and District Court was bound by that ruling, Connecticut court was not bound and *Pampillonia* standard required that "the plaintiff's claims must be judged by how they would fare in state court, not by how they would fare in *federal* court") (emphasis in original).

If pertinent questions of law are unsettled, remand is compulsory.  *See, e.g.*, *Ret. Program for Employees of the Town of Fairfield*, 642 F. Supp. 2d at 97-98 ("That there is at minimum a recognized dispute on this issue in the case law is a sufficient basis on which to conclude that Plaintiffs' claim against [the non-diverse defendant] survives this [fraudulent joinder] assessment."); *Kent State Univ. Bd. of Trustees v. Lexington Ins. Co.*, 512 F. App'x 485, 490 (6th Cir. 2013) (affirming district court's award of removal fees to plaintiff based on its finding that, "[g]iven the unsettled nature of Ohio law on this issue and the [fraudulent joinder] standard, remand was a foregone conclusion") (citation omitted); *In re Pradaxa (Dabigatran Etexilate) Products Liab. Litig.*, 2013 WL 5609340, at *2 (S.D. Ill. Oct. 11, 2013) ("Given that Nevada law on the issue of a sales representative's liability is unsettled, the Court must remand the case to

Nevada State Court. This is consistent with the Seventh Circuit's directive to resolve any ambiguities in the pertinent state law in favor of remand."); *IDS Prop. Cas. Ins. Co. v. Gambrell*, 913 F. Supp. 2d 748, 753, 754 (D. Ariz. 2012) ("[T]he law surrounding the viability of a bad faith claim against an insurance adjuster is unsettled in Arizona. . . .  While it is a close call, as noted above, ambiguity in the law must favor the plaintiff[.]"); *Hartman v. Caraco Pharm. Labs., Ltd.*, 789 F. Supp. 2d 701, 706 (S.D.W. Va. 2011) ("This incertitude respecting both legal issues dooms defendants' fraudulent joinder challenge."); *Moorhouse v. Bayer Healthcare Pharm., Inc.*, 2008 WL 2477389, at *3 (N.D. Cal. June 18, 2008) ("Defendants contend that no California case has held a distributor liable for failure to warn in the prescription drug context.  However, even if true, that fact alone does not suggest that it is *obvious* according to the *settled* rules of California that a failure to warn cause of action is not viable."); *Snyder v. Davol, Inc.*, 2008 WL 113902, at *1 (D. Or. Jan. 7, 2008) (remanding because "the issue of whether a healthcare provider can be held strictly liable under Oregon law is unsettled"); *Antonio v. Wal-Mart*, 2007 WL 2884371, at *7 (S.D. Ind. Sept. 27, 2007) ("For the purposes of deciding if removal was proper, it is enough to note that Indiana law is unsettled regarding the extent that a plaintiff may bring a claim in negligence against a store manager, based on a delegation of the premise owner's duties toward invitees.").

 In the cases cited above, there was state law precedent on the relevant issue and often it strongly favored the argument of the removing defendant.  Nonetheless, these courts remanded when state law was even arguably unsettled.  Here, there can be no debate about whether Connecticut law is settled or not:  *there is no Connecticut law on point, let alone binding precedent*.  The Court must accordingly heed *Pampillonia*'s directive and remand.

IV.     **STANDARD FOR CONSTRUCTION OF A FEDERAL STATUTE**

The *Pampillonia* analysis requires the Court to determine how a Connecticut court might construe PLCAA, a federal statute.  When construing a federal statute, both federal and Connecticut courts will follow federal principles of statutory construction.  *Dark-Eyes v. Commissioner of Revenue Services*, 276 Conn. 559, 571 (2006).

A.      **FEDERAL PRINCIPLES OF STATUTORY CONSTRUCTION.**

"Statutory construction must begin with the language employed by Congress and the assumption that the ordinary meaning of that language accurately expresses the legislative purpose."  *United States v. Aleynikov*, 676 F.3d 71, 76 (2d Cir. 2012) (quotation marks and citation omitted).  "Well-established principles of construction dictate that statutory analysis necessarily begins with the 'plain meaning' of a law's text and, absent ambiguity, will generally end there."  *Collazos v. United States*, 368 F.3d 190, 196 (2d Cir. 2004); *Perrin v. United States*, 444 U.S. 37, 42 (1979) ("A fundamental canon of statutory construction is that, unless otherwise defined, words will be interpreted as taking their ordinary, contemporary, common meaning.").  Only if the meaning of a statute is ambiguous should a court consult legislative history.  *See Puello v. Bureau of Citizenship & Immigration Servs.*, 511 F.3d 324, 327 (2d Cir. 2007).

It is a rule of statutory construction that each word in a statute be given meaning.  *Reiter v. Sonotone Corp.*, 442 U.S. 330, 339 (1979) ("In construing a statute we are obliged to give effect, if possible, to every word Congress used.").  When "Congress uses certain language in one part of the statute and different language in another, the court assumes different meanings were intended."  *Mary Jo C. v. New York State & Local Ret. Sys.*, 707 F.3d 144, 156 (2d Cir. 2013) (quotation marks and citation omitted).

### B.      WEIGHT GIVEN TO FEDERAL PRECEDENT.

With regard to the determinative nature of existing precedent, however, federal and state court approaches will differ.  The Second Circuit's construction of a federal statute is binding on future panels of the Second Circuit and district courts within the Circuit.  It is not binding – but rather merely persuasive – on the Connecticut Supreme Court:

> In general, we look to the federal courts for guidance in resolving issues of federal law.  *See, e.g.*, *Joo v. Capitol Switch, Inc.*, 231 Conn. 328, 332-36, 650 A.2d 526 (1994) (considering federal court precedent to interpret federal statute); *see also Schnabel v. Tyler*, 230 Conn. 735, 743 and n. 4, 646 A.2d 152 (1994) (noting that court looks to Second Circuit precedent when interpreting federal statute).  Decisions of the Second Circuit Court of Appeals, although not binding on us, are particularly persuasive.

*Turner v. Frowein*, 253 Conn. 312, 340-41 (2000); *see Johnson v. Williams,* 133 S. Ct. 1088, 1098 (2013) (observing that "the views of the federal courts of appeals do not bind [a state court] when it decides a federal constitutional question, and disagreeing with the lower federal courts is not the same as ignoring federal law.").  When the Federal Courts of Appeals divide on an issue, the Connecticut Supreme Court will generally side with the Second Circuit, although it is not bound to do so.  *See Dayner v. Archdiocese of Hartford*, 301 Conn. 759, 783-84 (2011) (declining to follow Seventh Circuit precedent when Second Circuit had chosen a different approach).

## V.      THE CASE MUST BE REMANDED

The Bushmaster Defendants contend that all of plaintiffs' claims are, on their face, barred by PLCAA.  It is *their* burden to persuade this Court of that very serious and sweeping charge, and a "heavy" one at that.  *Pampillonia*, 138 F.3d at 461.  "The doctrine of fraudulent joinder requires a defendant to show, by clear and convincing evidence, that a claim is so flawed that it would be impossible for the plaintiff to recover."  *Ret. Program for Employees of the Town of*

*Fairfield*, 642 F. Supp. 2d at 97.  Defendants utterly disregard this burden.  They have asked this Court to declare that plaintiffs' negligent entrustment, CUTPA, and nuisance claims are *unambiguously foreclosed* on the basis of a simple recitation of PLCAA's provisions and accompanying conclusory statements that plaintiffs' claims are barred.  *See* Notice of Removal ¶¶ 21-30.

Defendants' arguments are wrong.  In an effort to find that plaintiffs' negligent entrustment claim is barred by PLCAA, defendants distort the plain meaning of PLCAA, justify that distortion with illogical assumptions, and ignore the entire body of substantive law that governs that claim (the common law).  Defendants make an equally feeble effort to establish that plaintiffs' claim that Riverview knowingly violated CUTPA is barred by PLCAA.  In doing so, they once again ignore the plain meaning of PLCAA, misread Second Circuit precedent, and ignore the text of CUTPA itself.[1]  The many flaws in these arguments are discussed in detail below.

For the purposes of deciding plaintiffs' Supplemental Motion to Remand, however, it does not matter that the Bushmaster Defendants are wrong.  It matters only that they lack *any* binding authority to support their arguments.  The *Pampillonia* test requires the Court to determine that there is "no possibility. . . that a plaintiff can state a cause of action against the non-diverse defendant *in state court*."  *Pampillonia*, 138 F.3d at 461 (emphasis supplied).  Connecticut courts are bound by Connecticut precedent; yet defendants fail to identify any Connecticut case law that endorses defendants' restricted reading of PLCAA's negligent

_____

[1] Plaintiffs answer defendants' argument as to the nuisance claims with a constitutional challenge to PLCAA.

entrustment and predicate statute provisions.  Because all legal issues must be resolved in
plaintiffs' favor at this juncture, the Court must remand.

### A.   THE REMOVING DEFENDANTS CANNOT ESTABLISH THAT PLCAA BARS PLAINTIFFS' NEGLIGENT ENTRUSTMENT CLAIM.

Plaintiffs allege a negligent entrustment claim against Riverview under Connecticut
common law.  That claim is expressly preserved by the text of PLCAA.  In order to remain in
this Court, the Bushmaster Defendants must establish clearly and convincingly that there is no
possibility a Connecticut Superior Court would allow plaintiffs' claim to proceed.  Defendants
fail to meet that burden.

### 1.   PLCAA Preserves Negligent Entrustment Claims.

PLCAA identifies a category of lawsuits entitled "qualified civil liability action[s]" and
dictates that such actions be dismissed.  15 U.S.C. § 7903(5)(A); *id.* at § 7902.  It also describes
six causes of action that are *not* subject to dismissal.  *See id.* at § 7903(5)(A)(i)-(vi).  One of
those protected causes of action is the common law tort of negligent entrustment.  *See id.* at §
7903(5)(A)(ii) (qualified civil liability action "shall not include. . . an action brought against a
seller for negligent entrustment"); § 7903(5)(B) ("'[N]egligent entrustment' means the supplying
of a qualified product by a seller for use by another person when the seller knows, or reasonably
should know, the person to whom the product is supplied is likely to, and does, use the product in
a manner involving unreasonable risk of physical injury to the person or others.").

The Bushmaster Defendants do not dispute this point.  They fail, however, to
acknowledge that PLCAA's negligent entrustment provision has been only sparsely interpreted
and that there is *no case law at all* supporting their particular construction of PLCAA's negligent
entrustment definition.  Under the *Pampillonia* standard, these failings are fatal.

2.      **PLCAA Intends for Plaintiffs to Proceed Based on State Common Law Negligent Entrustment Causes of Action.**

PLCAA does not create a cause of action called negligent entrustment; it preserves that pre-existing common law claim.  The statute is unequivocal on this point:  "no provision of this chapter shall be construed to create a public or private cause of action or remedy."  15 U.S.C. § 7903(5)(C).

The import of that directive is obvious:  "While the Act may exempt 'negligent entrustment' claims from mandatory dismissal under federal law, it does not affirmatively authorize or establish such claims - it simply does not extinguish them. . . .  [Thus, plaintiffs] must look to some other source of law[.]"  *Noble v. Shawnee Gun Shop, Inc.*, 409 S.W.3d 476, 480-81 (Mo. Ct. App. 2013); *see also Phillips v. Lucky Gunner, LLC*, 2015 WL 1499382, at *8 (D. Colo. Mar. 27, 2015) ("[PLCAA] does not create any causes of action, but relies on state law to do so[.]"); *Ileto v. Glock, Inc.*, 565 F.3d 1126, 1138 (9th Cir. 2009) ("[T]he only function of the PLCAA is to preempt certain claims."); *id.* at 1135 n.6 ("While Congress chose generally to preempt all common-law claims, it carved out an exception for certain specified common-law claims (negligent entrustment and negligence per se).").

State common law is the only source of negligent entrustment liability.  It follows that negligent entrustment claims against firearm sellers are examined under the common law of the state in which the claim is brought.  *See Gilland v. Sportsmen's Outpost, Inc.*, 2011 WL 2479693, at *12 (Conn. Super. Ct. May 26, 2011) (recognizing PLCAA exception for negligent entrustment actions and then applying Connecticut common law to determine whether plaintiff had stated negligent entrustment claim); *Al-Salihi v. Gander Mountain, Inc.*, 2013 WL 5310214, at *12 (N.D.N.Y. Sept. 20, 2013) (same, but applying New York common law); *Phillips*, 2015

12

WL 1499382, at *6 (same, but applying Colorado common law); *Noble*, 409 S.W.3d at 480-82 (same, but applying Missouri common law); *cf. Woods v. Steadman's Hardware, Inc.*, 2013 WL 709110, at *4 (D. Mont. Feb. 26, 2013) (explaining that once a plaintiff's state law claims "pass the PLCAA filter" – that is, "fall into one of the predicate exceptions listed by the PLCAA" – plaintiff "can go forward in state court").

In *Noble*, the plaintiffs attempted to circumvent this rule because their negligent entrustment claim against a gun store was not supported by Missouri common law.  (Missouri does not recognize a cause of action for negligent entrustment against the seller of a chattel.)  The plaintiffs admitted that their claims were not "common law negligent entrustment" claims, but contended that the facts alleged were clearly encompassed by *PLCAA's* formulation of negligent entrustment.  The court rejected this argument.  The relevant question was whether "[plaintiffs'] allegations state a viable cause of action under the governing substantive law" – in this case, "Missouri's negligent-entrustment doctrine." *Id.* at 480, 482.

Congress' edict that PLCAA not be construed to create a cause of action compels this result.  If courts cannot look to PLCAA as a source of negligent entrustment law, state common law *must* govern; otherwise, the negligent entrustment provision would mean nothing.  The Bushmaster Defendants have not offered an alternative interpretation of how PLCAA interacts with negligent entrustment law.[2]  Yet they have also failed even to *mention* Connecticut's common law of negligent entrustment, let alone to explain why it precludes plaintiffs' claims.

---

[2] Indeed, counsel for the Bushmaster Defendants has taken the exact same position in a case currently pending in Wisconsin, in which he represents a firearm seller against a negligent entrustment claim.  During oral argument on the defendant seller's motion to dismiss – which was denied – Attorney Vogts echoed the arguments plaintiffs make here:

> All the PLCAA does is preempt certain state law claims.  It does not create claims.  So when the court is examining the plaintiffs' allegations and the plaintiffs' claims, I think it's important to keep in mind that federal law does

    **3.**    **The Bushmaster Defendants' Sole Attack on Plaintiffs' Negligent Entrustment Claim – Their Restrictive Reading of the Word "Use" in PLCAA – Is Unavailing.**

The Bushmaster Defendants make one – and only one – argument in support of their assertion that plaintiffs' claim against Riverview has no possibility of success.  They allege in their Notice of Removal that "a negligent entrustment action against a firearm seller must involve a sale of a firearm by a seller to the same person who thereafter 'use[s]' the firearm to harm himself or herself, or others."  Notice of Removal ¶ 25.  In their Surreply to plaintiffs' Motion to Remand, defendants expand on this allegation:

> In the context of civil tort law, "use" of a firearm can only mean employing the firearm's functional features to cause or threaten injury.  A firearm cannot be "use[d]" to cause a risk of injury other than by shooting it, or at least threatening to shoot it.  And more importantly, the "use" of a firearm under the definition of negligent entrustment must create "unreasonable risk of physical injury to *the person* or others."  15 U.S.C. § 7903(5)(B) (emphasis added).  It is impossible for a person to "use" a firearm to harm herself without discharging it (*e.g.*, suicide).  Any construction of "use" to include anything other than firing or threatening to fire a firearm is contrary to the plain meaning of the text and purpose of the PLCAA.

Surreply at 2-3.  This elaboration, however, only magnifies the deficiencies in defendants' argument.

    **a.**    **Defendants' Interpretation Is Not Supported by Any Case Law.**

Defendants' sole citation to a case that mentions "use" in the context of negligent entrustment is *Gilland v. Sportsmen's Outpost, Inc.*, 2011 WL 2479693 (Conn. Super. Ct. May 26, 2011).  Surreply at 5 n. 1.  *Gilland* holds, consistent with Connecticut common law, that the

---

    not dictate to this court that it must recognize … a negligent entrustment claim.  It's only allowing for those claims to be filed in court.  *And once they're filed it's up to your Honor to apply Wisconsin law to claims that fit within those exceptions.*

Transcript of Motion Hearing, *Norberg v. Badger Guns*, Civil Case No. 10-cv-020655 (Wis. Cir. Ct.), June 9, 2011, at p. 7 (emphasis supplied), attached as Exhibit A.

theft of a firearm fails to come within PLCAA's definition of negligent entrustment because there is no allegation that the seller "supplied the firearm for [the entrustee]'s use." *Id.* at *13.  It is unclear how this point is helpful to the Bushmaster Defendants.  Plaintiffs allege that Riverview supplied the Bushmaster XM15-E2S to Nancy Lanza for her use; they simply do not allege that Nancy Lanza "use[d]" the Bushmaster by firing it.  There is absolutely nothing in *Gilland* that suggests "use" should be read as narrowly as defendants would like.

The absence of any controlling Connecticut authority dooms the Bushmaster Defendants' argument from the outset, but the dearth of supporting case law is not limited to Connecticut. There is not a *single* citation in defendants' briefing to any case endorsing their reading of PLCAA – because no such case exists.  This fact alone requires remand.  *E.g.*, *Ret. Program for Employees of the Town of Fairfield*, 642 F. Supp. 2d at 97-98 ("That there is at minimum a recognized dispute on this issue in the case law is a sufficient basis on which to conclude that Plaintiffs' claim against [the non-diverse defendant] survives this [fraudulent joinder] assessment."); *Kent State Univ. Bd. of Trustees*, 512 F. App'x at 490 ("[g]iven the unsettled nature of Ohio law on this issue and the [fraudulent joinder] standard, remand was a foregone conclusion"); *Hartman*, 789 F. Supp. 2d at 706 ("This incertitude respecting both legal issues dooms defendants' fraudulent joinder challenge.").

Here, not only is there no *settled* law supporting defendants' argument that "use" is synonymous with "discharge," there is *no law at all*.  In order to determine that Riverview had been fraudulently joined, this Court would need to adopt a novel and restrictive interpretation of PLCAA's negligent entrustment provision *and* determine that there is no possibility that a Connecticut court might reach a different conclusion.  The breadth and scope of those hypothetical findings expose the weakness of defendants' position.

### b.      Defendants' Argument Is Illogical.

Defendants' inability to point to any supporting case law is also emblematic of how deeply flawed their argument is.  Defendants argue that "[a] firearm cannot be 'use[d]' to cause a risk of injury other than by shooting it, or at least threatening to shoot it."  Surreply at 2.  This is obviously untrue.  (It also uses imprecise language: PLCAA's definition does not refer to the entrustee "causing" a risk of injury, but rather using the firearm "in a manner involving unreasonable risk of physical injury."  15 U.S.C. § 7903(5)(B).)  Leaving a loaded handgun in a room full of children can certainly be said to "involve[e] [an] unreasonable risk of physical injury"; the same can be said of giving a firearm to a dangerous felon, or a mentally unstable person, or sharing a military assault weapon with someone unfit to use it.  Indeed, if Congress had intended the meaning defendants suggest, its choice of language is baffling – "us[ing]" a firearm "in a manner involving unreasonable risk of physical injury" is a needlessly convoluted way of saying "us[ing]" a firearm to *cause* injury.

Plaintiffs also fail to grasp the significance defendants attribute to PLCAA's inclusion of injury to the entrustee – in addition to injury to "others."  *See* Surreply at 2-3 ("And more importantly, the 'use' of a firearm under the definition of negligent entrustment must create "unreasonable risk of physical injury to *the person* or others.  15 U.S.C. § 7903(5)(B).  It is impossible for a person to 'use' a firearm to harm herself without discharging it (*e.g.*, suicide).").  Even if it is true that it is "impossible for a person to 'use' a firearm to harm herself without discharging it," that is not at all what PLCAA requires.  Once again, PLCAA refers to using a firearm "*in a manner involving unreasonable risk* of physical injury."  15 U.S.C. § 7903(5)(B) (emphasis supplied).  It is not at all impossible for a person to create a risk of injury to herself by

16

negligently allowing others to use a firearm.  Each of the examples listed above can be said to create a risk of injury to the person that is equal to the risk of injury to others.  In this case, of course, there is a more obvious example:  Nancy Lanza's decision to share firearms with her son resulted in him killing her with one of those firearms.

### c.     "Use" Does Not Mean "Discharge."

Nor can the Bushmaster Defendants establish that the plain meaning of "use" is "discharge."  *See* Surreply at 3 ("Any construction of 'use' to include anything other than firing or threatening to fire a firearm is contrary to the plain meaning of the text and purpose of the PLCAA.").  To start, the United States Supreme Court has recognized that "using" a firearm encompasses more than using it for its "intended purpose" – that is, as a weapon.  *Smith v. United States*, 508 U.S. 223, 230 (1993).  In *Smith*, the Court was called upon to discern "the everyday meaning" of the word "use" after a criminal defendant challenged a penalty enhancement on the grounds that trading a firearm in exchange for drugs did not constitute a "use" of the firearm under the statute.  *Id.* at 228.  After consulting multiple dictionaries and reviewing past interpretations of the term, the Court concluded that the ordinary meaning of "use" is expansive.  Notably, it rejected the defendant's argument that the statute required proof that the firearm was used *as a weapon*, noting simply that "the words 'as a weapon' appear nowhere in the statute." *Id.* at 229.  Likewise, the words "as a weapon" appear nowhere in PLCAA's negligent entrustment definition.  As in *Smith*, "use" must be given its ordinary meaning.[3]

---

[3] Defendants have argued that *Smith* is irrelevant because the Court's discussion of "use" arose in the context of criminal law, which addresses many different uses of firearms.  *See* Surreply at 3.  This is true, but inapposite.  The *Smith* Court did not derive the meaning of "use" by placing it in the context of the criminal laws; it looked to Webster's New International Dictionary and Black's Law Dictionary to determine "the everyday meaning" of the word.  508 U.S at 228-29.

Congress' word choices in other parts of PLCAA are also significant.  In PLCAA, Congress twice employed language that can be obviously contrasted with its choice of the word "use."  In the threshold definition of "qualified civil liability action," the statute proscribes certain actions that result "from the criminal or *unlawful misuse* of a qualified product."  *See* 15 U.S.C. § 7903(5) (emphasis supplied).  And in the provision governing product liability claims, PLCAA refers to scenarios where "the *discharge* of the [firearm] was caused by a volitional act that constituted a criminal offense[.]"  *Id.* at § 7903(5)(A)(v) (emphasis supplied).

Congress' decision to include the terms "discharge" and "unlawful misuse" in the text of PLCAA indicates that it knew how to employ narrower terms to refer to specific uses of firearms, and that it did so when such terms were appropriate.  Consequently, "use" must be read not merely to mean "discharge" or "unlawful misuse."  *See Mary Jo C. v. New York State & Local Ret. Sys.*, 707 F.3d 144, 156 (2d Cir. 2013) (When "Congress uses certain language in one part of the statute and different language in another, the court assumes different meanings were intended.") (quotation marks and citation omitted); *cf. Milner v. Dep't of Navy*, 562 U.S. 562, 131 S. Ct. 1259, 1272 (2011) (holding that "law enforcement purposes" must be read to "involve more than just investigation and prosecution" because other parts of the statute "demonstrate [that] Congress knew how to refer to these narrower activities").

### d.   The Legislative History of PLCAA Is Not a Useful or Reliable Interpretive Tool.

The Bushmaster Defendants' resort to legislative history does not save their argument. As an initial matter, consulting legislative history is only appropriate when the meaning of a statute is ambiguous.  *See Puello v. Bureau of Citizenship & Immigration Servs.*, 511 F.3d 324, 327 (2d Cir. 2007).  Defendants concede this, and do not even argue that the negligent entrustment definition is ambiguous.  Indeed, it is not.  But even if legislative history *were*

relevant to the Court's analysis, defendants' proffered evidence is not at all probative of Congressional intent.  They rely on a portion of a Report from the House of Representatives that includes a statement by House members who opposed the enactment of PLCAA.  In that statement, the dissenters describe the negligent entrustment exception as precluding a straw sale or other successive entrustment.

That reliance is doubly flawed.  First, the Supreme Court has instructed that legislative history "refers to the pre-enactment statements of those who drafted or voted for a law."  *District of Columbia v. Heller*, 554 U.S. 570, 605 (2008).  Thus, only the "intention of the drafters" provides guidance.  *United States v. Ron Pair Enterprises, Inc.*, 489 U.S. 235, 242 (1989).  By contrast, the Supreme Court has "often cautioned against the danger, when interpreting a statute, of reliance upon the views of its legislative opponents."  *NLRB v. Fruit & Vegetable Packers & Warehousemen, Local 760*, 377 U.S. 58, 66 (1964).  The Court noted that the "fears and doubts of the opposition are no authoritative guide to the construction of legislation. It is the sponsors that we look to when the meaning of the statutory words is in doubt."  *Id*. (internal quotation marks and citation omitted).

Second, as defendants surely know, PLCAA's legislative history is replete with wildly divergent characterizations of the proposed law.  The bill's proponents describe it in the most vanilla of terms, while its opponents foretell a sea change.[4]  *Cf. NLRB*, 377 U.S. at 66 ("In their zeal to defeat a bill, [opponents] understandably tend to overstate its reach.").  Perhaps most

---

[4] *E.g.*, *compare* 151 Cong. Rec. S9094 (July 27, 2005) (statement of Sen. Sessions) ("That is what we are trying to do here, to pass some legislation that does nothing more than restore the classical understanding of American civil liability."), *with* 151 Cong. Rec. S9081 (July 27, 2005) (statement of Sen. Durbin) ("They are changing the law.  They are saying, for firearms dealers, we are not going to hold them to this same standard that we hold every other business in America to when people buy products.").  Quoted portions of the Congressional Record are attached as Exhibit B.

saliently, although the Washington sniper case was discussed at length in both the House and the Senate, the legislators could not agree on whether PLCAA would permit a cause of action against the firearm seller to proceed.[5]

         **e.**        **Defendants Ignore the Common Law Meaning of Use.**

Finally, the meaning defendants attempt to give the word "use" in PLCAA's negligent entrustment definition both ignores and is fundamentally incompatible with the common law meaning of that term.

         ***i.***        ***Congress Borrowed Language from the Restatement (Second) of Torts, Thereby Incorporating the Common Law Meaning of "Use."***

Under PLCAA's definition, negligent entrustment of a firearm turns on whether the seller should have known that the person to whom it sold the weapon was likely to "use [the firearm] in a manner involving unreasonable risk of physical injury to the person or others." 15 U.S.C. § 7903(5)(B). That quoted language was not invented by Congress when it drafted PLCAA. The phrase mirrors the common law iteration of "use," as expressed by Section 390 of the Restatement (Second) of Torts. *See* Restatement (Second) of Torts § 390 (supplier of chattel subject to liability where entrustee is likely to "*use* [the chattel] in a manner involving unreasonable risk of physical harm to himself and others") (emphasis supplied).

---

[5] *Compare* 150 Cong. Rec. S1657 (Feb. 26, 2004) (statement of Sen. Reed) ("[T]he underlying legislation would cause currently pending suits on behalf of the families and the estates of these victims of the snipers to be thrown out of court. . . . [N]one of the appropriate exemptions from the preemption to sue would be applicable in this particular situation."), *with* 150 Cong. Rec. S1657, S1658 (Feb. 26, 2004) (statement of Sen. Craig) ("I believe we are protecting those families [of the sniper victims]. I would not write the kind of law that is being suggested would be written. . . . If Malvo walks in and pulls a Bushmaster from off the rack and walks out with it and that is not detected, they have a problem on their hands. I believe they have a problem on their hands, and they are not exempt. The argument is—and some have used it—they do not even make it to the courthouse. That is not a valid statement."). *See* Ex. B (Excepts from Congressional Record).

This congruence was clearly intentional.  The Restatement (Second) of Torts is "the most widely accepted distillation of the common law of torts."  *Field v. Mans*, 516 U.S. 59, 70 (1995).  Moreover, Section 390 is the authoritative source of negligent entrustment law in nearly every state that recognizes the cause of action.  *See Casebolt v. Cowan*, 829 P.2d 352, 358-59 (Colo. 1992) (collecting cases where states have "employed, approved, or adopted" Section 390); *W. v. E. Tennessee Pioneer Oil Co.*, 172 S.W.3d 545, 555 (Tenn. 2005) ("In line with a majority of other states, this Court has previously cited section 390 with approval in defining negligent entrustment.").  By borrowing Section 390's formulation of how "use" interacts with "unreasonable risk" of harm, Congress created a framework that accommodates state common law iterations of the negligent entrustment cause of action.[6]  The logic of that choice, of course, flows naturally from Congress' decision not to create causes of action through PLCAA.

Recognizing that the word "use" in PLCAA's negligent entrustment definition is culled from the Restatement informs the meaning of that word.  It is a well-settled principle of statutory interpretation that "when Congress uses language with a settled meaning at common law, Congress 'presumably knows and adopts the cluster of ideas that were attached to each borrowed word in the body of learning from which it was taken and the meaning its use will convey to the judicial mind unless otherwise instructed.'"  *Beck v. Prupis*, 529 U.S. 494, 500-01 (2000) (quoting *Morissette v. United States*, 342 U.S. 246, 263 (1952)); *cf. United States v. Neustadt*, 366 U.S. 696, 707 (1961) ("Certainly there is no warrant for assuming that Congress was

---

[6] Indeed, state courts frame their understanding of PLCAA's definition around its similarity to the Restatement and their own state law.  *E.g.*, *Gilland*, 2011 WL 2479693, at *12 (noting that "[the PLCAA] definition is consistent with Connecticut law on negligent entrustment," which is considered governed by § 390 of the Restatement); *Estate of Kim ex rel. Alexander v. Coxe*, 295 P.3d 380, 394 & n.89 (Alaska 2013) ("The PLCAA definition is substantially the same as the Restatement version Alaska follows. [Citing § 390 in footnote]"); *Al-Salihi*, 2013 WL 5310214, at *12 ("The PLCAA standard mirrors the standard for the tort of negligent entrustment under New York law[.][Citing § 390]").

unaware of established tort definitions when it enacted the Tort Claims Act in 1946[.]").  Thus,

when language "'is obviously transplanted from another legal source, whether the common law

or other legislation, it brings the old soil with it.'"  *Sekhar v. United States*, 133 S. Ct. 2720, 2724

(2013) (quoting Felix Frankfurter, *Some Reflections on the Reading of Statutes*, 47 Colum. L.

Rev. 527, 537 (1947)); *see also United States v. Soler*, 759 F.3d 226, 234 (2d Cir. 2014) (same).

### ii. *The Common Law Meaning of "Use" Embraces Successive Entrustments.*

Here, the relevant body of law applying and interpreting Section 390 unequivocally

rejects defendants' argument about the meaning of "use" in the context of negligent entrustment.

Cases decided under Section 390 teach that the person to whom the chattel is entrusted need *not*

be the person who later employs it to cause physical harm.  A claim for negligent entrustment can

involve successive entrustments, so long as they are reasonably foreseeable.

This common law rule is exemplified by *Collins v. Arkansas Cement Co.*, 453 F.2d 512

(8th Cir. 1972), in which a verdict against a cement manufacturer for negligently entrusting

cherry bombs to employees was upheld under Section 390 even though two additional

entrustments preceded injury to the plaintiff.  An employee of the defendant who was entrusted

with cherry bombs gave several of the bombs to a group of children; one of those children then

gave a bomb to the minor plaintiff, who was severely injured when she set it off.  The question

for the court was one of foreseeability.  Ultimately, the verdict was upheld because the

manufacturer's decision to entrust the bombs to employees without adequate precautions – and

with reason to know that employees were not exercising the proper level of care – created an

unreasonable and foreseeable risk that a cherry bomb would fall into careless or unsuspecting

hands and thereby cause injury.  Consequently, the successive entrustments did not sever the causal chain between the defendant's negligence and the plaintiff's injuries.[7]

Moreover, there can be no doubt that Congress *knew* of that rule at the time PLCAA was drafted; yet Congress nonetheless preserved the common law tort of negligent entrustment.  In the five years preceding PLCAA's enactment, state and federal courts had explicitly recognized that common law negligent entrustment claims could be asserted against gun sellers and manufacturers for negligence in the chain of distribution – which, by definition, involves successive entrustments.  In *Hamilton v. Beretta U.S.A. Corp.*, 96 N.Y.2d 222 (N.Y. 2001), for example, the court found that a negligent entrustment theory could be viable if the requisite knowledge was proved (although plaintiffs had not done so).  The court noted:  "The owner or possessor of a dangerous instrument is under a duty to entrust it to a responsible person whose use does not create an unreasonable risk of harm to others.  [Citing § 390.] *The duty may extend through successive, reasonably anticipated entrustees.*"  *Id.* at 236-37 (emphasis supplied); *see also Johnson v. Bryco Arms*, 304 F. Supp. 2d 383, 395 (E.D.N.Y. 2004) (finding that plaintiffs had stated prima facie negligent entrustment claim under theory articulated in *Hamilton*);

---

[7] Numerous courts have taken a similar approach, finding common law negligent entrustment claims sufficient where the entrustee's use of the chattel was confined to giving or lending it to another.  *See, e.g.*, *Rios v. Smith*, 95 N.Y.2d 647, 653 (2001) ("Thus, the evidence was legally sufficient for the jury to determine that [the defendant] created an unreasonable risk of harm to plaintiff by negligently entrusting the ATVs to his son, whose use of the vehicles involved lending one of the ATVs to Smith, another minor."); *Earsing v. Nelson*, 212 A.D.2d 66, 70 (1995) (upholding denial of motion to dismiss negligent entrustment claim where minor purchaser of BB gun lent it to friend who shot and injured the plaintiff); *LeClaire v. Commercial Siding & Maint. Co.*, 308 Ark. 580, 583 (1992) (reversing trial court's dismissal of negligent entrustment claim where employer entrusted car to employee, who then entrusted it to another person; the court noted:  "The real rub in this case is the fact that it involves two entrustments.  That is not a bar to recovery."); *Schernekau v. McNabb*, 220 Ga. App. 772 (1996) (plaintiff properly stated negligent entrustment claim against woman who permitted her son to bring air rifle to campground, even though another camper – and not defendant's son – used the rifle to injure the plaintiff).

*Johnson v. Bulls Eye Shooter Supply*, 2003 WL 21639244, at *5 (Wash. Super. June 27, 2003) (denying motion to dismiss negligent entrustment claim against Bushmaster for supplying the rifle that was used by the D.C. snipers because Bushmaster could be liable under § 390 "[i]f it was foreseeable that plaintiffs and others were endangered by the entrustment of the Bushmaster XM-15 assault rifle to [the dealer]").

The cases clearly put Congress on notice that the common law of negligent entrustment, *as expressed by Section 390 of the Restatement*, provided a viable cause of action against firearm sellers, including scenarios where successive entrustments were involved.  In fact, *Johnson*, which arose out of the high-profile Washington D.C. sniper shootings, was referenced numerous times during Congressional debate.  *See* fn. 6 above (citing Senators' comments on how PLCAA would affect the lawsuits brought by the families of sniper victims).  Yet Congress did nothing to alter the common law meaning of "use," choosing instead to adopt the Restatement's language. Congress could have narrowed the common law formulation in any number of ways – for example, by requiring that the person to whom the firearm is entrusted cause the physical injury – but it did not.  Under basic principles of statutory construction, we must assume that choice reflects Congress' intent.  *See Univ. of Texas Sw. Med. Ctr. v. Nassar*, 133 S. Ct. 2517, 2529 (2013) ("Congress' choice of words is presumed to be deliberate[.]").

### 4.    Plaintiffs' Allegations Conform to Connecticut's Common Law of Negligent Entrustment.

The Court should never reach this argument.  The Bushmaster Defendants have not provided *any* valid reason why plaintiffs' claims would be foreclosed by PLCAA in Connecticut's courts; certainly, they have not demonstrated that this Court could predict that result with the certainty required by *Pampillonia*.  Moreover, defendants have not even challenged the sufficiency of plaintiffs' allegations under Connecticut common law.  Although it

is not plaintiffs' burden to establish the viability of their claims against Riverview, here we briefly address the common law of negligent entrustment in Connecticut and the sufficiency of plaintiffs' allegations under that law.

Under the doctrine of negligent entrustment, one who supplies a dangerous instrument to another with knowledge that doing so is likely to create an unreasonable risk of physical harm to others may be held liable when injury foreseeably results. In Connecticut, liability under this rule is derived from Section 390 of the Restatement. *See Greeley v. Cunningham*, 116 Conn. 515, 165 A. 678, 679 (1933) (reciting elements of negligent entrustment as stated in Section 390); *Short v. Ross*, 2013 WL 1111820, at *5 (Conn. Super. Ct. Feb. 26, 2013) ("[A]s long recognized by the decisions of the Superior Court, [the Connecticut Supreme Court in] *Greeley* 'virtually adopted' the approach provided by the Restatement.") (citations omitted).[8]

Negligent entrustment liability arises from the affirmative duty to potential victims that attaches to those who handle dangerous chattels. As the commentary to Section 390 of the Restatement explains, "liability is based upon the rule. . . that the actor may not assume that human beings will conduct themselves properly if the facts which are known or should be known to him should make him realize that they are unlikely to do so." Restatement (Second) of Torts § 390 cmt. b.

Naturally, a defendant's knowledge about how "human beings will conduct themselves" is a fact-intensive question. It implicates the dangerousness of the chattel; *see Greeley*, 165 A. at 679 (recognizing cause of action for negligent entrustment of automobile; although cars do not belong in the same category as firearms or explosives, cars are nevertheless "capable of doing

---

[8] Thus, the substantive law governing plaintiffs' claims – Section 390 of the Restatement – aligns with the definition provided in PLCAA, which relies on the same Section to describe the entrustee's "use" of the firearm.

great injury when not properly operated"); the purpose for which the chattel is entrusted; *see Turner v. Am. Dist. Tel. & Messenger Co.*, 94 Conn. 707, 110 A. 540, 543 (1920) (knowledge of entrustee's recklessness was "vitally important" element, "since plainly it cannot be regarded as negligence to supply effective weapons of protection to [a night watchman]."); the propensities of certain classes of persons; *see Burbee v. McFarland*, 114 Conn. 56, 157 A. 538, 539 (1931) ("The common law requires of him who deals with dangerous explosives to refrain from placing them in the hands of children of tender age," who "might innocently play with or use it to his injury."); Restatement (Second) of Torts § 390 cmt. b (liability may arise where entrustor supplies a chattel to one who "belongs to a class which is notoriously incompetent to use the chattel safely[.]"); and common knowledge about how humans are likely to behave under certain sets of circumstances; *see Short v. Ross*, 2013 WL 1111820, at *6-9 (Conn. Super. Ct. Feb. 26, 2013) (plaintiffs stated prima facie case against U-Haul for renting truck that would be used at football game tailgate); *id.* at *7 ("[A] review of our state's common law of negligent entrustment outside of the context of automobiles shows that the essence of the tort includes circumstances where an entrustor should know that there is cause why a chattel ought not to be entrusted to another.").

Plaintiffs' negligent entrustment claim against Riverview touches on each of these factors in pleading that Riverview should have known of the unreasonable risks associated with selling the Bushmaster XM15-E2S to a civilian user.  With respect to the dangerousness of the weapon, plaintiffs allege:

- The Bushmaster XM15-E2S is an AR-15 rifle, a weapon designed for the United States military to inflict mass casualties.  *See* Compl. ¶¶ 45, 54.

- The XM15-E2S propels ammunition at a speed that far exceeds that of a handgun, which greatly increases the ammunition's destructive impact on the human body. *See id.* at ¶¶ 55-60.

26

- The XM15-E2S is designed to accept large capacity magazines, a feature that allows soldiers (and civilians) to fire more rounds and minimize time spent reloading. *See id.* at ¶¶ 61-63.

- The XM15-E2S is capable of rapid, semi-automatic fire that allows soldiers (and civilians) empty a 30-round magazine in a matter of seconds. *See id.* at ¶¶ 64-67.

- The XM15-E2S can pierce body armor, which increases its lethality when used against enemy troops (and police officers). *See id.* at ¶ 47.

- The combined effect of the XM15-E2S's mechanical features is more wounds, of greater severity, in more victims, in less time. *See id.* at ¶¶ 69-70.

This capacity for harm is contrasted with the weapon's limited purpose for civilian users:

- The XM15-E2S is ill suited to home defense:  among other reasons, the velocity and rate of semi-automatic fire greatly increase the risk that bullets will breach walls and doors of the home and thus endanger innocents. *See id.* at ¶¶ 83-94.

- The Bureau of Alcohol, Tobacco and Firearms has repeatedly determined, after extensive study, that semiautomatic assault weapons like the XM15-E2S serve a purpose in combat and crime but are not suited for either hunting or sporting. *See id.* at ¶¶ 95-104.

Finally, plaintiffs make specific allegations supporting their claim that civilian users constitute a "class" of persons who are unfit to possess the XM15-E2S.  These allegations speak to civilian users' demonstrated propensities for unsafe use.  *Cf. Gen. Agents Ins. Co. of Am. v. Midwest Sporting Goods Co.*, 328 Ill. App. 3d 482, 488 (2002) (Under Section 390, "a lawsuit may succeed with proof that the defendant entrusted the dangerous article to a member of a larger class, where the defendant knew or should have known that members of the larger class generally tended to use such articles in a manner involving unreasonable risk of harm.").  They also contrast the *environment* in which civilian users handle assault weapons with the environment for which those weapons were designed: the military and law enforcement.  For example:

27

- Specialized institutions like the military and law enforcement have extensive rules and protocols in place – concerning training, storage, safety, and the mental health of soldiers and officers – to prevent combat rifles from causing criminal or accidental harm.  *See* Compl. ¶¶ 105-127.

- There are no analogous rules and protocols in place when rifles like the XM15-E2S are sold to civilian users like Nancy Lanza.  *See id.* at ¶¶ 128-144.

- More than half of American households with firearms do not store them securely.  *See id.* at ¶ 139.

- The XM15-E2S is marketed to civilian users in explicitly militaristic terms that reinforce its image as a combat weapon used for the purpose of waging war and killing human beings.  *See id.* at ¶¶ 72-81.

- Civilian users are entrusted with militarized and highly lethal weapons like the XM15-E2S without a permit, safety training, or a mental health assessment, and regardless of whether they intend to make the rifle available to other persons.  *See id.* at ¶¶ 135-138.

- Prior to the sale of the XM15-E2S to Nancy Lanza in 2010, many highly publicized mass shootings had revealed the AR-15 to be the weapon of choice for mass shooters, including those that had targeted elementary school children, high school children, and college students.  *See id.* at ¶¶ 145-148.

Civilian users constitute an admittedly broad class.  But what matters is Riverview's actual or constructive knowledge about civilians' use of AR-15s.  Plaintiffs have made specific allegations that provide a rationale for why civilian users are an appropriate class in this case.  As detailed above, the AR-15 was designed with a particular market in mind – the military – and the weapon's terrifying lethality is both *justified* by the special needs of that market and *controlled* by the extensive safety measures embedded within that market.  It is plaintiffs' position that unleashing the same weapon on a population that has no such need, is held to no such safety measures, and has repeatedly used the weapon as it was intended – but on innocent civilians not enemy troops – is simply not reasonable.  *Cf. McCarthy v. Olin Corp.*, 119 F.3d 148, 163 (2d Cir. 1997) (Calabresi, J., dissenting) ("Selling tanks to the armed forces is fine; selling them to the

general public is, I would think, clearly negligent.").  It is the role of a Connecticut jury to assess the merits of that position.[9]

### B.     THE REMOVING DEFENDANTS CANNOT ESTABLISH THAT PLCAA BARS PLAINTIFFS' CUTPA CLAIMS.

In addition to claims for negligent entrustment, PLCAA permits claims for knowing violations of state statutes applicable to the sale or marketing of firearms.  The plain language of the statute describes this category of cases, indicating that "an action in which a manufacturer or seller of a qualified product knowingly violated a State or Federal statute applicable to the sale or marketing of the product, and the violation was a proximate cause of the harm for which relief is sought" is not barred by PLCAA.  15 U.S.C. § 7903(5)(A)(iii).  Defendants nonetheless claim that this provision is so narrow that there is no possibility it encompasses any claim based on CUTPA.  Notice of Removal ¶¶ 26-28.

---

[9] In their Surreply, the Bushmaster Defendants argue that – even assuming plaintiffs' interpretation of "use" is correct – plaintiffs have failed to allege that Nancy Lanza "used" the Bushmaster at all.  *See* Surreply at 4.  A fair reading of plaintiffs' complaint indicates otherwise. *See* Compl. ¶ 154 (On December 14, 2012, Adam Lanza retrieved the Bushmaster and ten 30-round magazines from "an unlocked gun closet in the house he shared with his mother"); *id.* at ¶ 138 (purchasers of AR-15s are not required to indicate whether they intend to share weapon with others); *id* at ¶ 139 (more than half of American households do not store firearms securely); *see also id.* ¶ 188 ("The Riverview Defendants knew, or should have known, that Nancy Lanza's receipt and possession of the XM15-E2S involved an unreasonable risk of physical injury to others.").  These allegations, construed in the light most favorable to plaintiffs, encompass the allegation that Nancy Lanza "used" the Bushmaster by sharing it with her son.

Moreover, even if the Court finds these allegations to be insufficient, remand is still required unless the defect cannot be cured by amendment.  *See Kenneson v. Johnson & Johnson, Inc.*, 2015 WL 1867768, at *4 (D. Conn. Apr. 23, 2015) (Shea, J.) (considering Connecticut procedural standards for amendment in deciding whether plaintiffs could possibly prevail against non-diverse defendant); *Nerad v. AstraZeneca Pharm., Inc.*, 203 F. App'x 911, 914 (10th Cir. 2006) (approving of district court's discussion of plaintiff's right to amend in context of fraudulent joinder analysis: "This was a jurisdictional inquiry.  As we read the order, the court determined that success was reasonably possible *at the time of removal* because, although the plaintiff might be required to amend his complaint, that amendment would be allowed as a matter of course."); *cf.* CT Prac. Bk. § 10-44 (a plaintiff whose complaint is stricken may plead over to cure any insufficiency).

A Connecticut court will find that PLCAA permits plaintiffs to proceed under CUTPA. It may reach that determination by following the Second Circuit and construing PLCAA's predicate statute provision as the Second Circuit did in *City of New York*, 524 F.3d at 399-404. Under that construction, PLCAA permits plaintiffs' CUTPA claims. Alternatively, a Connecticut court may reach its own determination as to the meaning of the predicate statute provision, construing that provision in accordance with its plain language. In either scenario, the court will conclude that CUTPA is an appropriate predicate statute.

### 1.    Because There Is No Binding Authority on This Issue, No Further Analysis Is Necessary and Remand Is Required.

The *Pampillonia* test requires the Court to determine that there is "no possibility. . .that a plaintiff can state a cause of action against the non-diverse defendant in state court." *Pampillonia*, 138 F.3d at 461. The District Court must determine what precedent would bind the state court and proceed accordingly, recognizing that the state court will be bound to follow the law as determined by the state's highest court, not the federal court of appeals. *CUSA LLC*, 2007 WL 3046270, at *3 (observing that, while it was bound to follow Second Circuit precedent, a Connecticut court is not and remanding because there were open questions of Connecticut law). Connecticut courts are bound by Connecticut precedent. *Stuart*, 297 Conn. at 45-46 ("[I]t is manifest to our hierarchical judicial system that this court has the final say on matters of Connecticut law and that the Appellate Court and Superior Court are bound by our precedent."). Second Circuit authority, while strongly persuasive, is not binding. *Turner*, 253 Conn. at 340-41.

Defendants cite no *Connecticut* authority to establish that their reading of PLCAA's predicate statute provision is the result a Connecticut court will reach. They cannot, because there is no Connecticut law on this particular question. As all legal issues must be resolved in plaintiffs' favor in this jurisdictional analysis, the Court must remand. *See Pampillonia*, 138 F.3d

at 461 (all legal issues must be resolved in plaintiff's favor); *see also* Section II.B. above (listing cases finding that if pertinent questions of law are unsettled, remand is required).

> **2.     The Bushmaster Defendants' Allegations on This Issue.**

The Bushmaster Defendants recognize that plaintiffs' Complaint alleges that Riverview "knowingly violated the Connecticut Unfair Trade Practices Act."  Notice of Removal ¶ 24. They acknowledge that PLCAA permits suits against a seller of firearms for knowingly violating a state statute applicable to the sale or marketing of firearms.  *Id.* ¶ 26.  They allege that because CUTPA does not "expressly regulate or clearly implicate the regulation of firearms" it is not a proper predicate statute.  *Id.* ¶ 27.  Therefore, they argue, PLCAA is a complete defense to plaintiffs' CUTPA claims against Riverview.  *Id.* ¶¶ 26-27.[10]

> **3.     PLCAA's Predicate Statute Provision.**

PLCAA provides that a qualified action *"shall not include"*:

> an action in which a manufacturer or seller of a qualified product knowingly violated a State or Federal statute applicable to the sale or marketing of the product, and the violation was a proximate cause of the harm for which relief is sought. . .

15 U.S.C. § 7903(5)(A)(iii) (emphasis added).

The scope of the predicate statute provision has been construed by both the Second Circuit and the Ninth Circuit, as well by the District of Columbia Court of Appeals, the Indiana Appellate Court and the Alaska Supreme Court.  *City of New York*, 524 F.3d at 399-404; *Ileto v. Glock*, 565 F.3d 1126, 1131-38 (9th Cir. 2009); *District of Columbia v. Beretta U.S.A. Corp.*, 940 A.2d 163, 169-72 (D.C. Cir. 2008), *cert. denied*, 556 U.S. 1104 (2009); *Smith & Wesson Corp. v. City of Gary*, 875 N.E.2d 422, 429-30 (Ind. App. 2007), *transfer denied*, 915 N.E.2d 978 (Ind.

---

[10] The Bushmaster defendants repeat these arguments in their Opposition to Plaintiffs' initial Motion to Remand, Dkt. #34, and their Surreply in that round of briefing, Dkt. #42.

2009); *Estate of Kim v. Coxe*, 295 P.3d 380, 393-94 (Ak. 2013).  No Connecticut appellate court has ever addressed this provision.

> **4.**    **The Second Circuit's Decision in *City of New York* Would Allow Plaintiffs' CUTPA Claims to Proceed under the Predicate Statute Provision.**

The Second Circuit's decision in *City of New York*, 524 F.3d at 399-404, will be persuasive to a Connecticut court, but not binding on it.  *E.g. Turner*, 253 Conn. at 340-41.  If a Connecticut court follows *City of New York*, it will recognize that PLCAA's predicate statute provision permits plaintiffs' CUTPA claims.

In *City of New York*, the City brought suit against firearms manufacturers and wholesale sellers, asserting various claims against them based on the theory that they distributed and sold firearms in a manner that increased their use by criminal populations.  The action was filed in federal court in 2000 on the basis of diversity jurisdiction.  In 2005, Congress passed PLCAA and the defendants moved to dismiss.  The City argued that PLCAA is unconstitutional and that it had asserted a statutory nuisance claim satisfying the predicate statute provision.[11]  The District Court rejected the constitutional challenges and found that the statute was an acceptable predicate.

Judge Miner, writing for a two-judge majority, affirmed the District Court's determination that PLCAA survives constitutional challenge but reversed concerning the scope of the predicate statute provision.  The court first addressed the plaintiff's challenge to PLCAA under the Tenth Amendment and fundamental principles of federalism.[12]  It defused that

---

[11] Although this statute had not been specifically pleaded, the City asserted that its allegations of common law nuisance encompassed a statutory nuisance claim based on Penal Law Code § 240.45.

[12] The plaintiff argued that PLCAA impermissibly elevates the state legislature above the state judiciary, because the predicate statute provision (as construed by the defendants) would only

challenge in part *by construing the predicate statute provision not to require express language regarding firearms and merely to require a judicial decision that the statute is applicable to firearms*:

> The Firearms Suppliers argued [in the District Court] that a predicate statute must explicitly mention firearms and that a general statute could not serve as a predicate statute even if a state's highest court were to construe that statute as applicable to firearms. *We disagree with this argument and, as set forth in more detail below, do not construe the PLCAA as foreclosing the possibility that predicate statutes can exist by virtue of interpretations of state courts.*

*City of New York*, 524 F.3d at 396 (citations omitted) (emphasis supplied).[13]

Turning then to the predicate statute provision, the court recognized that the key question is what "applicable" means: "Central to the issue under examination is what Congress meant by the phrase 'applicable to the sale or marketing of [firearms].' The core of the question is what Congress meant by the term 'applicable.'" 524 F.3d at 399. Rather than simply follow the plain meaning of "applicable," the Second Circuit narrowed that meaning in certain respects.[14] It emphasized again, however, that:

---

give force to legislative pronouncements and would ignore judicial interpretations of state statutes. *City of New York*, 524 F.3d at 396.

[13] The court continued, "We agree with the District Court in its rejection of the Firearms Suppliers' argument that a statute must expressly mention firearms in order to qualify as a predicate statute. The District Court held that the Firearms Suppliers' argument 'misconstrues the relationship of courts and legislatures in New York. The law is not only the language that the legislature adopts, but what the courts construe to be its meaning in individual cases.'" *City of New York*, 524 F.3d at 396 (quoting *City of New York v. Beretta U.S.A. Corp.*, 401 F. Supp. 2d 244, 266 (2005)).

[14] For example, the Court determined that in light of subsections (I) and (II) of the predicate provision, it would find a "textual definition" of "applicable," rather than follow its plain meaning. *Id.* at 401. (This was an application of the rule of *eiusdem generis*.) And it turned to the legislative history, although it is not clear exactly what conclusions, if any, the court drew from it. *Id.* at 403-04. We remark on these choices simply to highlight that a Connecticut court need *not* make the same choices.

> We find nothing in the statute that requires any express language regarding firearms to be included in a statute in order for that statute to fall within the predicate exception. *We decline to foreclose the possibility that, under certain circumstances, state courts may apply a statute of general applicability to the type of conduct that the City complains of, in which case such a statute might qualify as a predicate statute.*

524 F.3d at 399-400 (emphasis supplied).

> It determined finally:

> [T]he exception created by 15 U.S.C. § 7903(5)(A)(iii): (1) does not encompass New York Penal Law § 240.45; (2) does encompass statutes (a) that expressly regulate firearms, or (b) that courts have applied to the sale and marketing of firearms; and (3) does encompass statutes that do not expressly regulate firearms but that clearly can be said to implicate the purchase and sale of firearms.

524 F.3d at 404.

<blockquote>

a.   ***City of New York*'s Third Category Permits Plaintiffs to Proceed on their CUTPA Claims Because CUTPA Clearly Implicates the Purchase and Sale of Firearms.**

</blockquote>

*City of New York* recognizes that the predicate statute provision "does encompass statutes that do not expressly regulate firearms but that clearly can be said to implicate the purchase and sale of firearms." 524 F.3d at 404.[15]  This category of statutes is broad. The court indicates that statutes in this category *need not* expressly regulate firearms. They need merely be statutes that "clearly can be said to implicate the purchase and sale of firearms." *Id.*

The removing defendants allege and argue that because CUTPA is a statute of general application, it does not "clearly implicate the *regulation* of firearms." Notice of

---

[15] The Bushmaster defendants equate the holding of *City of New York* with that of the Ninth Circuit in *Ileto*, 565 F.3d at 1135-36, and *Estate of Charlot v. Bushmaster Firearms, Inc.*, 628 F. Supp. 2d 174, 180-81 (D.D.C. 2009).  Notice of Removal ¶ 27.  That is a significant misunderstanding of *City of New York*.  *City of New York* reads the predicate statute provision more expansively than *Ileto* or *Estate of Charlot*.

Removal ¶ 27 (emphasis supplied); *see also* Surreply, at 5-6.  This contention misstates the *City of New York* test, imposing a non-existent additional requirement.  *City of New York* does not require that the predicate statute clearly implicate the *regulation* of firearms, merely that it "clearly can be said to implicate the purchase and sale of firearms."  *City of New York*, 524 F.3d at 404.

And to make a point that is obvious, "clearly can be said to implicate the purchase and sale of firearms" cannot mean "expressly regulate firearms" – nor can it stand for any synonym of "expressly regulate firearms" – both because the Second Circuit treated statutes which regulate firearms expressly as a separate category and because the Second Circuit said the "clearly implicates" category of statutes *does not* "expressly regulate" firearms.  *City of New York*, 524 F.3d at 404.  As we discuss in Section V.B.4.c. below, CUTPA clearly implicates the purchase and sale of firearms.

> **b.**   ***City of New York*'s Second Category Would Allow Plaintiffs' CUTPA Claims If a Connecticut Court Applies CUTPA to the Sale or Marketing of Firearms.**

*City of New York*'s second category of permitted cases must be understood to mean cases in which a state court applies a statute of general applicability to a claim related to the sale or marketing of firearms.  *See City of New York*, 524 F.3d at 396, 399-400, 404.

In rejecting the City's Tenth Amendment challenge, the court rejected the very argument the removing defendants make here:  "The Firearms Suppliers argued that a predicate statute must explicitly mention firearms and that a general statute could not serve as a predicate statute even if a state's highest court were to construe that statute as applicable to firearms.  *We disagree*[.]"  524 F.3d at 396 (emphasis supplied).  Later, in its analysis of the predicate statute provision, the court indicated: "[w]e decline to foreclose the possibility that, under certain

circumstances, state courts may apply a state of general applicability to the type of conduct that the City complains of, in which case such a statute might qualify as a predicate statute." *Id.* at 400; *see also id.* at 396 ("We … do not construe the PLCAA as foreclosing the possibility that predicate statutes can exist by virtue of interpretations of state courts."). *City of New York*'s second category of permitted statutes thus includes statutes of general application that a state court applies to the sale or marketing of firearms.

The Bushmaster Defendants claim that *City of New York*'s rejection of the statutory nuisance claim at issue in that case implicates the scope of this second category of cases. *See* Surreply at 6 n.3. And it does, but not in a way that is helpful to defendants. At the time *City of New York* was decided, New York's higher courts had twice rejected claims against gun manufacturers nearly identical to the statutory nuisance claim at issue in *City of New York*. The statutory nuisance claim did not fail because the statute in issue was generally applicable; *it failed because New York's high courts had already indicated their disapproval of such a claim*.[16]

Thus under *City of New York*'s second category, a case may proceed if a Connecticut court would apply CUTPA, "a statute of general applicability," to the sale or marketing of firearms. *See City of New York*, 524 F.3d at 396, 399-400, 404. Applying the *Pampillonia*

_____

[16] *City of New York*'s determination that the New York statute would not serve as a predicate must be understood in the context of prior decisions by New York's high courts rejecting like claims. In 2001, the New York Court of Appeals held that gun manufacturers did not owe victims of gun violence a general duty of care in connection with the marketing and distribution of hand guns. *Hamilton v. Beretta U.S.A. Corp.*, 96 N.Y.2d 222, 230-31, 240 (N.Y. 2001). Two years later, the Appellate Division of the New York Supreme Court affirmed the dismissal of public nuisance claims brought against gun manufacturers, distributors and sellers in connection with their marketing and sales practices, finding that *Hamilton* foreclosed such claims. *People v. Sturm, Ruger & Co.*, 761 N.Y.S.2d 192, 194-95 (N.Y. App. 2003).

standard, if there is even a *possibility* that a Connecticut court will apply CUTPA to the sale or marketing of firearms, Riverview is not fraudulently joined, and the case must be remanded.[17]

### c.      CUTPA Clearly Implicates and Is Applicable to the Sale and Marketing of Firearms.

In their Notice of Removal, the Bushmaster Defendants attack the CUTPA counts based on their narrow interpretation of the predicate statute provision.  *See* Notice of Removal ¶¶ 26-27.  The limited question raised by their Notice of Removal is whether a Connecticut court would construe the predicate statute provision as restrictively as they do.  They have not alleged that CUTPA will not suffice as a predicate statute if the provision is construed more broadly, perhaps because they recognize the futility of such an argument.  Below, we address CUTPA more substantively than defendants have.  By doing so we do not concede or even imply that the Court could determine remand based on an issue not alleged in the Notice of Removal. *Pampillonia* requires the removing defendants to prove fraudulent joinder by clear and convincing evidence.  *Pampillonia*, 138 F.3d at 461.  *A fortiori*, a claim that is not alleged cannot serve as a basis for establishing fraudulent joinder.

---

[17] Fundamental concerns for federalism require that a Connecticut court be the final arbiter of the applicability of Connecticut's statute:

> This Court recognizes that "[w]here a decision is to be made on the basis of state law. . . the Supreme Court has long shown a strong preference that the controlling interpretation of the relevant statute be given by state, rather than federal, courts."  *Allstate Ins. Co. v. Serio*, 261 F.3d 143, 150 (2d Cir.2001). "[R]ooted in basic principles of federalism," this preference requires deference to the opinions of state court on state law question when such decisions are available.  *Id.*

*Baker v. Health Mgmt. Sys., Inc.*, 298 F.3d 146, 149 (2d Cir. 2002).  *City of New York* specifically allows for the creation of predicate statutes through the development of state jurisprudence: "under certain circumstances, state courts may apply a statute of general applicability to the type of conduct that the City complains of, in which case such a statute might qualify as a predicate statute."  524 F.3d at 400.

"[T]he purpose of CUTPA is to protect the public from unfair practices in the conduct of any trade or commerce, and whether a practice is unfair depends upon the finding of a violation of an identifiable public policy. . . .  *The entire act is remedial in character. . . and must be liberally construed in favor of those whom the legislature intended to benefit.*"  *Willow Springs Condominium Ass'n, Inc. v. Seventh BRT Development Corp.*, 245 Conn. 1, 42 (1998) (internal quotation marks and citations omitted) (emphasis supplied).

> CUTPA, by its own terms, applies to a broad spectrum of commercial activity. The operative provision of the act, [General Statutes] § 42–110b(a), states merely that [n]o person shall engage in unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce. Trade or commerce, in turn, is broadly defined as the advertising, the sale or rent or lease, the offering for sale or rent or lease, or the distribution of any services and any property, tangible or intangible, real, personal or mixed, and any other article, commodity, or thing of value in this state.

*Id.*  Clearly, CUTPA is applicable to and can be said to implicate sales and marketing conduct in Connecticut – including the sale and marketing of firearms.  *See generally Salomonson v. Billistics, Inc.*, 1991 WL 204385, at *12 (Conn. Super. Sept. 27, 1991) (Freeman, JTR) (applying CUTPA to transaction involving firearms; "The instant transaction for the sale, manufacture and delivery of remanufactured weapons to Plaintiff meets the statutory definition of trade or commerce, C.G.S. § 42-110a(4)[.]").

### d.    Plaintiffs Allege Claims under CUTPA.

The Bushmaster defendants do not allege that plaintiffs fail to state a claim under CUTPA.  *See* Notice of Removal ¶¶ 26-27.  Thus the sufficiency of plaintiffs' allegations are not before the Court.  We nonetheless briefly address our CUTPA allegations.

The criteria for establishing a violation of CUTPA are flexible:

> It is well settled that in determining whether a practice violates CUTPA we have adopted the criteria set out in the cigarette rule by the federal trade commission for determining when a practice is unfair:  (1) [W]hether the

> practice, without necessarily having been previously considered unlawful, offends public policy as it has been established by statutes, the common law, or otherwise-in other words, it is within at least the penumbra of some common law, statutory, or other established concept of unfairness; (2) whether it is immoral, unethical, oppressive, or unscrupulous; (3) whether it causes substantial injury to consumers, [competitors or other businesspersons].

*Am. Car Rental, Inc. v. Comm'r of Consumer Prot.*, 273 Conn. 296, 305 (2005) (citations and internal quotation marks omitted).  Under the cigarette rule, "[a]ll three criteria do not need to be satisfied to support a finding of unfairness.  A practice may be unfair because of the degree to which it meets one of the criteria or because to a lesser extent it meets all three[.]"  *Id.* at 305.  "CUTPA reflects a public policy that favors remedying wrongs that may not be actionable under other bodies of law."  *Willow Springs Condo. Ass'n, Inc.*, 245 Conn. at 42.

Plaintiffs allege, inter alia, that Riverview engaged in conduct that was immoral, unethical, and unscrupulous by holding the XM15-E2S out as an appropriate weapon for civilian purchase, despite their knowledge about its excessively dangerous qualities and despite their knowledge about the likelihood that it would be misused.  *See* Compl. ¶¶ 174-191.  Riverview's sale of a weapon with these qualities violated the public policy of the State of Connecticut as embodied in Connecticut General Statutes Sections 53-202a *et seq*. (2011 Rev.), which banned assault weapons closely resembling the XM15-E2S.[18]  Based on these allegations, a Connecticut court is likely to find that plaintiffs have alleged a CUTPA violation.

### 5.    A Connecticut Court May Reach Its Own Broader Interpretation of the Predicate Statute Provision.

While the Second Circuit's interpretation of PLCAA's predicate statute provision will be highly persuasive to the Connecticut Supreme Court, it is by no means binding.  *E.g. Turner*, 253

---

[18] Even if the removing defendants had challenged the substantive pleading of the elements of CUTPA, which they have not, the determination of such a challenge is best left to the Connecticut courts.  *See Baker*, 298 F.3d at 149.

Conn. at 340-41.  The Connecticut Supreme Court may adopt the more expansive construction of the predicate statute provision reached by Judges Katzmann and Weinstein, or one much like it.

All four judges who considered the predicate statute provision in this Circuit (Judges Miner, Cabranes, Katzmann, and Weinstein) agreed that "applicable" is a broad term, meaning "capable of being applied."  Two judges (Judges Weinstein and Katzmann) determined that the meaning of the predicate provision was clear on its face and would simply have implemented its plain language.  *E.g. City of New York*, 524 F.3d at 404-05 (Katzmann, J., dissenting) (finding that predicate statute provision is unambiguous and so the court must simply implement its plain language); *City of New York*, 401 F. Supp. 2d at 261 (Weinstein, J.) (holding that "[b]y its plain meaning. . . .  Section 240.45 satisfies the language of the predicate exception requiring 'a statute applicable to the sale or marketing of [a firearm].'"); *see also City of Gary*, 875 N.E.2d at 434 (predicate statute provision is unambiguous and encompasses statutes "applicable to the sale or marketing" of firearms).

The two judges in the *City of New York* majority read "applicable" as ambiguous and therefore resorted to contextual and extratextual evidence to determine Congress' intent.  *City of New York*, 524 F.3d at 400-04.  The Connecticut Supreme Court, however, may adhere more closely to federal canons of statutory interpretation, which give weight to plain meaning in statutory analysis.  *See e.g.*, *BedRoc Ltc., LLC v. United States*, 541 U.S. 176, 183 (2004) ("The preeminent canon of statutory interpretation requires us to 'presume that [the] legislature says in a statute what it means and means in a statute what it says there.'").  "Applicable" is not defined, so the general rule is that "[i]n the absence of such a definition, we construe a statutory term in accordance with its ordinary or natural meaning."  *F.D.I.C. v. Meyer*, 510 U.S. 471, 476 (1994) (citing dictionary definition).

In addition, a Connecticut court may disagree with the *City of New York* majority's use of the interpretive principle of *eiusdem generis*. *City of New York* departs from the plain language of the predicate provision partially because it relies on subparts (I) and (II) of that provision and determines that the examples given there limit the scope of the predicate statute provision.[19] *Eiusdem generis* is "only an instrumentality for ascertaining the correct meaning of words when there is uncertainty." *Gooch v. U.S.*, 297 U.S. 124, 128 (1936). And far from limiting the predicate statute provision, the subparts broaden it by "including" two subparts listing additional claims against gun manufacturers and sellers that are not barred by PLCAA. "'[I]ncludes' is a term of enlargement, not of limitation." *Alarm Indus. Comm. Inc., v. F.C.C.*, 131 F.3d 1066, 1070 (D.C. Cir. 1997). The Supreme Court has held that the term "including" indicates an "'illustrative and not limitative' function" that "provide[s] only general guidance" about Congressional intent. *Campbell v. Acuff-Rose Music*, 510 U.S. 569, 577-78 (1994) (citation omitted).

Thus a Connecticut court may well adopt a broader construction of the predicate statute provision than did the Second Circuit. In any event, because this Court cannot determine that a Connecticut court will certainly adopt defendants' restrictive interpretation of this provision, defendants fail to bear their burden under *Pampillonia*.

---

[19] The predicate statute provision states that cases it preserves "includ[e]" "any case in which the manufacturer. . . aided, abetted, or conspired with any person in making any false or fictitious oral or written statement with respect to any fact material to the lawfulness of the sale or other disposition of a [firearm]," or "any case in which the manufacturer or seller aided, abetted, or conspired with any other person to sell or otherwise dispose of a [firearm] knowing, or having reasonable cause to believe, that the actual buyer of the [firearm] was prohibited from possessing or receiving a firearm or ammunition under subsection (g) or (n) of section 922 of Title 18." 15 U.S.C. § 7903(5)(A)(iii)(I) & (II).

### C.   THE REMOVING DEFENDANTS CANNOT ESTABLISH THAT THE CONNECTICUT SUPREME COURT WILL CERTAINLY FIND PLCAA SURVIVES CONSTITUTIONAL CHALLENGE.

The Bushmaster Defendants assert that PLCAA bars plaintiffs' public nuisance claims. This bar to a long-standing common law cause of action – merely because it has not been legislatively codified – violates the Tenth Amendment.[20]

In our nation with dual sovereigns, "each [is] protected from incursion by the other." *Saenz v. Roe*, 526 U.S. 489, 504 n.17 (1999) (citation omitted).  The Tenth Amendment[21] makes explicit that the respect each must accord the other is a constitutional command under which the federal government must defer to "the constitutional role of the States as sovereign entities." *Alden v. Maine*, 527 U.S. 706, 713 (1999).  Besides its anti-commandeering mandate, federalism limits congressional designs that interfere with the structure and operation of state government,[22] as well as on the scope of Congress's enumerated powers and authority to preempt state law.[23]

PLCAA oversteps these limits by impermissibly determining which branch of state government will be recognized as the authoritative expositor of the State's pertinent laws.

---

[20] Again, while the Second Circuit addressed and rejected a similar argument in *City of New York*, 524 F.3d at 396, the Connecticut Supreme Court is not bound by that decision.  *See Johnson*, 133 S. Ct. at 1098 (observing that "the views of the federal courts of appeals do not bind [a state court] when it decides a federal constitutional question, and disagreeing with the lower federal courts is not the same as ignoring federal law").

[21] The Tenth Amendment provides:  "The powers not delegated to the United States by the Constitution, nor prohibited by it to the states, are reserved to the states respectively, or to the people."  U.S. Const. amend. X.

[22] *See Gregory v. Ashcroft*, 501 U.S. 452, 463 (1991).  *See also* Deborah Jones Merritt, *The Guarantee Clause and State Autonomy:  Federalism for a Third Century*, 88 Colum L. Rev. 1, 50 (1988).

[23] *See, e.g.*, *United States v. Lopez*, 514 U.S. 549, 553 (1995) (recognizing that "the scope of the interstate commerce power 'must be considered in the light of our dual system of government.'") (quoting *NLRB v. Jones & Laughlin Steel Corp.*, 301 U.S. 1, 37 (1937)).

Specifically, PLCAA prohibits "qualified civil liability actions" against gun manufacturers or sellers unless, *inter alia*, the defendant "knowingly violated a State or Federal statute applicable to the sale or marketing of the product, and the violation was a proximate cause of the harm for which relief is sought." 15 U.S.C. § 7903(5)(A)(iii).  Hence, PLCAA prohibits a nuisance action here because one has not been codified, but would permit an action based on a *legislative act*. The claims may have identical elements, but because one is legislative rather than statutory, PLCAA would favor the one and vitiate the other.

PLCAA unconstitutionally dictates to the States which branch of government Congress will recognize (and require the courts to recognize) as the authoritative expositor of state law in relation to firearms.  Congress, however, holds no authority to make such a selection among branches of state government; that authority rests solely, and constitutionally, with the States themselves.  It is axiomatic that "States are free to allocate the lawmaking function to whatever branch of state government they may choose."  *Minnesota v. Clover Leaf Creamery Co.*, 449 U.S. 456, 462 n.6 (1981) (citations omitted).  The U.S. Supreme Court has been emphatic on this point:  "While Congress has substantial powers to govern the Nation directly, including in areas of intimate concern to the States, the Constitution has never been understood to confer upon Congress the ability to require the States to govern according to Congress' instructions."  *New York v. United States*, 505 U.S. 144, 162 (1992) (citation omitted).

The federal government can neither dictate the form of government a state adopts, nor require that a state respect federal separation of powers principles within its own government. *Dreyer v. State of Illinois*, 187 U.S. 71, 84 (1902).  "Whether the legislative, executive, and judicial powers of a state shall be kept altogether distinct or separate, or whether persons or collections of persons belonging to one department may, in respect to some matters, exert powers

43

which, strictly speaking, pertain to another department of government, is for the determination of the state." *Id.* It follows that Congress may not require that the laws of a state be a product of legislative action, rather than authoritative construction by its courts.

It is also true that "decisions of state courts are definitive pronouncements of the will of the States as sovereigns." *Bush v. Gore*, 531 U.S. 98, 112 (2000) (Rehnquist, C.J., concurring). The "rules of decision established by judicial decisions of state courts are 'laws' as well as those prescribed by statute." *West v. American Tel. & Tel. Co.*, 311 U.S. 223, 236 (1940). Connecticut courts have long recognized a cause of action for nuisance. As such, a congressional enactment, like PLCAA, that denies state courts authority to declare the law, and prefers exclusive reliance on state legislatures for the definitive pronouncement of that state's law, unconstitutionally invades state sovereignty. After all, it is "[t]hrough the structure of its government, and the character of those who exercise government authority, [that] a State defines itself as a sovereign." *Gregory v. Ashcroft*, 501 U.S. 452, 460 (1991). *See also Highland Farms Dairy v. Agnew*, 300 U.S. 608, 612 (1937) ("How power shall be distributed by a state among its governmental organs is commonly, if not always, a questions for the state itself.").

PLCAA patently requires States to exercise their lawmaking authority over the marketing and distribution of guns though the legislature rather than through the courts, while also constricting state judicial power. Congress made plain its concern that liability would be imposed on gun manufacturers and dealers by a "maverick judge or petit jury" in a manner that was not supported by its own view of "hundreds of years of the common law and jurisprudence of the United States [or] a bona fide expansion of the common law." 15 U.S.C. § 7901(a)(7). Rather than chance such a "maverick" judgment out of the judicial branch, PLCAA withdraws authority from the courts over such actions, except when a state legislature decides to grant it.

This statutory expression of congressional preference for legislative determinations over judicial ones is not a legitimate exercise of federal power and violates the Tenth Amendment.

Once again, because the Connecticut Supreme Court has yet to address the constitutionality of PLCAA, remand is required.

## VI.    CONCLUSION

For these reasons, the Court must remand this case to the Connecticut Superior Court.

**Respectfully submitted,**

**By          /s/ Joshua D. Koskoff, ct15619**
**JOSHUA D. KOSKOFF, ct15619**
**ALINOR C. STERLING, ct17207**
**KOSKOFF KOSKOFF & BIEDER**
**350 FAIRFIELD AVENUE**
**BRIDGEPORT, CT  06604**
**jkoskoff@koskoff.com**
**asterling@koskoff.com**
**Telephone:     (203) 336-4421**
**Fax:              (203) 368-3244**

**ATTORNEYS FOR PLAINTIFFS**

## CERTIFICATE OF SERVICE

I hereby certify that on May 18, 2015, a copy of the foregoing Amended Memorandum of Law was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent by e-mail to all parties by operation of the court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing.  Parties may access this filing under the court's CM/ECF System.

<strong>/s/ Joshua D. Koskoff, ct15619</strong><br>
<strong>JOSHUA D. KOSKOFF, ct15619</strong><br>
<strong>ALINOR C. STERLING, ct17207</strong>

46