**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| DONNA L. SOTO, ADMINISTRATRIX OF | ) | |
| THE ESTATE OF VICTORIA L. SOTO, *et al.* | ) | |
| | ) | |
| Plaintiffs, | ) | |
| VS. | ) | Case No. 3:15-CV-00068-RNC |
| | ) | |
| BUSHMASTER FIREARMS | ) | |
| INTERNATIONAL, LLC a/k/a FREEDOM | ) | |
| GROUP, INC. a/k/a REMINGTON OUTDOOR | ) | |
| GROUP, INC, *et al.* | ) | June 3, 2015 |
| | ) | |
| Defendants. | ) | |

**DEFENDANTS REMINGTON ARMS COMPANY, LLC
AND REMINGTON OUTDOOR COMPANY, INC.'S
RESPONSE TO PLAINTIFFS' SUPPLEMENTAL MOTION TO REMAND**

Defendants, Remington Arms Company, LLC and Remington Outdoor Company, Inc. (collectively, the "Remington Defendants"), submit this Memorandum in Opposition to Plaintiffs' Supplemental Motion to Remand (DE 46; 46-1; and 47-1, "Pls.' Memo").

**<u>INTRODUCTION</u>**

The Protection of Lawful Commerce in Arms Act ("PLCAA") was enacted by Congress to protect federally-licensed firearm sellers from the very allegations made by Plaintiffs in this case. Riverview Sales, Inc. ("Riverview Sales") is alleged to be responsible for the criminal acts of Adam Lanza based on its lawful retail sale of a legal firearm to Nancy Lanza, who Riverview Sales did not know or have reason to believe was likely to use the firearm in a manner involving an unreasonable risk of harm. Congressional intent to provide firearms sellers with broad protection from liability for the criminal actions of others under these circumstances could not be clearer. Plaintiffs' claims against Riverview Sales are "qualified civil liability actions" under the PLCAA and are barred.

In the Supplemental Motion for Remand,[1] Plaintiffs attempt to fit their claims against Riverview Sales into enumerated exceptions to PLCAA immunity.  Plaintiffs' arguments are unavailing because they require expansive and unrecognized interpretations of the PLCAA which, if accepted, would swallow the statute's overall purpose—to protect firearm sellers from claims arising from the criminal use of lawfully sold firearms.  Because there is no reasonable basis for a cause of action against Riverview Sales, it has been improperly joined. As a result, this Court has subject matter jurisdiction based on the remaining parties' diversity of citizenship. Plaintiffs' Supplemental Motion to Remand should be denied.

## ARGUMENT

### I.      This Court Should Interpret and Apply the PLCAA to Plaintiffs' Claims against Riverview Sales without Regard to a Connecticut State Court's Interpretation.

Plaintiffs' argument that this case must be remanded for a Connecticut state court's interpretation of the PLCAA misses the mark.  The PLCAA is a preemptive federal immunity statute, enacted by Congress to limit the types of claims that may be brought against firearm sellers for damages resulting from the criminal use of firearms by third parties.  This Court's interpretation of the PLCAA and its application to Plaintiffs' allegations against Riverview Sales are matters to be addressed under the federal rules of statutory construction and controlling federal precedent. *See City of New York v. Beretta*, 524 F.3d 384 (2d Cir. 2008) (interpreting PLCAA under federal law and finding state-law claims preempted); *see also Ileto v. Glock*, 565 F.3d 1126 (9th Cir. 2008) (same).  Plaintiffs' contention that a federal court cannot apply a federal statute and decide that

---

[1] Plaintiffs filed their initial Motion for Remand on February 13, 2015 (DE 27).  Despite the fact that they submitted 35 pages of briefing on the initial Motion for Remand, Plaintiffs deemed it necessary to supplement their arguments in support of remand with the motion *sub judice* and another 45 pages of briefing, so far.

state-law claims against a non-diverse, improperly joined defendant are preempted is simply wrong.  The federal preemption doctrine arises from the Supremacy Clause of the Constitution, U.S. Const. art. VI, cl. 2, and federal legislation may expressly or impliedly preempt state law.  *See, e.g.*, *Fidelity Fed. Sav. & Loan Ass'n v. De la Cuesta*, 458 U.S. 141, 152-53 (1982).

The Second Circuit's decision in *Pampillonia v. RJR Nabisco, Inc.*, 138 F. 3d 459 (2d Cir. 1998) does not compel a different conclusion.  In *Pampillonia* and each of the other cases cited by Plaintiffs in support of remand, a federal immunity statute's impact on recognized state law claims was not at issue.  Rather, in those cases, the question of whether a reasonable basis existed for stating a cause of action against the non-diverse defendant turned only on whether the cause of action was recognized under settled state law. (Pls.' Memo at 6-7.)   If the possibility of stating a cause of action against a non-diverse defendant depended on resolution of unsettled state law, remand to the state court was held to be appropriate.  However, where the question on which remand depends is whether a federal statute preempts that cause of action, a state court's answer to the question is not required or controlling.  *See Charlot v. Bushmaster Firearms, Inc.*, 628 F.Supp. 2d 174, 180 (D.D.C. 2009) (state court construction of the PLCAA "is not controlling precedent for this Court."); *McDonal v. Abbott Laboratories*, 408 F.3d 177 (5th Cir. 2005) (federal court interpreted federal preemption statute on motion to remand to prohibit state tort law claims); *Silvas v. E*Trade Mortgage Corp.*, 421 F.Supp. 2d 1315, 1321 n.4 (S.D. Cal. 2006) (state court decisions interpreting federal preemption law are not binding on federal court); *Ramirez v. Am. Home Prods.*, C.A. No. B-03-155, 2005 U.S. Dist. LEXIS 40577 (S.D. Tex. Sept. 16, 2005) (interpreting federal law to preempt state common law claims and finding in-state defendants were fraudulently joined).[2]

_____

[2] A federal preemption statute is a viable basis to establish diversity jurisdiction through fraudulent

A recent Fourth Circuit Court of Appeals decision underscores the weakness of Plaintiffs' argument. In *Johnson v. American Towers, LLC*, 781 F.3d 693 (4th Cir. 2015), a prison guard was shot and seriously injured in his home.  The attack had been ordered by an inmate using a contraband cell phone.  Plaintiffs filed suit in state court against wireless service providers and owners of cell phone towers under a common law negligence theory. *Id*. at 700.  Plaintiffs alleged the defendants were aware that inmates illegally used cell phones using signals emitted from the defendants' towers, and their use of the phones created an unreasonable risk of harm to others. *Id*. The defendants removed the case to federal court, asserting, *inter alia*, complete diversity based on the fraudulent joinder of non-diverse defendants.  The basis for fraudulent joinder was that the state common law claims against the non-diverse defendants were preempted by the Federal Communications Act ("FCA"), 47 U.S.C. § 332. *Johnson*, 781 F.3d at 705.

The plaintiffs in *Johnson* moved to remand the case to state court.  The District Court denied the motion to remand, finding that it had subject matter jurisdiction under the fraudulent joinder doctrine. *Id*. at 704.  The Fourth Circuit affirmed, finding that the FCA preempted the plaintiffs' state-law tort claim, as a matter of law, because state-law claims that "obstruct or burden a wireless service provider's ability" to provide coverage were expressly preempted under the act. *Id*. at 706.  In so holding, the court applied the same standard set forth in *Pampillonia*:  "The removing party must show . . . there is *no possibility* that the plaintiff would be able to establish a cause of action against the in-state defendant in state court." *Id*. at 704 (emphasis in original).  The court reasoned that "[e]ven under this rigorous standard" the plaintiffs could not succeed against

---

joinder of a non-diverse party, especially where the preemptive defense would bar the claims in a state court. *Frontier Airlines, Inc. v. United Air Lines, Inc.*, 758 F. Supp. 1399, 1406 (D. Colo. 1989).  The PLCAA is a preemptive statute that bars claims in federal and state court. 15 U.S.C § 7902(a); *e.g.*, *Gilland v. Sportsmen's Outpost, Inc.*, No. X04CV095032765S, 2011 Conn. Super. LEXIS 1320 (Conn. Super. Ct. May 26, 2011); *see also* DE 1, NOR at 6, n. 7 (collecting cases).

the non-diverse defendants. *Id*.

The court in *Johnson* did not look to state law to determine whether the federal statute preempted the plaintiffs' state law claim against the non-diverse defendants because "[p]reemption fundamentally is a question of congressional intent." *Id*. at 705; *see also Cipollone v. Liggett Group, Inc.*, 505 U.S. 504 (1992) (deriving meaning of federal preemptive law from principles of statutory interpretation and examination of congressional intent in legislative history); *Phillips v. Lucky Gunner, LLC*, No. 14-cv-02822-RPM, 2015 U.S. Dist. LEXIS 39284, *21-22 (D. Colo. Mar. 27, 2015) (whether state law is "pre-empted by [the PLCAA] and therefore invalid under the Supremacy Clause of the Constitution, [the Court's] sole task is to ascertain the intent of Congress.") (quoting *Cal. Fed. Sav. & Loan Ass'n v. Guerra*, 479 U.S. 272, 280 (1987)).   This Court should not defer to Connecticut law to determine whether the PLCAA preempts plaintiffs' claims against Riverview Sales.  The plain language of the PLCAA and the purposes for which it was enacted control the analysis of whether Plaintiffs' claims against Riverview Sales are barred.

Plaintiffs cannot state a cause of action against Riverview Sales because their allegations fall within the PLCAA definition of a "qualified civil liability action." 15 U.S.C. § 7903(5)(A). The Court does not need to resolve a dispute over whether Connecticut law recognizes a cause of action for negligent entrustment, or whether CUTPA gives consumers and business persons standing to recover an "ascertainable loss of money or property" in trade or commerce resulting from unfair or deceptive practices.  Conn. Gen. Stat. § 42-1110g.  The question to be answered is whether the Plaintiffs have pleaded claims against Riverview Sales that are preempted by federal law.   The answer to this question depends on this Court's interpretation and application of the PLCAA, not on an interpretation of state law by a Connecticut state court.  This is a question of law for this Court's determination. *United States v. Santos*, 541 F.3d 63, 67 (2d Cir. 2008) (matters

of statutory interpretation are questions of law).

Its important to note that the court in *Johnson* went on to affirm dismissal of the entire case against all defendants based, *inter alia*, on federal preemption grounds. 781 F.3d at 707.  Because the Fourth Circuit, like the Second Circuit, does not recognize the "common defense rule," the rule did not bear on whether remand was required.  Indeed, at least one district court in the Second Circuit has had the opportunity but declined to adopt the rule.  *Pelman ex rel. Pelman v. McDonald's Corp.*, 237 F.Supp.2d 512, 516 (S.D.N.Y. 2003), was a putative class action filed against McDonald's, claiming that an unhealthy menu led to obesity among class members.  In addition to suing the diverse McDonald's, the plaintiffs named several non-diverse McDonald's franchises in New York. *Id.* at 521.  McDonald's removed the case to federal court, arguing the local McDonald's franchisees were fraudulently joined.  The court held that McDonald's met its heavy burden to show fraudulent joinder, finding that the state court complaint failed to state a cognizable claim against the local franchisees under New York law: "the plaintiffs' real beef is with McDonalds [sic] Corp." *Id.* at 523.  The district court also dismissed the case against McDonald's on essentially the same basis it found the local defendants had been fraudulently joined. *See id.* at 542-43.  On appeal from a subsequent, related dismissal, the Second Circuit reversed the dismissal of McDonald's, finding that the plaintiff had at least adequately stated a claim under a New York statute, but the district court retained subject matter jurisdiction. *See Pelman ex rel. Pelman v. McDonald's Corp.*, 396 F.3d 508, 512 (2d Cir. 2005).

For the reasons stated below, the only interpretation of the PLCAA consistent with the plain meaning and context of the language used by Congress, is that Plaintiffs' claims against Riverview Sales are "qualified civil liability actions" that "may not be brought in any Federal or State court." 15 U.S.C. § 7902(a).  As a matter of law, there is no reasonable basis for a claim

against Riverview Sales, and therefore its citizenship should be disregarded.   Plaintiffs' Motion to Remand should be denied.

> **II.      Congress Intended to Shield Firearm Sellers from Liability under the PLCAA, Which Should Be Read as a Whole and in Context, and its Exceptions Are to Be Construed Narrowly.**

Plaintiffs press two claims against Riverview Sales:  alleged negligent entrustment of the firearm used in the shooting to Nancy Lanza, and an alleged violation of CUTPA based on the argument that the firearm lawfully sold to Nancy Lanza was inappropriate for civilian ownership.[3] Plaintiffs argue they have stated causes of action under these theories because both claims fall within exceptions to the PLCAA definition of a "qualified civil liability action." Plaintiffs are wrong.

Plaintiffs' factual allegations regarding Riverview Sales' sale of the firearm to Nancy Lanza do not fit within the negligent entrustment exception to firearm seller immunity. *See* 15 U.S.C. § 7903(5)(B).  Broadly interpreting the PLCAA definition of negligent entrustment to encompass the lawful sale of a firearm to a person, who merely possessed the firearm in a household shared with another adult, would swallow the protections afforded by PLCAA entirely. Similarly, CUTPA cannot be found to be a predicate statute under the predicate exception to

---

[3] Plaintiffs have conceded that their public nuisance claim against Riverview Sales is a qualified civil liability action and subject to dismissal under the PLCAA by first limiting their defense of the claim to an argument that the PLCAA is unconstitutional under the Tenth Amendment to the United States Constitution. (Pls.' Memo at 42-45.)   Plaintiffs thereafter withdrew their constitutional challenge, incorrectly contending that this Court cannot hear their constitutional challenge but must remand the case to the Connecticut state court for a ruling on the constitutionality of the PLCAA. (DE 48.)  Plaintiffs are wrong, but regardless, their constitutional challenge to the PLCAA has been rejected by the Second Circuit in *City of New York*, 524 F.3d at 395-96, and by every other appellate court that has considered it. *See, e.g*., *Estate of Kim v. Cox*, 295 P.3d 380, 388 (Alaska 2013); *Adames v. Sheehan*, 909 N.E.2d 742, 764-65 (Ill. 2009). A Connecticut Superior Court has also rejected a constitutional challenge to the PLCAA, including the Tenth Amendment argument. *Gilliand*, 2011 Conn. Super. LEXIS 1320, at *43-45.

PLCAA immunity without completely ignoring the intent of Congress to protect firearm sellers and the clear guidance of the Second Circuit. 15 U.S.C. § 7903(5)(A)(iii); *City of New York* v. Beretta, 524 F.3d 384 (2d Cir. 2008).

Interpretation of the PLCAA language should begin from the irrefutable premise that Congress intended to protect federally licensed firearms dealers, such as Riverview Sales, from tort claims arising from the criminal use of firearms they lawfully sold. *See City of New York*, 524 F.3d at 401-02 (noting that those engaged in the lawful sale of firearms "should not . . . be liable for the harm caused by those who criminally or unlawfully misuse" firearms) (quoting 15 U.S.C. § 7901(a)(5)). Because the meaning of statutory language, plain or not, depends on context, the interpretative rule that a statute must be read as a whole controls the analysis. *King v. St. Vincent Hospital*, 502 U.S. 215, 221 (1991). Where examination of a statute as a whole "demonstrates that a party's interpretation would lead to 'absurd or futile results . . . plainly at variance with the policy of the legislation as a whole' that interpretation should be rejected." *Yerdon v. Henry*, 91 F.3d 370, 376 (2d Cir. 1996) (quoting *EEOC v. Commercial Office Products, Co*., 486 U.S. 107, 120 (1988).

Here, the declared purpose of the PLCAA is to "prohibit causes of action against manufacturers, distributors, dealers and importers of firearms" for harm "caused by the criminal or unlawful use of firearms" that "functioned as designed and intended." 15 U.S.C. § 7901(b)(1); *see City of New York*, 524 F.3d at 402 ("We think Congress clearly intended to protect from vicarious liability members of the firearms industry who engage in the 'lawful design, manufacture, marketing, distribution, importation or sale of firearms.'"). Congress created specific enumerated exceptions to the policy of broadly protecting firearm sellers. It is a fundamental rule of statutory construction that statutory exceptions should be narrowly construed to preserve the primary purpose of the statute. *Commissioner v. Clark*, 489 U.S. 726, 739 (1989).

Plaintiffs ignore these principles and instead ascribe meaning to PLCAA language that Congress could never have intended; Congress found that imposition of liability on firearm sellers for harm caused by the criminal use of firearms "is an abuse of the legal system." 15 U.S.C. § 7901(a)(6).

### III.   Plaintiffs' Negligent Entrustment Claim against Riverview Sales Is Barred.

Whether Plaintiffs' allegations regarding Riverview Sales' sale of the firearm to Nancy Lanza fit the PLCAA's definition of "negligent entrustment" is a question for this Court because it involves interpretation and application of the PLCAA—a federal statute.  Plaintiffs' argument that this question (and every question related to their motion to remand) must first be answered by a Connecticut state court is an incorrect reading of *Pampillonia*. (*See* Argument § I, *supra*.)

### A.   Plaintiffs' Negligent Entrustment Allegations against Riverview Sales Do Not Satisfy the PLCAA Definition of Negligent Entrustment.

Plaintiffs' analysis is correct in two respects.  First, the enumerated exceptions to PLCAA immunity do not create causes of action. 15 U.S.C. § 7903(5)(C) ("[N]o provision of this chapter shall be construed to create a public or private cause of action or remedy.").  Second, whether a cause of action is available under an exception to PLCAA immunity depends on whether the cause of action is recognized under applicable state law.  Plaintiffs' analysis, however, misses the mark because the allegations in support of even a recognized cause of action *must fit* an enumerated exception. If the allegations do not fit an exception to immunity, the claim is a "qualified civil liability action" and subject to dismissal.

The allegations in support of a negligent entrustment action must satisfy the following definition in order to survive PLCAA immunity:

> As used in subparagraph (A)(ii), the term "negligent entrustment" means the supplying of a qualified product by a seller for use by another person when the seller knows, or reasonably should know, the person to whom the product is supplied is likely to, and does, use the product in a manner involving unreasonable risk of physical

injury to the person or others.

15 U.S.C. § 7903(5)(B).   This definition provides the minimum elements required to be pleaded in order to qualify for the negligent entrustment exception under the PLCAA, notwithstanding the fact that some states may have less stringent standards.[4]   If the allegations in support of a negligent entrustment claim against a firearm seller do not reach the PLCAA's definitional "floor," the claim is a qualified civil liability action and it may not proceed. *Cf. Geier v. Am. Honda Motor Co.*, 529 U.S. 861, 870 (federal preemptive statute established a minimum standard, *i.e.*, a "floor"); *Riegel v. Medtronic, Inc.*, 552 U.S. 312 (2008) (holding that the preemption clause of the Food, Drug and Cosmetic Act relating to medical devices, 21 U.S.C. § 360k(a), preempts certain state law claims: "Petitioner's common-law claims are pre-empted because they are based upon New York 'requirement[s]' with respect to Medtronic's catheter that are 'different from, or in addition to' the federal ones, and that relate to safety and effectiveness, § 360k(a).").

> ### i.   Plaintiffs Have Not Alleged Facts Demonstrating that Riverview Sales Knew or Reasonably Should Have Known How Nancy Lanza Was Likely to Use the Firearm.

Plaintiffs do not allege any facts in their Complaint establishing that Riverview Sales knew or reasonably should have known that Nancy Lanza was likely to use the firearm she purchased in a manner involving an unreasonable risk of injury to others. In the absence of these factual allegations, Plaintiffs have not pleaded a cause of action for negligent entrustment against

---

[4] Plaintiffs' reliance on Arkansas law is unavailing. (Pls.' Memo at 22, 23 n.7.)  For example, under Arkansas law there are five elements of a negligent entrustment action, none of which includes a factual allegation that is required under the PLCAA definition of negligent entrustment—namely, that the person to whom the product is supplied be the same person who then uses the product to cause an unreasonable risk of physical injury. *See Collins v. Arkansas Cement Co.*, 453 F.2d 512, 514 (8th Cir. 1972); *LeClaire v. Commercial Siding & Maintenance Co.*, 308 Ark. 580, 582 (1992). Thus, a complaint simply setting forth the elements of an Arkansas common law negligent entrustment action against a firearm seller arising from a criminal firearm use would be a "qualified civil liability action" and subject to dismissal under the PLCAA.

Riverview Sales that reaches the PLCAA definitional floor or, for that matter, under the Connecticut cases relied on by Plaintiffs. *See Turner v. American Dist. Tel. & Messenger Co.*, 94 Conn. 707, 110 A. 540, 543 (1920) (knowledge of the entrustee's recklessness is a "vitally important" element of the claim). Indeed, Plaintiffs' Complaint describes a lawful sale of a lawfully-manufactured product to a law-abiding person, who did not disclose or even suggest to the seller an intention to use the product illegally or irresponsibly.[5] Such a sale cannot constitute negligent entrustment under any definition of the cause of action.[6]

> **ii. Plaintiffs' Argument that the Type of Firearm Purchased by Nancy Lanza Put Riverview Sales on Notice that She Would Use It in a Manner Involving Unreasonable Risk of Injury Should Be Rejected.**

The PLCAA prohibits a wide variety of claims against firearm manufacturers and sellers, and only allows specifically enumerated others. However, Plaintiffs' primary claim in this case—that a firearm seller acted tortiously by making a lawful sale of a commonly purchased firearm to a law abiding person without any knowledge or reason to believe the person would use the firearm irresponsibly—is prohibited by the PLCAA.

---

[5] Plaintiffs suggest that they could cure "insufficient" allegations on how Nancy Lanza "used" the rifle by way of amendment and remand is therefore required. (Pls.' Memo at 29, n. 9.) Plaintiffs' contention is incorrect. *In re Rezulin*, Liab. Litig., 133 F. Supp. 2d 272, 284-285 & n.35 (S.D.N.Y. 2001) (rejecting plaintiffs' assertion that they can avoid removal by curing their complaint's deficiencies by amendment and that this possibility requires remand).

[6] For instance, a firearm seller might acquire the requisite knowledge of the risk of unlawful misuse by a purchaser based on statements made by the purchaser or the purchaser's behavior during the sales transaction. *See, e.g.*, *Shirley v. Glass*, 308 P.3d 1, 4 (Kan. 2013) (firearm sale completed despite actual buyer informing seller that he had a felony conviction); *Woods v. Steadman's Hardware, Inc.*, No. CV 12-33-H-CCL, 2013 U.S. Dist. LEXIS 26261 (D. Mont. Feb. 13, 2013) (firearm sale completed despite buyer informing seller that he had been involuntarily committed six weeks earlier). A seller might also acquire such required knowledge based on the circumstances surrounding the sale. *See, e.g.*, *United States v. Carney*, 387 F.3d 436, 442 (6th Cir. 2004) (convicted felon selected firearm and companion applied for and completed purchase).

Plaintiffs, knowing they have not alleged that Riverview Sales knew or reasonably should have known that Nancy Lanza would put the firearm to a use involving an unreasonable risk of injury, instead argue that *the type of firearm* she purchased put Riverview Sales on notice that an unreasonable risk of injury would likely result from its use. If accepted, Plaintiffs' argument would expose firearm sellers across the country to liability for lawful sales of millions of firearms, should they subsequently fall into criminal hands and be used to cause harm. This is the very type of strict liability claim that Congress clearly intended to prohibit. Even prior to the enactment of the PLCAA, courts declined to impose such sweeping liability on firearm sellers. *Cf. Delahanty v. Hinckley*, 564 A.2d 758 (D.C.App. 1989) (rejecting strict liability claim against manufacturer for the criminal use of a small, concealable handgun based on the theory that they have no social value); *Riordan v. International Armament Corp*., 132 Ill. App. 3d 642 (1985) (same); *Perkins v. F.I.E. Corp*., 762 F.2d 1250 (5th Cir. 1985) (same); *Moore v. R.G. Industries, Inc*., 789 F.2d 1326 (9th Cir. 1985) (same).

The Bushmaster XM-15 semi-automatic rifle was lawfully manufactured, sold and possessed in Connecticut in 2010, when Nancy Lanza made her purchase from Riverview Sales.[7] Any adult resident of Connecticut who passed the required law enforcement background check and was not otherwise prohibited from owning or possessing the rifle under applicable federal, state and local laws, could own and use the firearm for lawful purposes. In fact, the XM-15 rifle and other similar AR-type semiautomatic rifles with the same design features are commonly

---

[7] On July 1, 2013, long after Nancy Lanza made her purchase, the Connecticut General Assembly passed "An Act Concerning Gun Violence Prevention and Children's Safety" in response to the shooting at Sandy Hook Elementary School. The legislation, prohibited, *inter alia*, ownership of numerous semiautomatic firearms in Connecticut, including the Bushmaster XM-15 semiautomatic rifle. *See Shew v. Malloy*, 994 F.Supp.2d 234, 238-41 (D.Conn. 2014). Obviously, that law is irrelevant to the lawfulness of Nancy Lanza's purchase.

purchased and owned by "[m]illions of Americans . . . for hunting and target shooting." *Shew v. Malloy*, 994 F.Supp.2d 234, 245 (D.Conn. 2014). "[T]here can be little dispute that tens of thousands of Americans own these guns and use them exclusively for lawful purposes such as hunting, target shooting and even self-defense." *N.Y. State Rifle & Pistol Association v. Cuomo*, 990 F.Supp.2d 349, 365 (W.D.N.Y. 2013); *Heller v. District of Columbia*, 670 F.3d 1244, 1260 (D.C. Cir. 2010) ("We think it clear enough . . . that semi-automatic rifles and magazines holding more than ten rounds are indeed in 'common use' as the plaintiffs contend.").

Indeed, semi-automatic rifles, like the XM-15 rifle, "traditionally have been widely accepted as lawful possessions." *Staples v. United States*, 511 U.S. 600, 612 (1994). Between 2008 and 2012, approximately 11.4% of firearms manufactured in the United States were semiautomatic rifles with design and functional characteristics similar to those of the XM-15 rifle. *Friedman v. Highland Park*, 784 F.3d 406, 2015 U.S. App. LEXIS 6902, *24 n.3 (7th Cir. Apr. 27, 2015) (Manion, J., dissenting). In 2012 alone, an estimated 11 million people participated in target shooting with such rifles. *Id.*

Thus, the argument that Nancy Lanza's purchase of the XM-15, a type of rifle that millions of other Americans have purchased and used for lawful purposes, put Riverview Sales on notice that her rifle would likely be used in a manner resulting in unreasonable risk of physical injury borders on frivolous. If Plaintiffs' allegations regarding Riverview Sales' lawful sale of the firearm to Nancy Lanza are held to state a cause of action for negligent entrustment, every lawful sale of a similar firearm to a law-abiding person could also be alleged to have been negligently entrusted. Plaintiffs acknowledge as much by asserting that Nancy Lanza was in a "class" of civilian firearm owners who are allegedly unfit to lawfully possess these types of firearms. (Pls.' Memo at 27.) Plaintiffs essentially argue that existing legislative determinations of who may own

firearms, and what types of firearms they may possess, should be disregarded, and that courts and juries should be tasked with making those decisions on a case-by-case basis.[8]

Once more, Plaintiffs ignore an expressly stated purpose of the PLCAA: "[t]o preserve and protect the Separation of Powers doctrine." 15 U.S.C. § 7901(b)(6). The PLCAA was deemed necessary because "liability actions" identical to this case were seen by Congress as "attempt[s] to use the judicial branch to circumvent the legislative branch of government." 15 U.S.C. § 7901(a)(8); *cf. Hamilton v. Beretta*, 96 N.Y.2d 222, 238 (N.Y. 2001) ("Federal law already has implemented a statutory and regulatory scheme to ensure seller 'responsibility' through licensing requirements  and buyer 'responsibility' through background checks."). In 2010, both Congress and the Connecticut General Assembly considered the firearm purchased by Nancy Lanza to be lawfully and appropriately possessed by law-abiding persons for lawful purposes. Riverview Sales cannot be found to have negligently entrusted the firearm without circumventing the intent of the legislature.[9]

---

[8] Cases in which knowledge of a person's propensity to use chattel unsafely has been imputed to the seller based only on the "class" to which the person belongs have almost exclusively involved sales of potentially dangerous instrumentalities to children and known criminals.  Plaintiffs' rely on *General Agents Ins. Co. v. Midwest Sporting Goods, Inc*., 328 Ill. App. 3d 482 (Ill. App. Ct. 2002) for the proposition that all "civilians" should be treated as a class of persons not to be trusted with semiautomatic rifles, but *General Agents* involved alleged sales of firearms to a narrow class of criminals. *Id.* at 484-85. And the cases cited by the court in *General Agents* both involved sales of dangerous instrumentalities to young children. *See Semeniuk v. Chentis*, 1 Ill. App. 2d 508 (Ill. App. Ct. 1954) (sale of air rifle to 7-year old child); *Moning v. Alfono*, 400 Mich. 425 (1977) (sale of slingshot to 11-year old child).

[9] Even before enactment of the PLCCA, courts recognized that policy decisions regarding firearm sales and ownership are decisions best left to the legislature. *Cf. City of Chicago v. Beretta U.S.A. Corp.*, 821 N.E.2d 1099, 1121 (Ill. 2004) ("[T]here are strong public policy reasons to defer to the legislature in the matter of regulating the manufacture, distribution, and sale of firearms."); *Penelas v. Arms Tech., Inc*. 778 So. 2d 1042, 1045 (Fla. App. 2001) ("[T]he judiciary is not empowered to 'enact' regulatory measures in the guise of injunctive relief. The power to legislate belongs not to the judicial branch of government, but to the legislative branch."); *People v. Sturm, Ruger*, 761 N.Y. 2d 192, 203 (N.Y. App. 2003) ("As for those societal problems associated with, or following, legal handgun manufacturing and marketing, their resolution is best left to the

iii.    **The Rules of Statutory Construction Require that a Firearm "Use" Be Narrowly Defined to Preserve the Purpose of the PLCAA.**

Plaintiffs argue that a "use" of a firearm under the negligent entrustment exception can include merely "sharing" a firearm with an adult member of one's household. (Pls.' Memo at 29, n. 9.)  Plaintiffs also contend that a "use" under the exception can be storing a firearm in an "unlocked gun closet." (*Id.*)  Plaintiffs' expansive interpretation of a firearm "use" is at odds with the overall purpose of the PLCAA and contrary to the plain meaning of the word and the context in which it is used.  Congress could not have intended that the mere possibility that someone other than the purchaser *might* use the firearm unlawfully many years after it was purchased could serve as the basis for a negligent entrustment action.  Again, if such general knowledge were sufficient to invoke the negligent entrustment exception, the other exceptions would be surplusage and congressional intent to immunize firearm sellers from excessive tort liability would be undermined.  Under Plaintiffs' absurdly broad interpretation of "use," every firearm used in crime by someone other than its initial purchaser was negligently entrusted by the seller.[10]

---

legislative and executive branches."); *In re Firearms Cases*, 126 Cal. App. 4th 959, 985 (Cal. App. 2005) ("While plaintiffs' attempt to add another layer of oversight to a highly regulated industry may represent a desirable goal . . . [e]stablishing public policy is primarily a legislative function and not a judicial function, especially in an area that is subject to heavy regulation."); *Hamilton*, 96 N.Y. 2d at 239-40 ("[W]e should be cautious in imposing novel theories of tort liability while the difficult problem of illegal gun sales remains the focus of a national policy debate.").

[10]   In their Memorandum of Law in Support of the Supplemental Motion to Remand (DE 46-1), Plaintiffs incorrectly asserted that "Nancy Lanza's decision to share the Bushmaster XM15-E2S with her son resulted in him killing her with that weapon" (DE 46-1 at 17).  Plaintiffs later acknowledged their error by filing an Amended Memorandum of Law stating that "Nancy Lanza's decision to share firearms with her son resulted in him killing her with one of those firearms" (DE 47).  To be clear, Nancy Lanza was killed, while in bed, with a different firearm—a .22 caliber rifle.  *See Report of the State's Attorney for the Judicial District of Danbury on the Shootings at Sandy Hook Elementary School and 36 Yogananda Street, Newtown, Connecticut on December 14, 2012*, p. 2 (available at  http://www.ct.gov/csao/lib/csao/Sandy_Hook_Final_Report.pdf (last visited June 2, 2015)).  However, under Plaintiffs' expansive interpretation of the negligent entrustment exception, Nancy Lanza "used" the .22 caliber rifle to harm herself and a cause of

Plaintiffs' suggestion that the Court adopt what they characterize as the "common law meaning of 'use'" is not helpful to their position. (Pls.' Memo at 20.)  First of all, there is no accepted common law meaning of the word "use."  As the Supreme Court has recognized, "[m]ost words have different shades of meaning and consequently may be variously construed, not only when used in different statutes, but when used more than once in the same statute or even the same section." *Environmental Defense v. Duke Energy Corporation*, 549 U.S. 561, 574 (2007).  The meaning of the word "use" as it appears in Section 7903(5)(B) can only be understood by considering the context of the surrounding language in which it appears and the PLCAA as a whole.  *See Robinson v. Shell Oil Co*., 519 U.S. 337, 341 (1997).  Fundamental rules of statutory construction require that "use" be defined narrowly in recognition of the purpose of the PLCAA: to protect firearm sellers against claims arising from the criminal misuse of lawfully sold firearms. *See Clark*, 489 U.S. at 739.[11]

Secondly, Plaintiffs' suggestion that certain "congruence" between language found in the Restatement (Second) of Torts § 390 and § 7903(5)(B) "was clearly intentional" on the part of Congress is merely speculation. (Pls.' Memo at 21.)  The "congruence" between Section 390 and Section 7903(5)(B) is not complete, which means that to the extent the drafters of the PLCAA considered Section 390, its language did not fully reflect their intent to provide firearm sellers broad protection against claims arising from the criminal use of firearms they sell.

Restatement Section 390 contemplates that a supplier will incur liability for supplying

_____

action would lie against the seller of that rifle for negligent entrustment. Such a construction of the exception is nonsensical.

[11]  The dictionary definition of "use" is the "act or practice of employing something" (WEBSTER'S NEW COLLEGIATE DICTIONARY, 1299 (1987)) or "to put or bring into action or service." BLACK'S LAW DICTIONARY 1382 (5th ed. 1979)).  These definitions include affirmative acts of use, not passive sharing.  Simply sharing a firearm with another adult member of one's household or storing it in a closet, is hardly "employing" a firearm or putting it into "action."

"directly *or through a third person* a chattel for the use of *another* whom the supplier knows or has reason to know to be likely . . . to use [the chattel] in a manner involving unreasonable risk of physical harm to himself and others."  Restatement (Second) of Torts § 390 (1965) (emphasis added).  In contrast, PLCAA Section 7903(5)(B) specifies that, in order to qualify for the negligent entrustment exception, the plaintiff must show that the firearm seller "knows, or reasonably should know, *the person to whom the product is supplied* is likely to, and does, use the product in a manner involving unreasonable risk of physical injury to the person or others." 15 U.S.C. § 7903(5)(B) (emphasis added).  PLCAA Section 7903(5)(B) is specific where Restatement Section 390 is general, *i.e.* with regard to the class of persons whose "use" will potentially expose the product seller to liability.  Under the PLCAA definition of negligent entrustment, this is a class of one: "the person to whom the product is supplied." 15 U.S.C. § 7903(5)(B).  This distinction from Restatement Section 390—which permits liability to attach to the seller based on use of the chattel by "another"—plainly reflects Congress's intent to craft a narrow exception to the broad immunity provided under the PLCAA.  Plaintiffs' reliance on case law applying Restatement Section 390 to hold sellers liable for "successive entrustments" thus flies in the face of clear congressional intent. (*See* Pls.' Memo. at 22-24.)  The language used by Congress in Section 7903(5)(B) controls the analysis of whether a cause of action for negligent entrustment against Riverview Sales can be stated, not Section 390.[12]

Congress's intent to limit "negligent entrustment" actions to situations in which "the person to whom the product is supplied" is the same person who "does use" the product, was surely based

---

[12] Indeed, each of the Illustrations to Section 390 involve a class of one—namely, the person to whom the product was supplied was the person who thereafter carelessly drove the car, operated the boat or discharged the firearm.  None of the Illustrations involved a situation where the person to whom the product was supplied later on gave it to another person without the supplier's knowledge, and the other person thereafter used the product to cause harm.

on its knowledge that firearms change hands frequently after their initial lawful sale, and that nearly all firearms that had been used in crime (89%) "changed hands at least once" before reaching the person who used it criminally. *See* Department of the Treasury, Bureau of Alcohol, Tobacco & Firearms, Youth Crime Gun Interdiction Initiative, Crime Gun Trace Reports (1999) National Report, p. ix (available at www.atf.gov/publications/historical/ycgii/ycgii-report-1999.html (last visited June 2, 2015)).  Permitting negligent entrustment actions arising from the criminal use of a firearm by persons who are once, twice or three times removed from the seller's initial sale would destroy the protections afforded by the PLCAA.  Under Plaintiffs' expansive interpretation of "use," the initial lawful sale of any firearm, which later changes hands and is used in crime, could be alleged to have been negligently entrusted. There is no way to reconcile that interpretation with the purpose of the PLCAA—to protect firearm sellers from claims arising from the criminal use of firearms.[13]

Plaintiffs' continued reliance on *Smith v. United States*, 508 U.S. 223 (1993), and the Supreme Court's interpretation of a firearm "use" under § 924(c)(1) of the Gun Control Act is misplaced. (Pls.' Memo at 17.)  First of all, Plaintiffs do not address the impact of the *in pari materia* doctrine on their argument that a firearm "use" under § 7903(5)(B) should be given the same meaning as a "use" under § 924(c)(1). (*See* DE 42 at pp. 1-2.)  And they ignore *Bailey v. United States*, 516 U.S. 137 (1995), a subsequent decision further addressing the meaning of "use" under § 924(c)(1). (*See* DE 42 at p. 3.)  *Bailey* establishes that, even under the expansive interpretation of a firearm "use" in *Smith*, Nancy Lanza did not "use" the firearm by merely

---

[13] This would be particularly true with respect to handguns, which are the most commonly owned type of firearm and the type of firearm most commonly used in crime. Government data shows that handguns were used in 87% of firearms crimes from 1993-2011. U.S. Department of Justice, Bureau of Justice Statistics, Firearms Violence, 1993-2011, Table 3, p. 3 (available at www.bjs.gov/content/pub/pdf/fv9311.pdf (last visited June 2, 2015)).

possessing the firearm in her home or storing it in a closet.

In *Bailey*, the defendant was convicted under § 924(c)(1) for "use" of a firearm in connection with a drug trafficking crime. *Bailey*, 516 U.S. at 138. The firearm was found together with drugs inside the defendant's closet during execution of a search warrant. *Id*. at 140. Reversal of the defendant's conviction was affirmed by the Supreme Court, which held that a "use" must involve more than mere possession, it must involve "active employment" of the firearm. *Id*. at 143. The Court held that although a "use" under Section 924(c)(1) can include "brandishing, displaying, bartering, striking with, and, most obviously, firing or attempting to fire a firearm," a defendant cannot be charged for merely storing a firearm near drugs. *Id*. at 149. "Storage of a firearm, without its more active employment, is not reasonably distinguishable from possession." *Id*.

Indeed, Section 924(c)(1) was amended in November 1998 to prohibit possessing a firearm "in furtherance of" a drug offense or crime of violence. *See* 18 U.S.C. § 924(c)(1)(A) (providing a sentencing enhancement for "any person who, during and in relation to any crime of violence or drug trafficking crime . . . , uses or carries a firearm, or who, in furtherance of any such crime, possesses a firearm"). Thus, even if the PLCAA and the Gun Control Act were held to be *in pari materia*, the Supreme Court's interpretation of "use" under § 924(c)(1) does not help the Plaintiffs. Nancy Lanza is alleged to have merely possessed and stored a firearm in her home. In no sense can her possession and storage of the firearm be considered "active employment." Regardless, the PLCAA and the Gun Control Act are not *in pari materia*, and, in light of the PLCAA's purpose to limit claims against firearm sellers, a firearm "use" should be interpreted to mean discharge or a threat of discharge. A broader interpretation of a firearm "use" to include Nancy Lanza's entirely lawful act of keeping a widely owned firearm in her home would render the PLCAA's protections

largely meaningless.[14]

> #### iv.    The PLCAA Was Enacted to Shield Firearm Sellers from Expansive Theories of Liability, Not to Preserve Them.

Plaintiffs have it backwards in arguing that Congress intended to preserve a cause of action against a firearm seller for a "successive entrustment" of the firearm resulting in a criminal use because "Congress knew" that some courts had recognized such a cause of action. (Pls.' Memo at at 23.)  Indeed, the opposite is true.  Congress was aware of lawsuits filed against firearms manufacturers, distributors and retail dealers alleging that they had entrusted firearms downstream in commerce to persons who were remote from the criminal use of the firearm and could not in any sense be found to have proximately caused the injuries claimed, and Congress enacted the PLCAA to extinguish such claims.  *See* 15 U.S.C. § 7901(a)(7) ("The liability actions commenced or contemplated by the Federal Government, States, municipalities, and private interest groups and others are based on theories without foundation in hundreds of years of the common law and jurisprudence of the United States and do not represent a bona fide expansion of the common law.").  An interpretation of the PLCAA that will allow the type of claims made in those cases to proceed would be directly at odds with the clear intent of Congress.[15]

Indeed, seventy-five law professors joined in the opinion that the PLCAA defines

---

[14]   Plaintiffs' characterization of Defendants' interpretation of "use" in § 7903(5)(B) as "novel," suggests that Plaintiffs' interpretation to include mere firearm possession and storage has been accepted by the courts. (Pls.' Memo at 15.)  It has not. No court has accepted Plaintiffs' expansive interpretation of the word.

[15]   *Ileto* is a good example of a "successive entrustment" case that Congress intended to preempt. There, the plaintiffs brought suit against the manufacturer and wholesale distributor of a handgun used in a mass shooting. The firearm changed hands multiple times before it reached the shooter, including a police department, a licensed retail dealer and two private gun collectors. *See Ileto v. Glock, Inc*., 421 F.Supp.2d 1274, 1280-81 (C.D. Cal. 2006). The Ninth Circuit looked to the PLCAA's legislative history and observed that "congressional speakers referred to *this very case* as the type of case they meant the PLCAA to preempt" and dismissed the plaintiffs' common law tort claims. *Ileto*, 565 F.3d at 1136 (emphasis in original).

"negligent entrustment extremely narrowly" and prohibits claims based on "successive entrustments":

> The exception applies only to sellers, for example, and would not apply to distributors or manufacturers, no matter how egregious their conduct. Even as to sellers, the exception would apply only where the particular person to whom a seller supplies a firearm is the one whom the seller knows or ought to know will use it to cause harm.

151 Cong. Rec. S9229 (July 28, 2005). The PLCAA should be interpreted in light of the historical context in which it was enacted:  namely, as a levy to stem the flood of litigation seeking to hold firearms suppliers responsible for the criminal misuse of firearms by remote third parties.[16]

---

[16] Among the lawsuits that preceded enactment of the PLCAA were a series of cases filed in the Eastern District of New York, including *Hamilton v. Accu-Tek*, 62 F.Supp.2d 802 (E.D.N.Y. 1999), *judgment vacated and remanded for entry of dismissal order*, 264 F.3d 21 (2d Cir. 2001). In *Hamilton*, an expansive duty was imposed on the defendants "to take reasonable steps … to reduce the possibility" that handguns "will fall into the hands who will likely misuse them." *Id*. at 231. The New York Court of Appeals, however, answering certified questions from the Second Circuit, refused to recognize the duty.  *Hamilton v. Beretta U.S.A. Corp.*, 96 N.Y.2d 222, 240 (N.Y. 2001). The Court of Appeals held that "[a] defendant generally has no duty to control the conduct of third persons so as to prevent them from harming others, even where as a practical matter defendant can exercise such control."  *Id.*  The Court of Appeals also held that a duty of care should not be imposed on firearm sellers under the negligent entrustment doctrine, finding that the tort of negligent entrustment is based on the degree of knowledge the supplier has concerning the entrustee's propensity to use the chattel dangerously. *Id*. at 236. "[W]ithout the requisite knowledge, the tort of negligent entrustment does not lie." *Id.*  The same district court subsequently denied the defendants' motion to dismiss a nearly identical claim in *Johnson v. Bryco Arms*, 304 F.Supp.2d 383 (E.D.N.Y. 2004), finding that the defendants owed a duty to exercise ordinary care in the marketing of their products based on the allegation that defendants were generally on notice that firearms could change hands a number of times before coming into the possession of a criminal.  *Id*. at 399. These cases and others against firearm industry members served as the impetus for the PLCAA. *See* 15 U.S.C. § 7901(a)(7); 151 Cong. Rec. S9394 (July 29, 2005) (statement of Sen. Craig) ("In *City of New York v. Beretta USA Corp., et al*. currently set for trial on September 7 in Federal court in Brooklyn, NY, the plaintiff has asserted that industry members have created a 'public nuisance.' The lawful sale of a highly regulated product later misused by criminals is not a public nuisance; and has never been considered a public nuisance in American jurisprudence.").

Nevertheless, the handful of "successive entrustment" cases cited by Plaintiffs are readily distinguishable from this case. (Pls.' Memo at 23 n. 7.)  For example, in *Rios v. Smith*, 95 N.Y.2d 647 (2001), a father was found to have negligently entrusted an ATV to his minor son because the father knew his son's friend, a frequent visitor to the family's farm, would also use the ATV and that the friend had done so dangerously in the past.  *Id*. at 653.  In contrast, Plaintiffs here do not allege that Riverview Sales had actual or constructive knowledge of how Nancy Lanza would choose to store her firearm in her home or that she would share the firearm with her adult son. And even if such knowledge had been imparted to Riverview Sales, it would not have put Riverview Sales on notice that the firearm would be used in a manner involving an unreasonable risk of injury.

*Schernekau v. McNabb*, 220 Ga. App. 772 (1996), was a simple negligence case in which a parent was alleged to be liable for permitting her minor son to bring an air rifle on a camping trip with 12 other children. The court reversed summary judgment for the parent, and held that the parent "in the exercise of ordinary prudence, might have foreseen that some injurious consequence could ensue from permitting her son to bring a dangerous weapon on a campout with many young children and limited adult supervision." *Id* at 773.  Again, Plaintiffs here plead nothing to suggest that Riverview Sales had reason to believe the firearm it lawfully sold to Nancy Lanza would likely be used by Lanza or anyone else to cause injury.

In *Earsing v. Nelson*, 629 N.Y.S.2d 563 (1995), an air rifle was illegally sold to a 13-year old child in violation of a New York criminal statute. The court permitted a cause of action to proceed against the seller based on its violation of the criminal statute, and also permitted a negligent entrustment action to proceed because the court found that general knowledge of a child's propensity to use a firearm improperly could be imputed to the seller.  *Id*. at 570.  In

contrast, the sale of the firearm to Nancy Lanza was lawful, and there is no basis on which to impute knowledge to Riverview Sales that Nancy Lanza was in a category of persons who are likely to use firearms improperly.  To the contrary, the opposite conclusion about Nancy Lanza must be drawn.

Nancy Lanza did not fall into any category of prohibited firearms purchasers under federal and state law.  To the extent that any knowledge can be imputed to Riverview Sales regarding the risk posed by her ownership of the firearm, the knowledge imputed should be that she did not pose a likely risk of harm to others or herself.  *See United States v. Orellana*, 405 F.3d 360 (5th Cir. 2005) (the purpose of Gun Control Act § 922(g) is to prohibit persons from possessing firearms within defined groups that have been selected for disqualification because they are typically considered dangerous or irresponsible); *cf. Greeley v. Cunningham*, 116 Conn. 515, 521, 165 A. 678, 680 (1933) (statute permitting unlicensed persons over 16-years old to drive in the company of a licensed driver is "legislative affirmance that an unlicensed person operating an automobile under the conditions specified . . . is not to be deemed incompetent . . .").

In sum, Plaintiffs do not have a cause of action against Riverview Sales that fits within the PLCAA's definition of negligent entrustment.  As a result, Riverview Sales is improperly joined and Plaintiffs' Supplemental Motion to Remand should be denied.

### IV.    Plaintiffs' CUTPA Claim against Riverview Sales Is Barred.

Plaintiffs again misapply *Pampillonia* and argue that, in the absence of a Connecticut state court decision directly on point, this Court cannot rule on whether Congress intended state unfair trade practices statutes, such as CUTPA, to serve as predicate statutes under PLCAA Section 7903(5)(A)(iii).  However, this Court need not wait for a Connecticut state court to address the issue of whether CUTPA is the type of statute Congress had in mind when it created the exception

to PLCAA immunity for causes of action against a seller who "knowingly violates a State or Federal statute applicable to the sale or marketing of firearms." 15 U.S.C. § 7903(5)(A)(iii).  *See Charlot*, 628 F.Supp.2d at 180 (state court construction of the PLCAA "is not controlling precedent for this Court.").  Whether Congress intended for statutes like CUTPA to serve as predicate statutes under Section 7903(5)(A)(iii) is squarely a question for this Court to answer. (*See* Argument § I, *supra*.)

### A.     The Second Circuit's Decision in *City of New York* Compels Rejection of CUTPA as a Predicate Statute under PLCAA Section 7903(5)(A)(iii).

Plaintiffs' attempt to turn the Second Circuit's decision in *City of New York v. Beretta* into precedent supporting recognition of CUTPA as a predicate statute under Section 7903(5)(A)(iii) is unavailing.  The nuisance statute at issue in *City of New York*—New York Penal Law § 240.45— prohibits conduct that endangers the public and is alleged to be "unreasonable under all the circumstances."  The court, relying on the overall purpose of the PLCAA, well-established canons of statutory construction and legislative history, held that the New York nuisance statute did not "fall within the predicate exception to the claim restricting provisions of the PLCAA." *City of New York*, 524 F.3d at 399.  In *dicta*, the court stated that predicate statutes are those that (1) expressly regulate firearms or have been applied to the sale or marketing of firearms or (2) clearly can be said to implicate the purchase and sale of firearms. 524 F.3d at 403.

The court's reasoning was straightforward:  the New York nuisance statute was not the type of statute Congress intended to serve as a predicate statute because it neither "expressly regulat[ed]" nor could "clearly . . . be said to implicate" the sale or marketing of firearms. 524 F.3d at 403.  The court expressly rejected an interpretation of "applicable to" to mean "capable of being applied" because it was a "too-broad reading of the predicate exception." *Id*. at 402.  Such an interpretation would be an "absurdity" because it "would allow the predicate exception to swallow

the statute, which was intended to shield the firearms industry from vicarious liability for harm caused by firearms that were lawfully distributed into primary markets." *Id*. at 401-02.

An analysis of whether CUTPA can serve as a predicate statute under Section 7903(5)(A)(iii) should be identical to the analysis performed in *City of New York* with regard to the New York nuisance statute. Both statutes are statutes of general applicability that are capable of being applied to a broad spectrum of impermissible conduct. CUTPA broadly focuses on "unfair or deceptive" conduct. Conn. Gen. Stat. § 42-110b(a). The New York nuisance statute is equally broad, prohibiting "conduct . . . unreasonable under all the circumstances." N.Y. Penal Law § 240.45(1). Neither statute expressly references the sale or marketing of firearms. And although the court in *City of New York* stated in *dicta* that a predicate statute need not necessarily "expressly refer to the firearms industry," 524 F.3d at 400, it held that "construing the term 'applicable to' to mean statutes that clearly can be said to regulate the firearms industry more accurately reflects the intent of Congress." *Id*. at 401. The court had little difficulty finding that Section 7903(5)(A)(iii) did "not encompass" the New York nuisance statute. *Id*. at 403.

The Plaintiffs agree that *City of New York* narrows "the scope" of statutes that can serve as predicates under Section 7903(5)(A)(iii): "City of New York's rejection of the statutory nuisance claim . . . does" narrow "the scope" of statutes that "clearly implicate" the sale or marketing of firearms. (Pls.' Memo at 36.) But after making this concession, Plaintiffs incorrectly assert that in *City of New York* "[t]he statutory nuisance claim did not fail because the statute in issue was generally inapplicable; it failed because New York high courts had already indicated their disapproval of such a claim." (*Id*.) Plaintiffs submit this unfounded reading of *City of New York* to convince the Court that it cannot reject CUTPA as a predicate statute because a Connecticut state court has not done so. Again, Plaintiffs are wrong.

The court in *City of New York* did not look to New York state court decisions to conclude that the New York nuisance statute was not "applicable to the sale or marketing of firearms" under Section 7903(5)(A)(iii).  Rather, the court rejected the City's arguments based on consideration of the overall purpose of the PLCAA, well-established canons of statutory construction and legislative history.  *City of New York*, 524 F.3d at 400-04.  But even if the court had looked to New York state court decisions addressing whether the nuisance statute could be applied to the otherwise lawful business practices of firearm manufacturers and sellers, it would have come up empty.  Contrary to Plaintiffs' assertion, there was no "context of prior decisions" by New York state courts addressing the viability of a cause of action against firearm manufacturers and sellers under the state nuisance statute. (*See* Pls.' Memo at 36, n. 16.)

*In Hamilton v. Beretta U.S.A. Corp.*, 96 N.Y.2d 222 (N.Y. 2001), the court rejected imposition of a common law duty on the part of firearm manufacturers and distributors to exercise ordinary care in marketing and distributing handguns.  Plaintiffs did not plead a statutory nuisance action and the court did not address the state nuisance statute.  Similarly, in *People v. Sturm, Ruger*, 761 N.Y.S.2d 192 (N.Y.App.2003), the plaintiffs had not pleaded a statutory nuisance claim, and application of the state nuisance statute to the defendants' alleged business activities was not considered by the court.  Rather, dismissal of a common law public nuisance action was affirmed. Thus, Plaintiffs' assertion that the Second Circuit in *City of New York* deferred (or even could have deferred) to New York state court decisions rejecting statutory nuisance claims against firearm industry members is meritless.

### B.   CUTPA Is Not a Statute that Expressly Regulates or Clearly Implicates the Sale or Marketing of Firearms.

Congress included examples of predicate statutes in Section 7903(5)(A)(iii), which, if knowingly violated by a firearms seller, could be actionable.  The examples include statutes

dictating the records to be kept by sellers with respect to firearm sales and prohibiting seller complicity in illegal firearm sales. 15 U.S.C. §§ 7903(5)(B)(iii)(I) & (II).  The court in *City of New York* relied upon these examples in its application of two canons of statutory construction:  *noscitur a sociis* (meaning of doubtful terms may be determined by reference to related words or phrases) and *ejusdem generis* (general words should be limited to things similar to those specifically enumerated).  *City of New York*, 524 F.3d at 401.  The same analysis dictates that state unfair trade practice statutes, such as CUTPA, should not serve as predicate statutes under Section 7903(5)(B)(iii).[17]

Plaintiffs state that the "category" of statutes that can "clearly be said to implicate" the sale or marketing of firearms "is broad." (Pls.' Memo at 34.)  It is true that "[t]he manufacture, importation, possession, sale, and use of firearms and ammunition in the United States are heavily regulated by Federal, State, and local laws." 15 U.S.C. § 7901(a)(4); *see, e.g.*, 18 U.S.C. § 921 *et seq*. (Gun Control Act of 1968) and regulations promulgated thereunder, 27 CFR Part 478 (Commerce in Firearms and Ammunition); 26 U.S.C. § 5801 *et seq*. (National Firearms Act) and regulations promulgated thereunder, 27 CFR Part 479 (Machine Guns, Destructive Devices and Certain Other Firearms); 28 CFR Part 25 (National Instant Criminal Background Check System); Conn. Gen. Stat. § 29-28 *et seq*. (permit for sale at retail of pistol or revolver); Conn. Gen. Stat. § 29-33 (sale, delivery or transfer of pistols and revolvers); Conn. Gen. Stat. § 29-37a (sale or delivery at retail of firearm other than pistol or revolver); Municipal Code of Hartford, Ch. 21, Art.

---

[17] The example provided in Section 7903(5)(B)(iii)(II) specifically refers to aiding and abetting violations of Sections 922(g) and (n) of the Gun Control Act, which identify the categories of persons who are prohibited from purchasing firearms. The example provided in Section 7903(5)(B)(iii)(I) sets forth language found in Sections 922(m) of the Gun Control Act, which makes it unlawful for sellers to knowingly fail to maintain required record of firearm sales or make false entries in those records.

II (pistol permits, sale or transfer of pistols and revolvers, and permit to carry pistols or revolver). The existence of these myriad laws regarding the manufacture, sale and ownership of firearms was not lost on Congress. Although many of these laws do not expressly reference the "sale or marketing" of firearms, many can be said to "implicate" the sales or marketing of firearms by, for example, dictating what types of firearms may be lawfully possessed and who may lawfully possess them. These were the laws Congress had in mind as predicate statutes.[18]

Plaintiffs argue that the PLCAA's legislative history is "not useful or reliable" because it does not support their position. (Pls.' Memo at 18-19.)  The Ninth Circuit in *Ileto v. Glock, Inc*., 565 F.3d 126, 1136-37 (9th Cir. 2009), like the Second Circuit in *City of New York*, was "mindful of the limited persuasive values of remarks" by individual legislators. *See City of New York*, 524 F.3d at 402.  The court in *Ileto* nevertheless found "the unanimously expressed understanding" of legislators that "sellers of firearms would be liable only for statutory violations concerning firearm regulations or sales and marketing regulations" was in "complete harmony" with the purpose and text of the PLCAA, *id*. at 1137:

> We make two general observations from our review of the extensive legislative history of the PLCAA. First, all of the congressional speakers' statements concerning the scope of the PLCAA reflected the understanding that manufacturers and sellers of firearms would be liable only for statutory violations concerning firearm regulations or sales and marketing regulations. *See, e.g*., 151 Cong. Rec. S9087-01 (statement of Sen. Craig) ("This bill does not shield [those who] . . . have violated existing law . . . and I am referring to the Federal firearms laws."); *id*. S9217-02 (statement of Sen. Hutchison) ("[Lawsuits] would also be allowed where there is a knowing violation of a firearms law."); *id*. (statement of Sen. Craig reading a *Wall Street Journal* article) ("The gun makers . . . would continue to face civil suits for defective products or for violating sales

---

[18] The dictionary definition of "implicate" is "to be involve[d] in the nature or operation of something." WEBSTER'S NEW COLLEGIATE DICTIONARY, 605 (1987).  It is difficult to envision a statute being "applicable to the sale or marketing of firearms" without some aspect of firearms-related activity being inherent in the statute's purpose or basic to its operation.

> regulations."); *id.* (statement of Sen. Reed in opposition to the PLCAA) ("We will let [plaintiffs] proceed with their suit if there is a criminal violation or a statutory violation, a violation of regulations, but for the vast number of other responsibilities we owe to each other, that are defined for the civil law, one will not have the opportunity to go to court."); *id.* S8927-01 (statement of Sen. Reed) (stating that the PLCAA would not apply to violations of "statutes related to the sale or manufacturing of a gun"); *id.* S9246-02 (statement of Sen. Santorum) ("This bill provides carefully tailored protections that continue to allow legitimate suits based on knowing violations of Federal or State law related to gun sales.").

*Id.* at 1136; *see also City of New York*, 524 F.3d at 402-03 ("[W]e think that the [congressmen's] statements nevertheless support the view that the predicate exception was meant to apply only to statutes that actually regulate the firearms industry, in light of the statements' consistency amongst each other and with the general language of the statute itself.").

Notably, Plaintiffs do not provide *any* examples of statutes that can "clearly be said to implicate" the sale or marketing of firearms that do not specifically reference firearms or have the regulation of firearms as their purpose.  The suggestion that a statute is "capable of being applied" to the sale or marketing of firearms is insufficient to bring a cause of action within the predicate exception. *City of New York*, 524 F.3d at 402 (finding this "a far too broad reading of the predicate exception"); *accord Ileto*, 565 F.3d at 1126 ("Indeed, if any statute that 'could be applied' to the sales and manufacturing firearms qualified as a predicate statute, there would be no need to list examples at all.").  There is simply no way to shoehorn CUTPA into the Section 7903(5)(A)(iii) exception as a statute that "clearly . . . implicates" firearms sales or marketing without ignoring binding Second Circuit precedent and congressional intent.  *See, e.g.*, *District of Columbia v. Beretta U.S.A. Corp.*, 940 A.2d 163, 171 (D.C.App. 2008) ("Shoehorning, as it were, into the predicate exception [the D.C. Assault Weapons Manufacturing Strict Liability Act] that, at bottom,

simply shifts the cost of injuries resulting from the discharge of lawfully manufactured and distributed firearms would, in our view, 'frustrate Congress's clear intention.'").[19]

Nevertheless, Plaintiffs argue that CUTPA "clearly . . . can be said to implicate . . . the sale and marketing of firearms," citing only *Salomonson v. Billistics, Inc*., No. CV-88-508292, 1991 Conn. Super. LEXIS 2231 (Conn. Super. Sept. 27, 1991) as support. (Pls.' Memo at 38.) *Salomonson*, however, was a case involving disappointed commercial expectations of the plaintiff, a firearms collector, who entered into a contract with the defendant to have certain remanufacturing work performed on his firearms. *Salomonson*, 1991 Conn. Super. LEXIS 2231, at *25. The defendant was also to prepare and submit applications to the federal government for approval to do the work and transfer the firearms back to the plaintiff when the work was completed. *Id*. The defendant failed to deliver timely the completed firearms to the plaintiff and made deceptive statements regarding the status of government approval. *Id*. An Attorney Trial Judge Referee found the defendant's failure to deal in good faith with the plaintiff was oppressive and violated CUTPA. *Id*. at *37. *Salomonson* merely stands for the proposition that CUTPA is capable of

---

[19] Plaintiffs' reliance on *City of Gary v. Smith & Wesson*, 875 N.E.2d 422 (Ind. App. 2007) is misplaced. (Pls.' Memo at 40.) *In City of Gary*, the Indiana appellate court found that the Indiana nuisance statute was "applicable" to the sale or marketing of firearms and could serve as a predicate statute under § 7903(5)(A)(iii), but did so for reasons not present here. The court's ruling was based on a pre-PLCAA decision in the case by the Indiana Supreme Court, which held that defendants' alleged violations of Indiana statutes "specifically applicable to the sale or marketing of firearms" gave rise to a statutory public nuisance claim. *Id*. at 430-32 ("Thus, even assuming that the PLCAA requires an underlying violation of a statute directly applicable to the sale or marketing of a firearm, the City has alleged such violations in their complaint.") In contrast, Plaintiffs here have not alleged that Riverview Sales violated any laws directly applicable to the sale or marketing of firearms. Recognizing a predicate exception claim based only on an alleged violation of a statute of general application like CUTPA would be inappropriate. Secondly, the court in *City of Gary* relied on an interpretation of "applicable" by the district court in *City of New York* to mean "capable of being applied." *Id*. at 431. That interpretation, however, has since been rejected by the Second Circuit as "a far too-broad reading of the predicate exception." *City of New York*, 524 F.3d at 384.

being applied to a specific commercial transaction involving goods in which a consumer suffers an ascertainable loss of money or property.  That firearms were the goods at issue was irrelevant to the court's decision.  *Salomonson* does not stand for the broader proposition that CUTPA, in and of itself, "clearly can be said to implicate" the sale or marketing of firearms.  *See City of New York*, 524 F.3d at 403.

In *dicta*, the court in *City of New York* "declin[ed] to foreclose the possibility that, under certain circumstances, state courts may apply a statute of general applicability to the type of conduct that the City complains of, in which case such a statute might qualify as a predicate statute." *Id.* at 399.  The court's *dicta*, however, should be viewed in light of the court's holding, in which it "foreclose[d] the possibility" that the New York state nuisance statute could serve as a predicate statute under Section 7903(5)(A)(iii).  The court did not provide any further guidance on what other type of "statute of general applicability" might qualify as a predicate statute, what "circumstances" might exist to conclude that Congress intended for such a statute to serve as a predicate, or whether the "specific conduct that the City complain[ed] of" led to the court's statement.  Without further guidance, the court's *dicta* is just that—a statement that is not binding in subsequent cases.  *Horne v. Coughlin*, 191 F.3d 244, 247 (2d Cir. 1999) (dictum not binding in future cases).

### C.  Plaintiffs' Characterization of Riverview Sales' Conduct Proves that Congress Did Not Intend for a Violation of CUTPA to be an Exception to PLCAA Immunity.

Plaintiffs' argument that Riverview Sales' lawful sale of the firearm to Nancy Lanza was "immoral, unethical, and unscrupulous" (Pls.' Memo at 39) only proves the point that statutes like CUTPA were not what Congress had in mind as predicate statutes under Section 7903(5)(B)(iii).  Virtually any conduct can be alleged to be "immoral, unethical or unscrupulous."  *Ventres v.*

*Goodspeed Airport, LLC*, 275 Conn. 105, 155 (2005).  If such an allegation against a firearm seller is all that is required to circumvent congressional intent to protect sellers from claims arising from the criminal use of firearms, the PLCAA becomes meaningless.  Firearm manufacturers and sellers will find themselves immersed in litigation based only on an allegation that what they do is morally wrong and causes harm. Moreover, a judicial finding against a firearm manufacturer or seller in such a case would have serious constitutional consequences.  *See District of Columbia v. Heller*, 554 U.S. 570 (2008) (the Second Amendment confers an individual right to keep and bear arms). The PLCAA was enacted, in part, "[t]o preserve a citizen's access to a supply of firearms and ammunition for all lawful purposes, including hunting, self-defense, collecting and competitive or recreational target shooting."  15 U.S.C. § 7901(b)(2).

Plaintiffs' argument that the sale of the firearm to Nancy Lanza "violated the public policy of the State of Connecticut" (Pls.' Memo at 39) makes no sense at all.  Connecticut policy in 2010 regarding the sale and possession of semiautomatic rifles, such as the XM-15, was embodied in Connecticut General Statutes Sections 53-202a *et seq*., which then made it legal for Riverview Sales to sell the firearm to Nancy Lanza.  The law specifically listed and described firearms considered to be "assault weapons" that could not be sold in Connecticut. Conn. Gen. Stat. § 53-202a(a).  The firearm sold by Riverview Sales was not among the prohibited firearms. *See Shew v. Malloy*, 994 F.Supp.2d 234, 238-41 (D.Conn. 2014).

Public policy is also embodied in the Gun Control Act, including Section 922(t), which specifies operation of the national instant criminal background check system, and authorizes firearm sales to persons who are submitted for a background check and approved to make the purchase.  Within constitutional boundaries, our legislative branches of government—not our courts—are charged with determining who may purchase firearms and what types of firearms they

may keep in their homes for lawful purposes.

**D.      Plaintiffs Cannot Allege a CUTPA Claim.**

The "critical issue to be decided is whether the district court had subject matter jurisdiction at any time before it rendered judgment." *Brown v. Eli Lilly & Co.*, 654 F.3d 347, 356 (2d Cir. 2011) (citation omitted) (affirming that in-state defendants were "fraudulently joined" and remand was not required, and affirming summary judgment for removing defendant).   All reasons why Plaintiffs have no reasonable basis for a claim against Riverview Sales are properly presented to the Court at this time, so long as the focus remains on why diversity of citizenship exists under the fraudulent joinder analysis.  *See Whitaker v. American Telecasting, Inc.*, 261 F.3d 196, 205 (2d Cir. 2001) (finding it proper to consider additional argument in support of timely removal based on diversity jurisdiction when raised in response to motion to remand). [20]

Plaintiffs' claims fail under Connecticut law, even if CUTPA were found to be a predicate statute. First, Plaintiffs are not within the categories of persons who can maintain an action under CUTPA:   (1) consumers, (2) competitors, or (3) other business persons with a consumer or commercial nexus to the defendant. *Ventres*, 275 Conn. at 155.  Plaintiffs do not allege (nor could they) that they are consumers, competitors or "other business persons" with a recognized consumer or commercial nexus to Riverview Sales.

Second, Plaintiffs do not seek the sort of relief CUTPA affords.  CUTPA may be used to

---

[20] Plaintiffs address CUTPA substantively in their Motion to Remand and argue that it broadly protects them from Riverview Sales' unfair commercial activities. (Pls.' Memo at 37-38)    The Remington Defendants are free to respond to Plaintiffs' arguments. In any event, Plaintiffs mistakenly contend that the Remington Defendants did not "challenge[] the substantive pleading of the elements of CUTPA" in its Notice of Removal. (Pls.' Memo at 39, n. 18.)    But the Remington Defendants stated in their Notice of Removal that CUTPA only creates an action to recover an "ascertainable amount of money or property" resulting from an unfair or deceptive business practice and thus clearly questioned its use to recover wrongful death and personal injury damages. (DE 1, NOR at ¶ 27 (quoting CUTPA, Conn. Gen. Stat. § 42-110g).)

recover damages for financial injury, but not damages flowing from personal injury or wrongful death. *See Gerrity v. R.J. Reynolds Tobacco Co.*, 263 Conn. 120, 129-30 (2003); *cf. Haynes v. Yale-New Haven Hospital*, 243 Conn. 17, 34 (1997) (although entrepreneurial and commercial aspects of medical profession are covered by CUTPA, medical negligence claims for personal injury damages are not covered.); *see also Lafountain v. Smith & Nephew*, 2015 U.S. Dist. LEXIS 68717 (D. Conn. May 28, 2015) (Eginton, J.) (denying plaintiff's motion to remand and finding that in-state defendant was fraudulently joined under *Pampillonia* standard because plaintiff's allegations were not within the category of claims covered by CUTPA).   CUTPA does not encompass Plaintiffs' wrongful death and personal injury claims.

Finally, Plaintiffs' CUTPA claims are time-barred by the applicable three-year statute of limitations.   Conn. Gen. Stat. § 42-110g(f).   The limitation period began to run upon the occurrence of the alleged violation, not the discovery of the alleged practice.   *Independence Ins., Service Corp. v. Hartford Life & Ins., Co.*, 472 F.Supp.2d. 183, 190 (D. Conn. 2007).   Plaintiffs allege Riverview Sales sold the rifle to Nancy Lanza in March 2010, more than three years before filing this lawsuit in December 2014. (Compl. at ¶ 153.)   *See also Lafountain*, 2015 U.S. Dist. LEXIS 68717, at *3 (denying plaintiff's motion to remand and finding that in-state defendant was fraudulently joined under *Pampillonia* standard because negligence claim was barred by the applicable Connecticut statute of limitations).

## CONCLUSION

There is no reasonable basis for a cause of action against Riverview Sales under the facts alleged in Plaintiffs' Complaint.   Thus, the case pleaded against Riverview Sales is "qualified civil liability action" that is barred under the PLCAA.   Riverview Sales has therefore been improperly joined, and the Court has jurisdiction over this case based on the complete diversity of the

remaining parties.  Plaintiffs' Supplemental Motion to Remand should be denied.

Respectfully submitted,

/s/ *James B. Vogts*
One of the Attorneys for Defendants,
Remington   Arms   Company,   LLC,   and
Remington Outdoor Company, Inc.

Jonathan P. Whitcomb (CT15014) (jwhitcomb@dmoc.com)
Matthew C. Wagner (CT25926) (mwagner@dmoc.com)
Diserio Martin O'Connor & Castiglioni LLP
One Atlantic Street
Stamford, Connecticut 06901
(203) 358-0800

James B. Vogts (phv07263) (jvogts@smbtrials.com)
Andrew A. Lothson (phv07262) (alothson@smbtrials.com)
Swanson, Martin & Bell, LLP
330 North Wabash, Suite 3300
Chicago, IL 60611
(312) 321-9100

**Attorneys for Defendants Remington Arms Company, LLC,
and Remington Outdoor Company, Inc.**

## CERTIFICATE OF SERVICE

I hereby certify that on the 3ʳᵈ day of June, 2015, I caused to be served a copy of the foregoing document on all counsel of record listed below, via the Court's ECF system.

Joshua D. Koskoff
Alinor Sterling
Koskoff, Koskoff & Bieder, P.C.
Bridgeport, CT 06604
Tel: 203-336-4421
Fax: 203-368-3244
jkoskoff@koskoff.com
asterling@koskoff.com
**Attorneys for Plaintiffs**

Christopher Renzulli
Scott Charles Allan
Renzulli Law Firm, LLP
81 Main Street, Suite 508
White Plains, NY 10601
Tel:  914-285-0700
Fax: 914-285-1213
crenzulli@renzullilaw.com
sallan@renzullilaw.com
**Attorneys for Defendants Camfour, Inc. and Camfour Holding, Inc.**

Michael Ryan Patrick
Patrick, LLC
6 Landmark Square, Fourth Floor
Stamford, CT 06901
Tel:  203-541-0355
Fax: 203-724-2393
Michael@pllclaw.com
**Attorney for Defendants Riverview Sales, Inc. and David LaGuercia**

*/s/  James B. Vogts*
One of the Attorneys for Defendants, Remington Arms Company, LLC, and Remington Outdoor Company, Inc.